## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

    v.

BANKATLANTIC BANCORP, INC. and
ALAN B. LEVAN,

        Defendants.
_____/

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges and states as follows:

## I.  INTRODUCTION

1.  BankAtlantic Bancorp, Inc. ("Bancorp") and its CEO and Chairman, Alan B. Levan, defrauded investors by:  not timely disclosing a known trend regarding extended and downgraded loans in its commercial residential real estate land acquisition and development portfolio (the "Commercial Residential" portfolio); selectively disclosing problem loans; and engaging in improper accounting treatment of loans they were attempting to sell.  Levan also intentionally misled investors about the extent and nature of the problems in the Commercial Residential portfolio in related earnings calls.

2.  On October 26, 2007, Bancorp, the holding company for BankAtlantic ("BankAtlantic" or "the bank"), one of Florida's largest banks, announced in a Form 8-K filing and earnings call that it would suffer a loss of $29.6 million from continuing operations for the

third quarter ended September 30, 2007.  The investing public did not expect a loss of that magnitude and Bancorp's share price immediately dropped 37%.

3.      Bancorp's loss was due almost entirely to an increase in BankAtlantic's provision for loan losses associated with impaired loans in the bank's Commercial Residential portfolio. This portfolio consisted primarily of loans on large tracts of lands intended for development into single family housing and condominiums.

4.      According to Bancorp's October 26, 2007 Form 8-K, the bank placed eleven loans, totaling $148.7 million or 28% of the Commercial Residential portfolio's book value, on non-accrual status in the third quarter and recorded $27.8 million in specific reserves on nine impaired Commercial Residential loans.  In total, BankAtlantic recorded a provision for loan losses in the third quarter of $48.9 million.

5.      Bancorp and Levan knew many of the Commercial Residential loans deemed impaired and requiring a provision for loan losses in the third quarter of 2007 were already in serious jeopardy no later than the first quarter of 2007.  Sales of lots in many of the loan properties had slowed or become non-existent by the first quarter, and many loans had been extended past their original due date, sometimes more than once.  The bank kept a number of loans "current" only by replenishing the interest reserves from an increase in the loan principal.

6.      By the time Bancorp filed its Form 10-Q for the first quarter of 2007, the bank had internally downgraded nearly 25% of the Commercial Residential portfolio to a non-passing grade indicating a "special mention" or "substandard" status, and had extended the loan terms for more than 26% of the portfolio.  By the time Bancorp filed its Form 10-Q for the second quarter, the bank had downgraded nearly 40% of the portfolio's loans to a non-passing grade, and had extended more than 39% of the portfolio.

7.      The existence of such a large number of Commercial Residential loans extended and/or internally downgraded to a non-passing grade constituted a known trend that Bancorp should have disclosed in the Management's Discussion and Analysis ("MD&A") of its periodic filings for the first and second quarters of 2007.  Bancorp's Form 10-Q for these two quarters made no mention of this known trend.

8.      In related earnings calls for the first and second quarters, Levan also misled investors and analysts by suggesting the bank was only concerned, if at all, about one type of loan class in the Commercial Residential portfolio.  In reality, the numerous extensions and downgrades in the first and second quarters of 2007 had been impacting the credit quality of all types of loans in the portfolio.

9.      After announcing the loss as of the third quarter of 2007, Bancorp and Levan attempted to sell a number of the troubled loans in the Commercial Residential portfolio. Because these sale efforts were largely unsuccessful, Bancorp subsequently transferred loans totaling nearly a quarter of the overall value of the Commercial Residential portfolio to an inactive subsidiary in the first quarter of 2008.

10.     Bancorp failed to reclassify the loans it was attempting to sell in the fourth quarter of 2007 as "held for sale" and did not write them down to the lower of cost or fair value as required by generally accepted accounting principles ("GAAP").  To avoid a write down of at least $60.7 million on the outstanding balance of these loans, Levan concealed that he had decided to sell the loans and told Bancorp's outside auditors the bank was only seeking a "market evaluation" of their value.  As a result of this scheme, Bancorp in its 2007 Form 10-K understated its net loss by about 51%.

11.     By reason of the foregoing, Bancorp and Levan violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; Bancorp violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; Levan violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1, 13b2-2, and 13a-14 thereunder; and Levan aided and abetted Bancorp's violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder.

## II.     DEFENDANTS

12.     **Bancorp,** a Florida corporation with principal offices in Fort Lauderdale, Florida, is the parent of BankAtlantic, a federally chartered savings bank.  Bancorp's common stock is listed on the New York Stock Exchange and is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  In February 2011, the Office of Thrift Supervision ("OTS") issued Cease and Desist Orders against Bancorp and the bank, requiring, among other things, that the bank revise its internal asset review processes to ensure timely loan grade classification and increase its capital ratio.

13.     **Levan**, age 66, is the Chairman and CEO of Bancorp and the Chairman of BankAtlantic.  Until January 2007, he was also the CEO of BankAtlantic.  Levan effectively controls Bancorp through his control of BFC Financial Corporation ("BFC"), which holds majority voting rights in Bancorp.  Levan is the Chairman, President and CEO of BFC.

## III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

15.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida, because, among other reasons, Bancorp and BankAtlantic's principal place of business is in the Southern District of Florida.  In addition, Defendants' acts and transactions constituting violations of the Exchange Act occurred in the Southern District of Florida.

16.     The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices and courses of business set forth in this Complaint.

## IV.   **THE DISCLOSURE FRAUD**

### A.     **FACTUAL BACKGROUND**

17.     On October 26, 2007, Bancorp announced it would suffer a loss from continuing operations of $29.6 million for the quarter ended September 30, 2007.  The loss was primarily due to BankAtlantic's net loss of more than $45 million associated with impaired loans in its Commercial Residential portfolio.  In an earnings call that day, Levan suggested the loss from this portfolio was a surprise to the bank, resulting from a number of borrowers missing their October 1 payments.

18.     In fact, Levan and others at the bank had known about serious problems in the Commercial Residential portfolio for at least two quarters prior to the third quarter 2007 announcement.  Bancorp misrepresented the extent of problem loans in its public filings for these quarters and Levan made misstatements in related earnings calls, thereby misleading investors and analysts as to the nature and extent of the bank's problem loans.

1.        **The Commercial Residential Portfolio**

19.        In 2007 BankAtlantic had approximately $1.5 billion in its commercial real estate loan portfolio.   Of that amount, about $533 million consisted of loans in the Commercial Residential portfolio as of the third quarter of 2007.   The borrowers on these loans intended to develop large tracts of land for residential housing construction.

20.        There were three types of loans in the Commercial Residential portfolio, each having slightly different characteristics.   Builder Land Bank ("BLB") loans were issued to entities whose sole intent was to sell or "flip" the raw land to a national builder at a later date. The bank usually required the borrower in a BLB loan to have option contracts with the builder in which the builder agreed to give a down payment to the borrower and close on the purchase of a minimum number of lots by a certain date.

21.        This arrangement permitted the builders to keep the land off their books until they were ready to build and theoretically allowed the borrower to make a profit from selling the lots to the builder.   The BLB loans were the first in the portfolio to suffer in the economic downturn when builders began walking away from their option contracts with the borrowers.

22.        The other two types of loans in this portfolio were different from BLB loans in that the borrowers actually developed the land.   In a Land Acquisition and Development ("LAD") loan, the borrower purchased land and conducted horizontal development such as building utilities and roads.   The borrower then either sought another loan from a different lender for vertical development, such as building houses, or contracted with a builder that had its own financing.

23.     The third type of loan, a Land Acquisition, Development, and Construction ("LADC") loan, exhibited the same features as a LAD loan but also included financing for the borrower to perform the vertical construction of the development itself.

24.     BankAtlantic expected borrowers in the Commercial Residential portfolio to make monthly interest payments, and repay the principal at the end of the loan period.  Most loans had an interest reserve account set up at inception and funded by a portion of the loan proceeds.  When an interest reserve account was depleted, the borrower was supposed to either replenish the account or make payments out of its own pocket.

### a. Major Loan Committee and Loan Approval

25.     BankAtlantic had a Major Loan Committee ("MLC") that needed to approve any loan in excess of $5 million.  Between 2005 and 2007, when BankAtlantic issued or modified most of the relevant loans, the MLC consisted of Levan, one member of the Board of Directors, the Chief Risk Officer, the Chief Credit Officer, the head of the lending department, and another loan officer who had significant experience with large loans.   Loans in BankAtlantic's Commercial Residential portfolio were generally between $5 million and $30 million and required MLC approval.

26.     The approval process began with the loan officer submitting a loan package to the MLC.  The package was supposed to include, among other things, an appraisal, development plans, financial statements from the guarantors, and copies of option contracts from builders for BLB loans.  Committee members reviewed the packages and discussed any concerns before the MLC meeting.  During the relevant period, the MLC scheduled two meetings per week at which the loan officers made oral presentations concerning the loans and answered questions from the MLC.

27.     The MLC then voted on whether to approve the loans.  Committee members who were absent from the meetings also reviewed packages and received a vote.  Although each member of the MLC theoretically had an equal vote, Levan ultimately controlled the committee.

28.     Levan sometimes exercised what was termed a "hard no" vote which permitted him to overrule a committee decision even if he was outvoted.  No other member of the MLC ever exercised a "hard no" vote, and the committee never approved a loan without Levan's approval or acknowledgement.

### b.  Loan Grades

29.     Upon approval, the bank gave loans a numerical credit-worthiness rating on a scale between 1 and 13.  Grades 1 through 7 were considered passing grades (with 1 being the highest).  The bank did not use grades 8 and 9 except in special circumstances.  Grades 10 through 13 were non-passing grades.

30.     The loan officer suggested the initial loan grade and presented it to the MLC with the loan package.  The bank graded most loans 4 or better at the time of approval.  Loan officers were expected to provide updated ratings during the course of the loan so that problems with a borrower's credit or with the project itself would result in a downgrade.

31.     The specific definitions of grades 10 and 11 are significant because Bancorp failed to disclose in its quarterly filings that BankAtlantic had downgraded a material number of the loans in the Commercial Residential portfolio to these "non-passing" statuses.

32.     Grade 10 is "special mention," which BankAtlantic defined as a loan with "potential weaknesses that deserve management's close attention.  If left uncorrected, these potential weaknesses may result in deterioration of the repayment prospects for the asset or in the institution's credit position at some future date. . . . Debt service is uncomfortably tight and the

borrower is relying heavily on external sources of liquidity.  Sufficient liquidity from external sources may be in question, however, and the ability of the company to resolve its operating problems is not immediately evident.  Any further deterioration in business, financial, industry, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitments and could result in further deterioration of the rating into the substandard category."

33.     Grade 11 is "substandard" and referred to loans "inadequately protected by the current sound worth and paying capacity of the obligor or the collateral pledged, if any.  Assets so classified have a 'well defined weakness or set of weaknesses' that jeopardizes the liquidation of the debt.  They are characterized by the distinct 'possibility' that the bank will sustain some loss.  Loss potential, while existing in the aggregate amount of Substandard assets, does not have to exist in individual assets classified Substandard."

### 2.     The Portfolio Begins to Deteriorate in 2006

34.     The signs of problems in BankAtlantic's Commercial Residential portfolio began to appear in early 2006.  By May 2006, Levan and others at Bancorp knew builders had begun walking away from option contracts with borrowers in BLB type loans at other banks.  As a result, the head of the lending department began to take a closer look at the BLB portfolio in order to evaluate the bank's potential exposure.

35.     In August 2006, the head of the lending department sent an e-mail to all of the loan officers asking them to provide updated information on the status of the projects underlying the BLB loans.  Attached to the e-mail was a spreadsheet that contained loan balances, loan-to-cost and loan-to-value ratios, lots taken by builders to date, and other pertinent information.  The

updated BLB loan spreadsheet was subsequently sent to Levan and others in executive management.

36.     Levan acknowledged internally that there were problems on the horizon.  In a November 2006 e-mail, Levan's son (who was an executive at the bank) sought his father's feedback on a presentation he had made at a banking conference during which he told the conference attendees that Bancorp did not see any credit-related problems in its portfolio.

37.     Levan responded: "I would not have been so bold on the credit front.  I think [the head of the lending department] is going to have a problem with her land loans."

38.     By year end 2006, the bank had downgraded two BLB loans to a non-passing status.  The problems in the Commercial Residential portfolio, however, were not limited to just this category of loans, as would quickly become evident in the first quarter of 2007.

> **3.     First Quarter 2007 – Loans Are
> Extended and Problems are Discovered**

39.     BankAtlantic had a policy requiring its internal Loan Review department to conduct a comprehensive review once a year.  The Loan Review department reviewed the loan files for appropriate and updated documentation, status of the borrower, and other issues.  The Loan Review department also commented on whether it considered the loans' current grades to be accurate.

40.     Between September 2006 and April 2007, the Loan Review department looked at all commercial real estate loans of more than $15 million, which constituted 50% of the value of the total portfolio.

41.     By January 2007, BankAtlantic's Loan Review department had become aware that a number of Commercial Residential loans had begun to experience slow sales of individual lots, and many had depleted their interest reserves or were close to doing so.  Rather than wait

until it completed the full review, the Loan Review department prepared an interim report on its findings related to four of the large problem loans (all of which were non-BLB) in order to give management an early warning.  The MLC discussed this interim report in January 2007, including its findings regarding the slow sales and depleted interest reserves.

42.     At the same time, borrowers with loans coming due in the Commercial Residential portfolio began to approach BankAtlantic about extensions of the repayment dates and modifications of the terms.

43.     BankAtlantic's policy required that loans for which borrowers were seeking an extension go back to the MLC for approval if the MLC had initially approved the loans.

44.     By the time Bancorp filed its first quarter Form 10-Q, the MLC in 2007 had granted extensions on eleven loans constituting a book value of $147.5 million, or 26.28% of the Commercial Residential portfolio.  The MLC granted ten out of eleven of these extensions to LAD and LADC loans.  In some cases the MLC also approved an increase in the loan principal to replenish depleted interest reserve accounts.

45.     For most of these extensions the MLC noted that sales had slowed or stopped, and some borrowers were formulating entirely different development plans to attempt to salvage the project.

46.     Levan became concerned about this trend in the portfolio and on March 14, 2007, sent an e-mail to numerous Bancorp's executive officers stating:

> There seems to be a parade of land loans coming in for extentions [sic] recently.  It's pretty obvious the music has stopped.  In most cases, the presold contract to a builder has either gone away or is in dispute or being modified.  I'm not sure what the purpose of the extentions [sic] are other than hoping that more time will solve their problems (and ours).

47.     Levan then outlined additional requirements the borrowers would have to meet before the bank would consider future extensions and modifications.  Levan closed the e-mail by stating, "I believe we are in for a long sustained problem in this sector."

48.     In response to the e-mail, Bancorp's then-CFO told Levan he felt the bank's present system to deal with "potential problem credits" was inadequate to handle the anticipated increased load.  He proposed increasing the number of employees in the loan "work out" group.

49.     The MLC became increasingly concerned in March 2007 about the bank's Commercial Residential portfolio exposure.   On March 20, 2007, the head of the lending department sent an e-mail to all loan officers to prepare them for the additional scrutiny the portfolio would face from the MLC, stating:  "Obviously, there is significant concern about these loans given the current state of the market.   We will be reviewing each of these loans to determine what action, if any, may be necessary to protect the bank."  The e-mail also noted that many more of the loans would likely be coming in for extensions and modifications.

### 4.     Loans are Downgraded Immediately After the Close of the First Quarter

50.     BankAtlantic's senior management became so worried about the mounting issues in the Commercial Residential portfolio that it formed a special Land Loan Committee to closely review loans about which the bank had concerns.  The new committee first met in April 2007. As a result of this expanded review it became apparent that a number of the bank's large loans had deteriorated significantly.

51.     After the close of the first quarter on March 31, but before Bancorp filed the first quarter Form 10-Q on May 10, 2007, BankAtlantic downgraded nine Commercial Residential loans to non-passing grades between April 6 and April 25, and placed two on non-accrual status effective as of the end of the first quarter.

52.     Thus the bank downgraded $84 million of Commercial Residential loans, more than 15% of the portfolio, to non-passing status in less than three weeks.   Of these, approximately $50.4 million worth of loans were of the BLB type and $33.6 million were LAD and LADC loans.   Once BankAtlantic downgraded a loan to a non-passing status, it was placed on the bank's monthly loan watch list and evaluated for impairment.   As part of this evaluation, the bank would determine whether to record a reserve for loan losses.

53.     The reasons given for the downgrades included depletion of interest reserve accounts, lack of sales of lots, and past due payments that had not yet reached the 90-day threshold (which would have required placing them on non-accrual status).

54.     Levan received copies of the monthly loan watch list and participated on the Land Loan Committee.

### 5.     Additional Deterioration of the Portfolio and Loan Downgrades in the Second Quarter of 2007

55.     The MLC's practice of granting extensions on loan terms and increasing interest reserves as a strategy for handling the problems in the Commercial Residential portfolio was ineffective.   During the remainder of the second quarter of 2007, the bank downgraded many more loans in the portfolio to a non-passing grade.

56.     In addition to the nine downgrades in April, the bank downgraded eight more loans to grades 10 or 11 in the remainder of the second quarter and added them to the loan watch list.   These seventeen downgraded loans totaled more than $136 million, or in excess of 25% of the Commercial Residential portfolio.   The value of the downgraded loans was nearly an even split between BLB and non-BLB loans.   Moreover, the bank downgraded additional non-BLB loans worth $40.4 million prior to Bancorp filing its second quarter Form 10-Q on August 9, 2007.

57.     In his March 14, 2007 e-mail, which noted the "parade of land loans coming in for extensions," Levan had expressed an unwillingness to grant further loan extensions. Nevertheless, during the second quarter the MLC approved extensions on eight Commercial Residential loans totaling nearly $70 million.  The reasons for such extensions generally related to the borrowers' inability to develop the properties in the time frame or manner originally contemplated for the loans.  The additional second quarter downgrades and extensions included all three types of loans in the Commercial Residential portfolio.

58.     By the time Bancorp filed its second quarter Form 10-Q, the MLC in 2007 had granted extensions (sometimes more than once) on seventeen loans constituting a book value of nearly $210 million, or 39% of the Commercial Residential portfolio.  Of the loans extended, fifteen of them were LAD and LADC loans.

### 6.     Third Quarter Announcement

59.     The difficulties with the Commercial Residential portfolio continued to snowball in the third quarter of 2007, forcing the bank to finally publicly acknowledge the seriousness of its problems.

60.     During the third quarter, BankAtlantic downgraded at least twelve additional loans in the Commercial Residential portfolio to grades 10 or 11 and granted extensions on another nine loans.  Moreover, after the close of the third quarter the bank placed nine loans from the group graded as 10 or 11 on non-accrual status effective as of end of the quarter.

61.     On October 26, 2007, Bancorp announced in a Form 8-K that it would suffer a net loss of $29.6 million for the third quarter due to an increase in its provision for loan losses.  For the first time Bancorp described in detail the problems in the three loan categories in the

Commercial Residential portfolio, including the number and dollar amount of loans it had downgraded to a non-passing status within each category.

62.     Bancorp's loss was caused by BankAtlantic's net loss of more than $45 million, attributable almost entirely to an increase in the bank's provision for loan losses associated with classified loans in its Commercial Residential portfolio.  The bank recorded a provision for loan losses of $48.9 million for the third quarter, which included $27.8 million in specific reserves on nine impaired loans.

63.      The following day, Levan and others in senior management held the third-quarter earnings call.  Levan said the bank had placed many of the loans on non-accrual status because the borrowers missed the October 1 payment.  He further stated the earnings release would have been very different if it had been done on September 30, 2007, implying that the problems in the portfolio were a surprise after the end of the quarter.

64.     In fact, the problems with the bank's Commercial Residential loans were no surprise as evidenced by the numerous extensions and downgrades across the entire portfolio during the first two quarters of 2007.

65.     After the announcement, analysts felt Bancorp had misled them about the extent of the problems in the Commercial Residential portfolio.  One analyst wrote that he no longer had any confidence in Bancorp's management to make full disclosures.   The stock price immediately dropped 37% following the earnings release.  By the close of the market on October 30, 2007, four days later, Bancorp's share price had dropped 47% from the pre-announcement closing price.

**B.     FRAUDULENT DISCLOSURES IN EARNINGS CALLS AND QUARTERLY FILINGS**

66.     Beginning in the first quarter of 2007, Bancorp and Levan began a pattern of public misstatements and omissions about the true state of the bank's Commercial Residential portfolio.  Overall, their disclosures were merely general recitations concerning the deterioration of the Florida real estate market, without any discussion of the existing problems within BankAtlantic's Commercial Residential portfolio.   In earnings calls, Levan also actively misstated the facts concerning the credit quality of loans within the Commercial Residential portfolio.

**1.     First Quarter 2007 Earnings Call on April 26, 2007**

67.     In the first quarter 2007 earnings call on April 26, 2007, Levan discussed the BLB segment of the Commercial Residential portfolio, stating that many builders had walked away from contracts with borrowers and that borrowers were looking for extensions due to slowing sales.

68.     However, when one analyst asked Levan whether the problems extended to the LAD and LADC portions of the portfolio, Levan said no, stating that the latter types of loans were "proceeding in the normal course" and the bank was experiencing no differences from what it had seen in the last 10 or 15 years.

69.     Levan knew that this assertion was false.  Among other things, the MLC had expressed concern and held discussions about all three types of loans during meetings in March 2007.

70.     In his role on the MLC, Levan was actively involved in reviewing the borrowers' requests for extensions and modifications to their loans.  The "parade of land loans" coming in for extension, as Levan termed it in his March 2007 e-mail, were mostly LAD and LADC loans.

16

By the time of the first quarter earnings call, the MLC in 2007 had granted extensions on eleven loans constituting a book value of $147.5 million, or 26.2% of the Commercial Residential portfolio.  Ten of the eleven extensions were on LAD and LADC loans, and only one was a BLB loan.

### 2. First Quarter Form 10-Q Filed May 10, 2007

71.    Bancorp's first quarter Form 10-Q, filed on May 10, 2007, discussed the Commercial Residential portfolio in broad terms but did not alert investors to the serious problems already existing at that time.  The Form 10-Q noted there was a slight increase in the provision for loan losses in the quarter, related almost entirely to a single loan.  The filing stated that conditions in the residential real estate market in Florida had deteriorated generally but made no mention of the actual deterioration in BankAtlantic's own loan portfolio.

72.     With regard to the BLB segment, Bancorp noted that it was dependent on the builders acquiring lots in accordance with the option contracts with Bancorp's borrowers.  It stated that "if" such acquisitions did not occur, a borrower "may not be in a position to service the loan," which might result in an increase in losses.

73.    The filing did not disclose that such acquisitions had already failed to occur in a number of large BLB loans.  Bancorp also continued to downplay the risk to the LAD and LADC portions of the portfolio, stating only that they were of "relatively lower risk" than the BLB loans.

74.    Bancorp's Form 10-Q was misleading in that it failed to disclose (1) that many of the BLB loans already had suffered from builders walking away from option contracts with borrowers, and (2) borrowers were already having difficulty meeting loan obligations, as

17

evidenced by the number of extensions granted and downgrades to non-passing status that occurred before Bancorp filed the Form 10-Q.

75.     The Form 10-Q also misled investors to believe that the LAD and LADC portions of the portfolio were not experiencing problems when, in reality, they were suffering from the same problems as the BLB loans.

76.      By the time Bancorp filed its first quarter Form 10-Q, the MLC in 2007 had granted extensions on eleven loans, or more than 26% of the Commercial Residential portfolio. As discussed earlier, ten out of the eleven extensions the MLC had granted were on LAD and LADC loans.  These ten loans constituted a book value of nearly $135 million, or 24% of the portfolio.  Furthermore, by this time the bank had downgraded nearly 25% of the total portfolio to a non-passing grade (15% BLB versus 10% LAD or LADC).

77.     The first quarter Form 10-Q failed to disclose in the MD&A the known trend that BankAtlantic had extended and/or downgraded to a non-passing status a material number of loans in the Commercial Residential portfolio.

78.     The Form 10-Q also inaccurately disclosed the magnitude and nature of "potential problem loans" in the Commercial Residential portfolio.  Bancorp disclosed the fact that there were two non-accrual loans in the Commercial Residential portfolio, but disclosed only one $4.6 million commercial real estate loan as being a potential problem loan about which management had "doubts" as to the borrower's ability to comply with the loan repayment terms.

79.     Bancorp should have disclosed many of the loans in the Commercial Residential portfolio as potential problem loans.  The reasons given for many of the downgraded loans and extensions granted to borrowers in the first quarter included lack of sales in the borrowers' projects, depleted interest reserves, attempts to sell or refinance the land, and other issues that

clearly gave rise to doubts as to whether the borrower would be able to comply with the repayment terms.

### 3.  Second Quarter 2007 Earnings Call on July 25, 2007

80.     During the second quarter earnings call on July 25, 2007, Levan maintained his position that the bank was concerned only about the BLB loans.  After touting the bank's conservative lending strategy that had resulted in "almost no losses" over the last 20 years, Levan remarked that the non-performing loans had decreased.

81.     One analyst specifically asked whether Bancorp was concerned about loans in addition to the BLB loans, to which Levan responded:

> There are no asset classes that we are concerned about in the portfolio as an asset class.  We've reported all the delinquencies that we have, which actually, I don't think there are any, other than the ones that we've just reported to you.  So the portfolio has always performed extremely well, continues to perform extremely well. . . . The one category that we just are focused on is this land loan builder portfolio because just from one day to the next the entire homebuilding industry went into a state of flux and turmoil and is impacting that particular class.  But to our knowledge and in, just in think through, there are no particular asset classes that we're concerned about other than that one class.

82.     Levan repeated the assertion that the BLB portion of the Commercial Residential portfolio was the only one of concern in response to questions another analyst raised later in the call.  However, the book value of the seventeen Commercial Residential loans that were downgraded in the second quarter was almost evenly split between BLB and non-BLB loans in the portfolio.  Moreover, of the eight Commercial Residential loans receiving extensions in the second quarter, only two were BLB loans.

83.     Levan's statement that Bancorp was worried only about the BLB loans was false and concealed the serious nature and true extent of the problems in the Commercial Residential portfolio, well-known to Levan and senior management.  Less than three weeks before this call,

two senior BankAtlantic loan officers described the portfolio to each other in an e-mail as "ticking time bombs" and "explosive piles of crap."

84.     By the time of the second quarter earnings call, the MLC in 2007 had granted extensions on $209.7 million, or 39.1% of the Commercial Residential portfolio.   Of this amount, $177.1 million represented LAD and LADC loans, constituting 33% of the portfolio. Also by this time, the bank had downgraded to a non-passing grade $106.4 million worth of LAD and LADC loans, or nearly 20% of the portfolio.

### 4.     Second Quarter Form 10-Q Filed August 9, 2007

85.     Bancorp's second quarter Form 10-Q, filed on August 9, 2007, included nearly identical language as the first quarter filing about the Commercial Residential portfolio.  Bancorp again described the BLB portion of the portfolio as one that "may" have issues "if" builders failed to acquire the borrowers' lots as anticipated.   The filing made no mention of concerns about the LAD and LADC loans other than to say they were of "relatively lower risk" than the BLB loans.   The filing also stated that market conditions "may" result in the bank's borrowers having difficulty selling lots, which could result in increased delinquencies and non-accruals.

86.     In fact, much of the Commercial Residential portfolio was in dire condition by the time Bancorp filed its second quarter Form 10-Q in August 2007.   It was not a question of "if" builders would walk away from the borrowers' projects, because Levan knew many already had walked away, forcing borrowers to consider other options for their property.   Likewise, the LAD and LADC loans were suffering and the bank had extended and downgraded a material number of them due to problems with the projects.

87.     By the time Bancorp filed the second quarter Form 10-Q, the MLC in 2007 had granted extensions on seventeen loans representing more than 39% of the Commercial

Residential portfolio.  Fifteen of these extensions were on LAD and LADC loans, constituting a book value of $177.1 million, or 33% of the portfolio.  In addition, by this time the bank had downgraded to a non-passing status nearly 40% of the total portfolio, with almost half of that total, or $106.4 million, consisting of LAD and LADC loans.

88.      Bancorp's Form 10-Q again failed to disclose in the MD&A the known trend that BankAtlantic had already extended and/or downgraded to a non-passing status a material number of loans in the Commercial Residential portfolio.

89.      Bancorp also again failed to fully and accurately disclose "potential problem loans" in the Commercial Residential portfolio.  The filing referenced two non-accrual loans in the Commercial Residential portfolio and reported only $4.6 million in loans for which management had doubts concerning the borrower's ability to pay in accordance with the loan terms.  Yet, during the second quarter Bancorp clearly had serious concerns about a large portion of the Commercial Residential portfolio as a result of numerous additional extensions and downgrades to non-passing status.

## V.     THE ACCOUNTING FRAUD

### A.     FACTUAL BACKGROUND

90.       In the fourth quarter of 2007, BankAtlantic began efforts to sell many of its problem loans from the Commercial Residential portfolio.  The American Institute of Certified Public Accountants ("AICPA") Statement of Position 01-6, "Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others" ("SOP 01-6"), which is part of GAAP, states that once a decision has been made to sell loans not previously classified as "held for sale," such loans should be transferred into the "held for sale" classification and carried on the books at the lower of cost or fair value.

91.     Bancorp should have reclassified the loans subject to BankAtlantic's sales efforts to "held for sale" on its balance sheet in the fourth quarter and written them down to the lower of cost or fair value in accordance with GAAP.  As a result of the bank's failure to reclassify these loans, Bancorp in its 2007 Form 10-K materially understated its net loss.

### 1.   Engagement of Third Party to Sell Loans

92.      More than three weeks before he announced the third quarter loss, Levan and others at Bancorp contacted an investment bank, JMP Securities, Inc. ("JMP"), to inquire about selling some of the problem loans in the Commercial Residential portfolio.  JMP met and communicated with Levan and other individuals at Bancorp to identify which loans they should include in the sale.  Bancorp employees, including Levan, and JMP employees used the term "sale" to describe the engagement at all times in early discussions about the loans.

93.     The initial contract JMP drafted and sent to Bancorp stated that Bancorp had engaged JMP to provide advice "concerning opportunities to sell certain loans and real estate owned (collectively "Loans") by BankAtlantic (the "Transaction")."  JMP's services were to include preparing a memorandum concerning the loans, identifying parties with potential interest in the loans, participating in related negotiations, developing and administering a bidding process, and consulting in the financial aspects and administration of closing any sale that resulted from the process.  In addition to a flat fee for services, JMP was entitled to receive a percentage based commission if the loans were sold.

94.      Members of Bancorp's executive management, including Levan, reviewed the bank's non-performing loans to determine which loans they wanted to include in the JMP engagement.  An October 17, 2007, e-mail reflects that Levan was concerned about getting problem loans off the bank's financial statements.  Bancorp settled on thirteen loans (about 25%

of the value of the Commercial Residential portfolio) for JMP to market.  Levan and others at Bancorp repeatedly referred to the engagement as a sale of the loan portfolio.  At the same time, Bancorp was making efforts to sell other loans in addition to those included in the JMP Transaction.

## 2. Accounting Questions Raised by CFO

95.   By November 13, 2007, CFO Valerie Toalson had learned of the JMP engagement, having seen portions of an early draft of the presentation materials JMP would later send to potential bidders.  Two days later Toalson e-mailed Levan, raising concerns about the accounting treatment of the loans if the bank was considering selling them because the bank did not originate them with the intent to sell.  Toalson told Levan that the bank would have to reclassify the loans on the balance sheet and record them at the lower of cost or fair value.

96.   Toalson also pointed out that bids received in the process might constitute the "market," and the bank could be required to write down a loan even if there was no sale.  Levan forwarded Toalson's e-mail to his contact at JMP, asking whether he had ever heard of this issue before.  His JMP contact responded: "Yes. Let's discuss."

97.   Toalson had conversations in late 2007 about the "held for sale" issue with the lead engagement partner for PricewaterhouseCoopers ("PwC"), Bancorp's outside auditor.  The purpose of these conversations was to make sure PwC was comfortable with the accounting of the loans involved in the engagement.

98.   On November 29, 2007, Toalson sent an e-mail to Levan and others summarizing one such conversation with PwC.  Toalson wrote, the PwC lead engagement partner "did express the importance of ensuring any packages, presentations or other documentation have wording that clearly represents management's intent and is not misleading.  [We are] reaching out to JMP

to ensure everything is clear."  Nevertheless, Levan approved marketing materials that reflected the bank was trying to sell the loans.

99.     Toalson met with Levan on January 4, 2008, and again discussed the "held for sale" issue.

100.     During the time Toalson was raising these issues with PwC and Levan, BankAtlantic employees working on the JMP engagement continued to refer to the process as a "sale" or "offering."

### 3.     The Engagement Contract is Changed

101.     After the discussions with PwC, Bancorp attempted to avoid having to reclassify the loans as "held for sale" by referring to the bidding process for the first time as a market evaluation.  On December 11, 2007, JMP sent a new version of the engagement contract to Levan.  The contract was modified from the previous language concerning JMP advising Bancorp on "opportunities to *sell* certain loans" to "opportunities to *test market* certain loans" (emphasis added).

102.     JMP's e-mail, which attached the new version of the contract, stated "here is the final BankAtlantic engagement letter for the market test on the A&D loans.  You can keep the signature pages which have been sent under separate cover.  We will do the same."  The date on the new version remained October 29, 2007, as it was on the original contract.  The language of the contract was changed solely to support Bancorp's claim that it did not have an intent to sell the loans.  JMP's duties and the fee structure under the contract were unchanged (including the sales commission), and neither Bancorp nor JMP ever signed a new version of the contract.

### 4.      PwC Year-End Audit

103.      At 2007 year-end, BankAtlantic continued to record as held for investment the twelve problem loans ultimately subject to the JMP engagement (one of the original loans had been paid off during the engagement).   Seven of these loans were considered impaired and specific reserves had been recorded on five of them by year end.

104.      PwC's lead engagement partner had discussions with Levan about the accounting for loans "held for sale."   Levan, however, did not mention that the bank was trying to sell the JMP engagement loans or that JMP was sending marketing materials to potential bidders. Instead, Levan misleadingly told PwC that the bank had made no decision to sell and Bancorp was only evaluating the market for the loans in question.

105.      Also, at year-end, PwC obtained a management representation letter (signed by Levan and others) falsely stating that "Management has the intent and ability to hold loans classified as held-for-investment for the foreseeable future or until maturity or payoff.   Loans held-for-sale at year-end are reflected in the financial statements at the lower of aggregate cost or market value by type of loans.   Market value has been determined based on management's best estimate of sale proceeds."

### 5.      Solicitation of Bids

106.      JMP compiled a list of about fifty potential bidders, and Levan then reviewed the list and suggested additions and deletions.   As other interested investors heard about the offering later in the process, they contacted Bancorp for information and were put in touch with JMP to receive materials.   BankAtlantic told potential loan buyers that JMP had the exclusive right to the sales process with respect to these particular loans.

107.     JMP prepared materials about the loan portfolio that included general information about each of the twelve loans for which the bank was seeking bids.   These documents reflect an outstanding balance of $144 million as of December 2007 for the bank's share of the twelve loans.   JMP sent drafts of the presentation materials to Levan and others at Bancorp for review and editing.

108.     The presentation materials contained the following language:

JMP Securities LLC ("JMP") has been retained by the Company as its financial advisor in connection with a potential sale of certain assets within BankAtlantic's Acquisition and Development Loan Portfolio (the "Transaction").   JMP will receive a fee from the Company for its services in assisting the Company in consummating the potential Transaction.

109.     The final version of the presentation also contained a Transaction Summary page which stated Bancorp was "considering offering its interests in the loan portfolio for cash," that it "will either retain servicing or sell servicing to the buyer," and that interested parties should submit indications of interest on a per loan basis by January 2, 2008.   The summary also stated that the "targeted closing of agreed upon transaction is January 31, 2008."

110.     JMP sent the presentation materials to potential bidders after they executed a confidentiality agreement.   The firm told bidders that bids were due in January 2008 with closings in February 2008.   Individuals at the bank met and negotiated with the bidders over the loan valuation.

**6.        JMP Received Bids on the Loans**

111.     Potential bidders who expressed interest after reviewing the general information contained in the presentation materials were given access to an on-line data room.   The data room contained detailed information about each of the loans, including all loan documents, land surveys, and appraisals.   The head of BankAtlantic's commercial lending division also had

telephone conferences with, and provided additional information about the loans to, individual bidders.

112.     From late December 2007 through early 2008, JMP ultimately received formal bids from six bidders (including major financial institutions).  Two of the bidders proposed to purchase all twelve loans for 50% of the book value.  The four other bidders placed bids on less than the entire portfolio at amounts ranging from 28% to 33.5% of book value.  The proposals from the bidders demonstrated they believed they were participating in a sale rather than a market evaluation.  BankAtlantic ultimately decided not to sell the loans because it considered the bids too low.

### 7.     Bancorp's Subsequent Transfer of Loans to a Subsidiary

113.     Having failed to attract bids to its liking, but still eager to get the Commercial Residential loans off the books, Bancorp, in the first quarter of 2008, transferred five of the twelve JMP engagement loans, along with nineteen other problem loans, to an inactive Bancorp subsidiary with no assets.

114.     As part of the transaction, Bancorp gave the subsidiary $100 million, which the subsidiary subsequently sent to the bank in exchange for the problem loans.  The purpose of the transfer was to strengthen BankAtlantic's capital position by removing the loans from its books while, at the same time, infusing the bank with cash.

115.     Bancorp valued the loans for purposes of the transfer based in part on appraisals instead of the bids received in the JMP engagement from late 2007 through March 2008.  The appraisals of the five loans that were also part of the JMP engagement were much higher than the 50% of book value, the highest bidder offered.  In valuing the transferred loans, Bancorp entirely

ignored these lower JMP-related bids, even though the bank had supposedly obtained these bids as part of a market evaluation.

116.    Even after it transferred the loans to the subsidiary, Bancorp continued to actively market the loans to potential buyers who were given access to the JMP data room as well as other information from BankAtlantic.  Furthermore, Bancorp engaged two financial advisors, in addition to JMP, to market and sell certain of these loans, with the expectation that closings would occur by the end of the second quarter 2008.

### 8.    Attempts to Sell Loans Outside the JMP Engagement in the Fourth Quarter of 2007

117.    Concurrent with the JMP engagement in the fourth quarter of 2007, BankAtlantic also separately marketed loans in the Commercial Residential portfolio.  In December 2007, the bank sent an e-mail to more than thirty potential buyers in which the bank stated its intent to sell two Commercial Residential loans prior to year end.  The outstanding amount owed on these loans was just less than $9 million and the bank said it would be willing to sell them for a $3 million discount.  In addition, the bank asked other prospective buyers to sign confidentiality agreements, and they were then given access to information about loans the bank was willing to sell.

118.    Despite having actively sought to sell these Commercial Residential loans, BankAtlantic never reclassified any of them to a "held for sale" status.

119.    During the fourth quarter of 2007, BankAtlantic also entered into specific agreements to sell at least four loans in the Commercial Residential portfolio but failed to classify them as "held for sale."

120.    These sales agreements included a signed November 2007 agreement to sell three non-performing loans from the portfolio with closing dates in January 2008, pending the

purchaser's due diligence.  BankAtlantic never completed the sale because the purchaser backed out in January 2008 after deciding that the market was deteriorating.  After the buyer backed out, the bank continued to aggressively try to find a replacement buyer.

121.    An additional non-performing loan was the subject of an oral sale agreement in November 2007 under similar circumstances.  This agreement eventually fell through when the buyer backed away from completing the purchase.

122.    These sales agreements also reflected a decision to sell the loans in question on the part of the bank.  Therefore, BankAtlantic should have reclassified these four loans to "held for sale" status in the fourth quarter and written them down to the lower of cost or fair value in accordance with GAAP.

## B.    BANCORP FRAUDULENTLY UNDERSTATED ITS LOSS IN THE 2007 FORM 10-K

123.     Despite having retained JMP, identified specific loans to sell, and actively pursued bids, Bancorp did not transfer the loans to a "held for sale" account on the bank's balance sheet or record the loans at the lower of cost or fair value.  The bank also failed to reclassify the four loans subject to sales agreements as "held for sale," and failed to record the loans at the agreed selling prices.

124.    As a result, Bancorp's financial statements in its 2007 Form 10-K, signed by Levan, were false.   As of December 31, 2007, Bancorp reported a loss from continuing operations before income taxes of approximately $57.6 million, of which a loss of approximately $40.8 million was due to BankAtlantic's operations.

125.    Assuming a fair value measured by the most favorable bids of 50% for the JMP loans, and sales agreement price on the additional four loans, Bancorp failed to record in total an additional credit loss of about $60.7 million.  In total, Bancorp should have reported a pre-tax

loss of $118.3 million for 2007 rather than the reported pre-tax loss of $57.6 million, or a 51% understatement.

**CLAIMS FOR RELIEF**

**COUNT I**

**FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER**
**(As to Bancorp and Levan)**

126.    The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    Defendants Bancorp and Levan directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

128.    By reason of the foregoing, Defendants Bancorp and Levan directly or indirectly, violated, and are reasonably likely to continue to violate, unless enjoined, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

<u>**COUNT II**</u>

**AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER**
**(As to Levan)**

129.   The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

130.   Defendant Bancorp directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

131.   Defendant Levan, directly and indirectly, had a general awareness that he was part of an overall activity that was improper or illegal and knowingly, or acting extremely recklessly, provided substantial assistance to violations by Bancorp of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

132.   By reason of the foregoing, Defendant Levan aided and abetted Bancorp's violations, and is reasonably likely to again aid and abet Bancorp's violations, unless enjoined, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## COUNT III

### VIOLATIONS OF SECTION 13(b)(5) AND RULES 13a-14, 13b2-1, and 13b2-2
### OF THE EXCHANGE ACT
#### (As to Levan)

133.    The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

134.    Defendant Levan, in violation of Section 13(b)(5) of the Exchange Act, knowingly circumvented or failed to implement a system of internal accounting controls or falsified books, records or accounts as described in Section 13(b)(2) of the Exchange Act.

135.    Defendant Levan, in violation of Rule 13b2-1 of the Exchange Act, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2) of the Exchange Act.

136.     Defendant Levan, in violation of Rule 13b2-2 of the Exchange Act, directly or indirectly, as an officer or director of an issuer, in connection with the preparation of an audit, made or caused to be made, misrepresentations or omissions to an accountant.

137.    Defendant Levan, in violation of Rule 13a-14 of the Exchange Act, directly or indirectly, as an officer or director of an issuer, falsely certified in annual and quarterly reports that based on his knowledge, the disclosure reports did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

138.    By reason of the foregoing, Defendant Levan, directly or indirectly, violated, and is reasonably likely to continue to violate, unless enjoined, Section 13(b)(5) of the Exchange Act,

15 U.S.C. § 78m(b)(5), and Rules 13a-14, 13b2-1, and 13b2-2 thereunder, 17 C.F.R. §§ 240.13a-14, 240.13b2-1, and 240.13b2-2.

## COUNT IV

### VIOLATIONS OF SECTION 13(a) AND RULES 12b-20 13a-1, AND 13a-13 OF THE EXCHANGE ACT
### (As to Bancorp)

139.     The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

140.     Defendant Bancorp violated Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 of the Exchange Act, by knowingly, or acting extremely recklessly, failing to timely and accurately file reports with the Commission regarding its assets, liabilities, and related party descriptions and transactions; omitting information necessary to make the required information, in the light of the circumstances under which they were made, not misleading; and by filing or causing to be filed with the Commission materially false and misleading financial and informational statements.

141.     By reason of the foregoing, Defendant Bancorp violated, and is reasonably likely to continue to violate, unless enjoined, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

## COUNT V

### AIDING AND ABETTING BANCORP'S VIOLATIONS OF SECTION 13(a) AND RULES 12b-20, 13a-1, AND 13a-13 OF THE EXCHANGE ACT
### (As to Levan)

142.     The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

143.    Defendant Levan aided and abetted Bancorp's violations of Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 of the Exchange Act, by knowingly, or acting extremely recklessly, providing substantial assistance to Bancorp, which failed to timely and accurately file reports with the Commission regarding its assets, liabilities, and related party descriptions and transactions; omitted information necessary to make the required information, in the light of the circumstances under which they were made, not misleading; and by filing or causing to be filed with the Commission materially false and misleading financial and informational statements.

144.    By reason of the foregoing, Defendant Levan aided and abetted Bancorp's violations, and is reasonably likely to again aid and abet Bancorp's violations, unless enjoined, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

## COUNT VI

### VIOLATIONS OF SECTIONS 13(b)(2)(A) AND 13(b)(2)(B) THE EXCHANGE ACT
**(As to Bancorp)**

145.    The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

146.    Defendant Bancorp violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions of the issuer; by failing to devise and maintain a system of internal accounting controls sufficient to reasonably assure that transactions were recorded and financial statements were prepared in conformity with GAAP.

147.    By reason of the foregoing, Defendant Bancorp violated, and is reasonably likely to continue to violate, unless enjoined, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

## COUNT VII

### AIDING AND ABETTING BANCORP'S VIOLATIONS OF SECTIONS 13(b)(2)(A) AND 13(b)(2)(B) THE EXCHANGE ACT
### (As to Levan)

148.    The Commission repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

149.    Defendant Levan aided and abetted Bancorp's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions of the issuer; and by failing to devise and maintain a system of internal accounting controls sufficient to reasonably assure that transactions were recorded and financial statements were prepared in conformity with GAAP.

150.    By reason of the foregoing, Defendant Levan aided and abetted Bancorp's violations, and is reasonably likely to again aid and abet Bancorp's violations, unless enjoined, of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.

## Declaratory Relief

Declare, determine and find that Defendants committed the violations of the federal securities laws alleged in this Complaint.

## II.
## Permanent Injunctive Relief

Issue a Permanent Injunction, restraining and enjoining:

(1) Defendant Bancorp, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from violating Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13 of the Exchange Act;

(2) Defendant Levan, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Sections 10(b) and 13(b)(5), and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 of the Exchange Act; and from aiding and abetting any violation of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13 of the Exchange Act.

## III.

## Penalties

Issue an Order directing Defendants Bancorp and Levan to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

## <u>Officer and Director Bar</u>

Issue an Order barring Defendant Levan from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## V.

## <u>Retention of Jurisdiction</u>

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.

## <u>Further Relief</u>

Grant such other and further relief as may be necessary and appropriate.

Respectfully submitted,

January 18, 2012          By:     s/C. Ian Anderson
                                  C. Ian Anderson
                                  Senior Trial Counsel
                                  Court No. A5501232
                                  Direct Dial:  (305) 982-6317
                                  E-mail: andersonci@sec.gov
                                  ***Lead Counsel***

                                  Adam L. Schwartz
                                  Senior Trial Counsel
                                  Court No. A5501169
                                  Direct Dial: (305) 982-6390
                                  E-mail: schwartza@sec.gov

                                  Brian P. Knight
                                  Senior Counsel
                                  Fla. Bar. No. 0993662
                                  Direct Dial: (305) 982-6385

E-mail: knightb@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154