## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## Case No. 12-60082-Civ-SCOLA/ROSENBAUM

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

BANKATLANTIC BANCORP, INC. and
ALAN B. LEVAN,

      Defendants.

_____/

### ORDER ON DEFENDANTS' MOTION TO DISMISS

      THIS MATTER is before the Court upon the Defendants' Motion to Dismiss the Complaint (ECF No. 13). The Motion came before the Court for oral argument on April 26, 2012. The Court has considered the Motion, the record, the arguments of the parties at the hearing, and the relevant legal authorities. For reasons set forth more fully below, it is **ORDERED and ADJUDGED** that the Motion (ECF No. 13) is **GRANTED IN PART and DENIED IN PART.**

### I. FACTUAL BACKGROUND

#### a. The Parties

      Defendant Bankatlantic Bancorp ("Bancorp") is a Florida corporation and the parent of BankAtlantic, a federal savings bank offering consumer and commercial banking and lending services throughout Florida. Bancorp's common stock is listed on the New York Stock Exchange and is registered with the Securities and Exchange Commission (the "SEC") pursuant to § 12(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78O(b). Defendant Alan Levan ("Levan") is allegedly the Chairman of the Board and CEO of Bancorp and the former Chairman, President, and CEO of BankAtlantic.

    *b.   Factual Allegations*

Pursuant to § 21(d) of the Exchange Act, the SEC filed this action against Bancorp and Levan (the "Defendants") on January 18, 2012.  For the purposes of this Motion, the Court accepts the SEC's well-pled factual allegations as true.

### 1.   BankAtlantic's Loan Portfolio and Structure

As one of Florida's largest commercial banking and lending institutions, Bancorp's subsidiary, BankAtlantic, allegedly had $1.5 billion in its commercial real estate loan portfolio in 2007, a substantial portion of which consisted of loans in its Commercial Residential portfolio (the "CR" portfolio) in late 2007.  Compl. 6 ¶ 19, ECF no. 1.  The loans in the CR portfolio were allegedly further classified by type:  (1) Builder Land Bank loans ("BLB loans"), issued to entities who acquired parcels of raw land for initial development into lots and sold them to a national builder; and (2) the remainder of the land loan portfolio (the "non-BLB loans"), in which the borrowers themselves developed and built upon the land.  A BLB loan borrower often had an option contract with the eventual builder, which only required a partial down-payment to the borrower and closed when the builder exercised its option at a later date.  *Id.*  at 6–7 ¶¶ 20–23.  As a result of this structure, BLB loan borrowers allegedly relied upon the builders to exercise the options in order to meet their own obligations to BankAtlantic.  *See Id.* at 17 ¶ 71.

BankAtlantic allegedly maintained certain internal policies for approving and monitoring loans in the CR portfolio.  First, it had a Major Loan Committee ("MLC"), on which Levan sat, that had to approve any loan in excess of $5 million.  Compl. 7 ¶ 25.  According to the SEC, Levan effectively controlled the decisions of the MLC, and had a "hard no" vote which operated as a one-man veto power over any proposed decision.  *Id.* at 8 ¶¶ 27–28.  Second, BankAtlantic allegedly monitored the CR portfolio through an internal loan-grading system that assigned loans a "grade" from 1 to 13, with a grade of 1 through 7 considered passing grades and a grade of 10 through 13 considered non-passing grades.  *Id.*at 8 ¶ 29.  Notably, grade 10 loans were allegedly deemed "special mention" loans with "weaknesses that deserve management's close attention," and grade 11 loans were allegedly deemed "substandard" loans whose "well defined weaknesses . . . jeopardize[d] the liquidation of the debt."  *Id* at 8–9 ¶¶ 31–33.

### 2.  The Alleged Disclosure Fraud

#### A.  Q3 2007:  Bancorp's Losses Announced

The events giving rise to this case relate to the collapse of the Florida residential real estate market in 2007.  On October 26, 2007, Bancorp filed a Form 8-K (generally used to notify the SEC or investors of any material event) that incorporated a previous day's earnings press release for the third quarter of 2007 ("Q3 2007"), in which it announced that it would suffer a loss of $29.6 million.  Subsequently, Bancorp's share price allegedly dropped by 37%.  Compl. 1–2 ¶¶ 2–3.  This loss was allegedly driven by large losses associated with problem loans in the CR portfolio.  Levan allegedly stated in a subsequent earnings conference call ("earnings call") that this loss from the CR portfolio was a surprise resulting from an unanticipated collapse of the Florida real estate market.  *Id.* at 5 ¶ 17.  According to the SEC, however, this statement was false, and the substantial losses in Q3 2007 were allegedly the result of a long-known trend of serious problems, the extent of which the Defendants allegedly affirmatively misrepresented or failed to disclose in its public filings and related earnings calls as far back as the first and second quarters of 2007 ("Q1 2007" and "Q2 2007," respectively).  *Id.* at 5 ¶ 18.

#### B.  Q1 2007:  Occurrences and Allegedly Fraudulent Disclosures

The SEC alleges that before filing Bancorp's quarterly report ("Form 10-Q") for Q1 2007, a trend of problems that would eventually lead to the Q3 2007 losses was known to the Defendants.  In particular, The MLC allegedly discussed an interim report by BankAtlantic's loan review department in January 2007, which allegedly reflected an awareness of a number of loans in the CR portfolio where the borrowers were becoming unable to sell lots to builders and were slowing down on their interest payments to BankAtlantic.  Compl. 10–11 ¶¶ 39–41.  Similarly, multiple borrowers approached the MLC for approval of extensions of their payment dates.  *Id.* at 11 ¶¶ 42–43.  Before it filed its 10-Q for Q1 2007, the MLC allegedly granted 11 extensions, constituting 26.28% of the CR portfolio's value.  Ten of these extensions were allegedly granted to non-BLB loans.  *Id.* at 11 ¶ 44.  Levan allegedly acknowledged this as a concern in an internal email on March 14, 2007, in which he described "a parade of land loans coming in for extensions" and stated "I believe we are in for a long sustained problem in this sector."  *Id.* 11–12 ¶¶ 46–47.  On March 20, in another internal email, the head of BankAtlantic's lending department allegedly stated that there was "significant concern" about the loans in the

CR portfolio.  *Id.* at 12 ¶ 49.  Finally, after the close of Q1 2007 but before the filing of Bancorp's Form 10-Q for that quarter, BankAtlantic also allegedly downgraded 9 loans in the CR portfolio to non-passing grades, constituting more than 15% of the CR portfolio.  *Id.* at 12 ¶ 51.

According to the SEC, despite these concerning trends, the Defendants made material misrepresentations and omissions in the earnings call and Form 10-Q for Q1 2007.  Bancorp's earnings call for Q1 2007 took place on April 26, 2007.  In the call, Levan allegedly stated generally that a number of builders had walked away from their option contracts with borrowers in BLB loans, leading to extension requests.  When allegedly asked whether the problem extended to non-BLB loans, Levan stated that the non-BLB loans were "proceeding in the normal course" and that the Defendants were not seeing any difference in the performance of those loans than they had seen over the previous decade.  Compl. 16 ¶¶ 67–68;  *see also* Q1 Earnings Call 24, ECF No. 13-8.[1]

Bancorp filed its Form 10-Q for Q1 2007 on May 10, 2007.  In particular, the Form 10-Q allegedly reflected an increase in the provision for loan losses for that quarter.  In the Management Discussion and Analysis section ("MD&A"), Bancorp allegedly explained that these extra losses were due to the generally deteriorating conditions in the Florida and national residential real estate market during Q1 2007.  Discussing BLB loans, the Form 10-Q allegedly acknowledged that repayment of those loans primarily depends upon the builders' exercise of their options, and then allegedly stated that "if" the lots were not acquired as anticipated, a borrower "may not be in a position to service the loan."  Regarding non-BLB loans, the Form 10-Q allegedly noted that those loans were of relatively lower risk than BLB loans.  Compl. 17 ¶¶ 71–79; *see also* Q1 Form 10-Q 18, ECF No. 13-9.

The SEC alleges that these two disclosures contained material misrepresentations or omissions of material fact relating to Bancorp's assets, liabilities, and financial position.  First, the SEC alleges that Levan's averment in the earnings call that non-BLB loans were "proceeding in the normal course," was materially false, because Levan knew—as the alleged de-facto controller of the MLC—that nearly all (10 of 11) of the extensions granted before the earnings call—what he himself allegedly described as a "parade of loans"—were granted to non-BLB

---

[1] For a discussion of the Court's consideration of the relevant documents attached to the Motion, *see infra* Part II.c.

loans, and that he allegedly noted personally that those extensions forecast a "long sustained problem." Compl. 16 ¶¶ 69–70. Second, the SEC alleges that despite the conditional language in the Form 10-Q predicting what "may" occur "if" builders did not exercise their options related to BLB loans, the Defendants allegedly omitted the material fact that builders already *had* walked away from the options. Finally, the SEC asserts that the Form 10-Q omitted the material and known trend of the extensions granted and loans downgraded to non-passing status up to that point. The SEC asserts that this omission resulted in allegedly false representations as to the relative risk of non-BLB loans and the alleged disclosure of only $4.6 million worth of "potential problem loans" in the CR portfolio, despite the alleged trend reflecting more serious problems with the whole CR portfolio. *Id.* at 18 ¶¶ 76–79.

### C. Q2 2007: Occurrences and Allegedly Fraudulent Disclosures

The SEC alleges that the known trend of significant concerns continued and grew in Q2 2007 before, and leading up to, Bancorp's relevant disclosures for that quarter. In particular, the MLC allegedly downgraded 8 additional loans to non-passing status (in addition to the 9 downgraded loans in April, discussed above). These 17 total downgrades allegedly constituted over 25% of the CR portfolio value, and were evenly split between BLB and non-BLB loans. Compl. 13 ¶ 55–56. The MLC also allegedly approved 8 additional extensions in Q2 2007, which allegedly included all types of loans in the CR portfolio. Only two of them were allegedly BLB loans. *Id.*at 14 ¶¶ 57–58; 19 ¶ 82.

According to the SEC, despite this continuing known trend, the Defendants continued to make material misrepresentations and omissions in both the earnings call and the Form 10-Q for Q2 2007. Bancorp's earnings call for Q2 2007 took place on July 25, 2007. In the call, one analyst allegedly asked specifically if Bancorp was concerned about loans other than BLB loans. Levan responded that "[t]here are no asset classes that we are concerned about in the portfolio as an asset class. . . . [T]he portfolio has always performed extremely well . . . . The one category that we just are focused on is this [BLB] portfolio . . . . [T]here are no particular asset classes that we're concerned about other than that one class." Compl. 19 ¶¶ 80–81. *See also* Q2 Earnings Call 20–21, ECF No. 13-11.

Bancorp filed its Form 10-Q for Q2 2007 on August 9, 2007. In particular, the Form 10-Q allegedly contained nearly identical language to the Form 10-Q for Q1 2007 regarding the

generally deteriorating condition of the Florida and national residential real estate market, the general description of BLB loans, the conditional language of what concerns "may" arise "if" builders did not exercise their options related to BLB loans, and the "relatively lower risk" of non-BLB loans.  Compl. 20 ¶ 85.  *See also* Q2 Form 10-Q 22–23, ECF No. 13-12.

The SEC alleges that these two disclosures also contained material misrepresentations or omissions of material fact.  First, the SEC alleges that Levan's statement in the earnings call that the Defendants were not concerned about non-BLB loans was materially false, because Levan knew—as the alleged controller of the MLC—that the value of the total loans downgraded to non-passing status in Q2 2007 was evenly split between BLB and non-BLB loans, and that only 2 of the 8 extensions approved in that quarter were for BLB loans.  Compl. 19 ¶ 82.  Second, the SEC alleges that the conditional language in the Form 10-Q for Q2 2007 continued to omit the material fact that many builders had already walked away from the options related to BLB loans.  *Id*. at 20 ¶ 86.  Third, the SEC alleges again that the Form 10-Q omitted the material and known trend reflected by the extensions and downgrades up to that point.  The SEC asserts that this omission again allegedly resulted in the Form 10-Q downplaying the relative risk of non-BLB loans and reporting only $4.6 million worth of potential problem loans, despite this alleged trend reflecting more serious and widespread concerns.  *Id.* at 20–21 ¶¶ 85, 88–89.

In sum, the SEC alleges that the Defendants made material misrepresentations and omissions of fact about Bancorp's assets, liabilities, and financial position in their earnings calls and Forms 10-Q for Q1 and Q2 2007, constituting a pattern of fraudulent and misleading misrepresentations and omissions about the true state of BankAtlantic's CR portfolio, which allegedly misled analysts and investors leading up to Bancorp's losses announced in the Form 8-K in Q3 2007.

### 3.  The Alleged Accounting Fraud

The Complaint alleges that after the Defendants announced Bancorp's losses in the Form 8-K in Q3 2007, they began efforts to sell many of the problem loans in the CR portfolio.  Compl. 21 ¶ 90.  As part of these efforts, Levan and other officers allegedly contracted with JMP Securities ("JMP"), an investment bank, to provide advice "concerning opportunities to sell certain loans and real estate owned . . . by BankAtlantic."  The contract also allegedly provided that JMP would receive a percentage based commission if the loans were sold.  *Id*. at 22 ¶ 93.

The SEC asserts that all communications between Levan, others at Bancorp, and JMP leading up to the contract formation used the term "sale" to describe the relationship.  *Id.* at 22 ¶ 92.

On November 15, 2007, Bancorp's CFO, Valerie Toalson ("Toalson") allegedly sent an email to Levan raising concerns regarding the engagement with JMP and generally accepted accounting practices ("GAAP").  According to GAAP, once an entity decides to sell loans not previously classified as "held for sale," such loans should be formally classified as "held for sale" and recorded on the entity's books at the lower of cost or fair value.  Compl. 21 ¶ 90.  Toalson's email allegedly stated this practice, and noted that any bids received on loans Bancorp set out for sale may constitute "market" or fair value, requiring Bancorp to write down the loan to that value even if the sale did not go through.  *Id.* at 23 ¶¶ 95–98.  Toalson allegedly continued to raise these concerns throughout late 2007.  *Id.*

After discussions with Toalson and with Bancorp's outside auditor, Bancorp and JMP modified the previous contract to contain new language changing "opportunities to sell certain loans" to "opportunities to *test market* certain loans."   Compl. 24 ¶ 101 (emphasis added).  Despite this change, the SEC alleges that the new contract contained the same date as the old contract and retained the provision regarding JMP's sales commission.  *Id.* at 24 ¶ 102.  After this change, in Bancorp's year-end audit, Levan allegedly told the outside auditor that the bank had made no decision to sell the loans and was only conducting a market evaluation.  Levan also allegedly signed a management representation letter stating that "[m]anagement has the intent and ability to hold loans classified as held-for-investment for the foreseeable future or until maturity or payoff.  Loans held-for-sale at year-end are reflected in the financial statements at the lower of aggregate cost or market value . . . .  Market value has been determined based on management's best estimate of sale proceeds."  *Id.* at 25 ¶¶ 103–105.

Meanwhile, JMP allegedly solicited bids for the twelve problem loans subject to its contract, and consulted with potential bidders, telling bidders that their bids were due in January 2008, and that the transactions were to close in February 2008.  By early 2008, JMP allegedly received formal bids from 6 bidders.  Two of the bidders allegedly proposed to purchase all twelve loans for 50% of book value, and the rest allegedly proposed to purchase less than all of the loans for amounts ranging from 28% to 33.5% of book value.  Bancorp ultimately decided not to sell the loans, allegedly because the bids were considered too low.  *See generally* Compl. 25–27.  The SEC additionally alleges that the Defendants actively sought to sell other loans in

the CR portfolio, but these sales were never completed for various reasons. *Id.* at 28–29 ¶¶ 119–122. According to the SEC, throughout this period, and despite the active marketing and arrangements to sell the loans, Bancorp never reclassified any of the loans as "held for sale" or wrote them down to the lower of cost or fair value, or even the agreed selling prices set forth in other agreements. *Id.* at 28 ¶ 118, 123.

The SEC alleges that Bancorp's annual report ("Form 10-K") for 2007 reported a loss of around $57.6 million. However, using the most favorable alleged bids for the JMP engagement loans (50% of book value), the SEC claims that Bancorp failed to record an additional credit loss of around $60.7 million, and should have reported a pre-tax loss of $118.3 million in its Form-10K rather than $57.6 million, an alleged understatement of 51%. Compl. 29 ¶¶ 123–125. The SEC alleges that this was a material understatement in Bancorp's Form 10-K, which was caused by the Defendants' willful and reckless failure to properly classify the loans according to GAAP. *Id.* at 22 ¶ 91.

  *c.*  *The Complaint*

In its Complaint, the SEC seeks permanent injunctive relief, civil money penalties, and an officer and director bar against the Defendants for various violations of the Exchange Act. The Complaint raises seven Counts against the Defendants, set forth in detail below.

  1.  <u>Counts I and II: Section 10b and Rule 10b-5 Violations (Securities Fraud)</u>

Counts I and II raise claims for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. These claims are raised against both Defendants based on the alleged theories of disclosure and accounting fraud described above, and they form the crux of the SEC's Complaint. In Count I against both Defendants, the SEC alleges that in connection with the purchase or sale of securities, the Defendants knowingly, willfully, or recklessly employed schemes or artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading given the circumstances; and engaged in acts and practices operating as a fraud upon the purchasers of those securities. The SEC claims that these fraudulent actions and omissions constituted a violation of § 10(b) and Rule 10b-5.

In Count II against Levan, the SEC alleges that Levan aided and abetted Bancorp's violations set forth in Count I by his general awareness that he was part of that illegal practice, and his knowing or reckless provision of substantial assistance in those violations.

### 2.  Counts III, VI, and VII:  Recordkeeping and Internal Control Violations

Counts III, VI, and VII of the Complaint allege recordkeeping and internal control violations by both Defendants in connection with the alleged fraud in Count I.  In Count III against Levan, the SEC alleges that Levan knowingly:  (1) Failed to implement a system of internal accounting controls or falsified records in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1; (2) made misrepresentations as an officer or director to an accountant in connection with the preparation of an audit, violating Exchange Rule 13b2-2, 17 C.F.R. § 240.13b2-2; and (3) falsely certified in 10-K and 10-Q Forms for 2007 that the reports were complete and did not contain any untrue statement of material fact or omission of material fact necessary to make the statements not misleading given the circumstances, thereby violating Exchange Rule 13a-14, 17 C.F.R. § 240.13a-14.

In Count VI against Bancorp, the SEC alleges that Bancorp failed to make and keep accurate records fairly reflecting the disposition of its assets, and failed to maintain a system of internal accounting controls sufficiently reasonable to assure that its records and financial statements conformed to generally accepted accounting principles ("GAAP"), violating §§ 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A)–78m(b)(2)(B).

In Count VII against Levan, the SEC alleges that Levan aided and abetted Bancorp's violations set forth in Count VI by knowingly or recklessly providing substantial assistance.

### 3.  Counts IV and V:  Reporting Violations

Counts IV and V of the Complaint allege reporting violations by both Defendants in connection with the alleged fraud in Count I.  In Count IV against Bancorp, the SEC alleges that Bancorp knowingly or recklessly filed inaccurate, false, and materially misleading 10-K and 10-Q reports regarding its assets, liabilities, and related party transactions, and omitted material information necessary to make those reports not misleading in light of the circumstances, in

violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a-1, 13a-13, and 12b-20 thereunder, 17 C.F.R. §§ 240.13a-1, 240.13a-13, and 240.12b-20.

In Count V against Levan, the SEC alleges that Levan aided and abetted Bancorp's violations set forth in Count IV by knowingly or recklessly providing substantial assistance in those violations.

In the present Motion, the Defendants move to dismiss all Counts of the Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## II. <u>LEGAL STANDARDS</u>

### a. *Motions to Dismiss Generally*

Under the general pleading standard set forth in Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its own face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation omitted). While a court must accept well-pled facts as true, it need not assume the truth of conclusory allegations, nor are plaintiffs entitled to have the court view unwarranted deductions of fact or argumentative inferences in their favor. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (finding "labels and conclusions, and a formulaic recitation of the elements of a cause of action" insufficient to survive motion to dismiss); *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007) (per curiam). In order to be "minimally sufficient," a complaint must put the defendant on notice of the claims against him. *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x. 597, 603 (11th Cir. 2008); *see also City of Fort Lauderdale v. Scott*, 773 F. Supp. 2d 1355, 1362 (S.D. Fla. 2011) (Cohn, J.) ("Under the *Iqbal* standard, a plaintiff must allege facts which put each defendant on notice of the claims against him."). Moreover, a complaint will not suffice if it tenders "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct.at 1949 (2009) (quoting *Twombly*, 550 U.S. at 557 (2007)); *see also id.* at 1945 (well-pled complaint "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation" (citing *Twombly*, 550 U.S. at 555)). The Supreme Court also held that this standard applies to all civil actions. *Id.* at 1953.

b. *Heightened Pleading – Rule 9(b)*

When a party raises claims of fraud or mistake, it must allege "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* As the Eleventh Circuit has explained:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) *precisely what* statements or omissions were made in which documents or oral representations; (2) the *time and place* of each such statement and the *person responsible* for making (or, in the case of omissions, not making) them; (3) the *content* of such statements and the *manner in which they misled* the plaintiff; and (4) *what the defendant obtained* as a consequence of the fraud.

*FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (emphasis added) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

c. *Documents to Consider on Motion to Dismiss*

The Complaint itself contains no attached exhibits; however, in support of their Motion, the Defendants have attached 13 separate exhibits constituting 647 pages in total. *See generally* Motion Exs., ECF Nos. 13-1–13-16. The Defendants argue that the Court must consider these documents in order to achieve an accurate sense of the "total mix" of information in which the specific disclosures referenced in the Complaint must be viewed. *See infra* Part III.a.1.A.

The Eleventh Circuit has adopted the "incorporation by reference" doctrine with respect to documents other than the pleadings on a Rule 12(b)(6) motion. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Under this doctrine, a court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed. *Id.* (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999)). "'Undisputed' in this context means that the authenticity of the document is not challenged." *Id.* The Eleventh Circuit has also held—in the context of a suit brought under the Private Securities Litigation Reform Act of 1995 ("PSLRA")—that a court may take judicial notice of *relevant* documents legally required by, and publicly filed with, the SEC for the limited purpose of determining what statements the

documents contain (rather than to prove the truth of the documents' contents). *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276–81 (11th Cir. 1999) (emphasis added).[2]  Therefore, in analyzing the present Motion the Court has considered the documents attached to the Defendants' motions that are relevant to the allegations of the Complaint.

### III. <u>ANALYSIS AND CONTROLLING AUTHORITY</u>

The Defendants' arguments for dismissal are broadly divided between their arguments for dismissal of Counts I and II, and their arguments for dismissal of the related claims raised by Counts III through VII.  As the parties focus primarily on Counts I and II, the Court will address these arguments first, then turn to the related claims in Counts III through VII.

### a. *Counts I and II:  Section 10(b) and Rule 10b-5 Violations*

"The scope of liability under Section 10(b) and Rule 10b–5 is the same."  *S.E.C. v. Merch. Capital, LLC,* 483 F.3d 747, 766 n.17 (11th Cir. 2007) (citing *SEC v. Zandford,* 535 U.S. 813, 816 n.1 (2002) ("The scope of Rule 10b-5 is coextensive with the coverage of § 10(b).")); *S.E.C. v. U.S. Pension Trust Corp.,* No. 07-22570-CIV, 2010 WL 3894082, at *20 (S.D. Fla. Sept. 30, 2010) (Martinez, J.).  The elements of a § 10(b) violation are (1) a material misrepresentation or materially misleading omission; (2) made in connection with the purchase or sale of a security; (3) made with scienter.  *S.E.C. v. Morgan Keegan & Co., Inc.,* No. 11-13922, 2012 WL 1520895, at *9 (11th Cir. May 2, 2012) (citing *Merch. Capital,* 483 F.3d at 766 (same)); *S.E.C. v. U.S. Pension Trust Corp.,* No. 07-22570-CIV, 2010 WL 3894082, at *20 (S.D. Fla. Sept. 30, 2010) (Martinez, J.) ("To prove a 10(b) violation, the SEC must show (1) material

---

[2] Federal courts have stated that "The PLSRA applies only to private actions, not to actions filed by the SEC."  *S.E.C. v. Betta,* No. 09-80803-CIV, 2010 WL 963212, at *5 (S.D. Fla. Mar. 15, 2010) (Marra, J.) (citing 15 U.S.C. § 78U-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter.")); *see also S.E.C. v. Dunn,* 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language.").  The Court is not aware of, nor have Defendants made the Court aware of, any case within this Circuit that applied *Bryant*'s judicial notice holding to an action brought by the SEC.  However, *Bryant*'s holding in this regard was based on generally applicable principles of judicial notice under Federal Rule of Evidence 201 and Rule 12(b)(6), which are certainly not limited in application to the PSLRA.

misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter.").[3]

As set forth above, the SEC pursues two separate theories in its allegations concerning securities fraud under Counts I and II: disclosure fraud and accounting fraud. Similarly, the Defendants' Motion challenges Counts I and II as to both theories, and raises distinct arguments against each of the SEC's theories of fraud. The Court addresses each of these theories in turn.

### 1. Count I: The Alleged Disclosure Fraud Theory

Regarding the SEC's allegations of disclosure fraud relating to Count I, the Defendants argue that: (1) the Complaint fails to sufficiently allege that the Defendants made any material misrepresentations or omissions of material facts given the "total mix" of the disclosures the Defendants made; (2) the Complaint improperly attempts to premise liability on forward-looking statements, which are protected under the "bespeaks caution" doctrine; and (3) the Complaint does not assert sufficient facts to allege the required scienter.[4]

---

[3] Other decisions have added a requirement that the material misrepresentation or omission use an instrumentality of interstate commerce. *See, e.g., S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1262 (S.D. Fla. 2011) (Lenard, J.) ("[T]he SEC must show the defendants: (1) employed a device, scheme or artifice to defraud or made materially false statements; (2) in connection with the purchase or sale of securities; (3) using an instrumentality of interstate commerce; and (4) with scienter."); *S.E.C. v. Solow*, No. 06-81041-CIV, 2007 WL 917269, at *2 (S.D. Fla. Mar. 23, 2007) (Middlebrooks, J.) (same). To the extent that it is required, the Court finds that this element has been sufficiently alleged: The parties do not dispute that Bancorp's stock was publicly traded, and the earnings conference calls containing several of the alleged misstatements and omissions were allegedly interstate telephone calls. *See, e.g., S.E.C. v. Huff*, 758 F. Supp. 2d 1288, 1353 (S.D. Fla. 2010) (Rosenbaum, Mag.), *aff'd*, 455 Fed. Appx. 882 (11th Cir. 2012) (finding interstate commerce connection met where corporation at issue was publicly traded and evidence was presented that interstate telephone calls were used in furtherance of misrepresentations).

[4] The Defendants do not dispute that the SEC sufficiently alleges that the alleged misrepresentations and omissions were made "in connection with the purchase or sale of securities." To this end, the Court observes that "[i]n SEC enforcement actions, courts broadly construe the 'in connection with' language to effectuate the securities statutes' remedial purposes and to protect investors." *Huff*, 758 F. Supp. 2d at 1353. Thus, "if the material misrepresentation or omission occurred in the context of a public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Id.* The SEC has sufficiently alleged that the claimed misrepresentations and omissions were made in Bancorp's public filings, statements, and releases. As to materiality, *see infra* Part III.a.1.A.

A.  Material Misrepresentations or Omissions

"To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1318 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic Inc.*, 485 U.S. at 238.  In the Eleventh Circuit, the test for materiality in securities fraud actions is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *Merch. Capital*, 483 F.3d at 766 (citing *S.E.C. v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)); *see also U.S. Pension Trust Corp.*, 2010 WL 3894082, at *18 (same).   In other words, a misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Morgan Keegan & Co.*, 2012 WL 1520895, at *10 (citing *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004)).

Notably, in the Eleventh Circuit materiality is considered at least a mixed question of law and fact involving "assessments peculiarly within the province of the trier of fact."  *Mech. Capital*, 483 F.3d at 766.  As such, "[t]he trier of fact usually decides the issue of materiality." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).   Such a question "may rarely be resolved at the motion to dismiss stage. . . .   Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001) (Highsmith, J.); *see also Oxford Asset Mgmt.*, 297 F.3d at 1189 (applying same standard).

With these principles in mind, the Court turns to the misrepresentations and omissions alleged in the Complaint—as well as the relevant disclosures themselves—in order to determine whether the Complaint sufficiently alleges (1) that the statements were misrepresentations or omissions; and (2) that the statements, if misrepresentations or omissions, were material.

The Complaint alleges that the following constituted misrepresentations or omissions of material fact:

**1. Earnings call for Q1 2007**:  Levan's statement that non-BLB loans were "proceeding in the normal course" and that Bancorp was not seeing a difference in those loans from the previous decade is alleged to be an affirmative misrepresentation.

**2. Earnings Call for Q2 2007:**  Levan's statement that loans other than the BLB loans had been and were performing "extremely well," and that he was not concerned with any class of assets in the CR portfolio other than BLB loans is alleged to be an affirmative misrepresentation.

**3. Forms 10-Q for Q1 and Q2 2007:**  The Forms allegedly omitted in the MD&A the known trend of extensions granted and loans downgraded to non-passing status for a material number of loans, constituting an omission of a known trend having a material impact on income.  This also allegedly resulted in misleading statements as to (1) the fact that non-BLB loans were of "relatively lower risk" than BLB loans despite the fact that the majority of extensions granted were for non-BLB loans; and (2) the disclosure of only $4.6 million worth of "potential problem loans" despite the downgrade to non-passing status of many more loans.

*i.*     *Material Misrepresentations:  Earnings Calls*

As to the alleged misrepresentations in the earnings calls, the Defendants claim that the relevant disclosures show they did not "overemphasize[]" the problems with BLB loans.  They point out that Levan described the unique nature of the BLB loans and the options contracts related to those loans, putting them at a higher risk due to the borrower's reliance on the builders' exercise of the option.  *See* Q1 Earnings Call 4:6.  They also note that later in the earnings call for Q1 2007, Levan discussed the general deterioration of the real estate market as a whole, and described the "phenomenon that is going on today in Florida and nationally," namely that difficult market circumstances existed across the board and that there were "not a lot of home sales going on and not a lot of land portfolios that are being sold anymore to the national homebuilders.  Everybody is just looking for extensions, waiting for the market to get better." *Id.* at 27.  The Defendants argue that these disclosures, taken as a whole, reflect genuine concern with the entire CR portfolio.

As to this argument, it appears that the Defendants misapprehend the SEC's claims regarding Levan's statements.  Rather than claiming that Levan falsely overemphasized the

problems with BLB loans, the Complaint alleges that he affirmatively misrepresented the risk presented to the non-BLB loans.  The argument that the BLB loans were exposed to *greater* risk than the non-BLB loans does not address whether Levan's statements were false, as the SEC alleges.  The Complaint alleges that at the time of the earnings call for Q1 2007, Levan knew that the non-BLB loans were not, in fact, "proceeding in the normal course," since most of what he described as "a parade" of loans coming in for an extension in Q1 2007 were non-BLB loans which allegedly caused him to express undifferentiated concern about "a long sustained problem in this sector."  Compl. ¶¶ 46–47, 70.  The Complaint also alleges that at the time of the earnings call for Q2 2007, Levan knew that non-BLB loans were not performing "extremely well" and that Bancorp was not concerned with BLB loans as a class to the exclusion of others, because: (1) the MLC had allegedly granted extensions to $177.1 million worth of non-BLB loans, constituting 33% of the CR portfolio;  and (2) the MLC had allegedly downgraded to a non-passing status $106.4 million worth of non-BLB loans, constituting nearly 20% of the CR portfolio.  *Id.* at ¶ 84.  The Complaint alleges that Levan and others at Bancorp expressed undifferentiated concern with the entire CR portfolio at this point as well, describing it as "ticking time bombs" and "explosive piles of crap."  *Id.* at ¶ 83.  Taken as true, these allegations sufficiently assert that Levan's statements in these earnings calls were false when made.  The allegations support a reasonable inference that Levan falsely stated his belief, and that the factual justification for that statement was false.  Nothing in the disclosures referenced by the Defendants contradicts this alleged falsity.  The Court finds that the Complaint sufficiently alleges that Levan's statements in the earnings calls were misrepresentations.

As to the materiality of Levan's alleged misrepresentations, the Defendants reference Levan's comments describing the difficult market circumstances that existed at the time, the risk that the market might become worse, and the possibility that the general deterioration might affect the CR portfolio.  *See, e.g.,* Form 8-K Q1 2007 4, ECF No. 13-7 ("Florida's real estate market has slowed significantly, and we are facing the challenges associated with this slowdown."); *Id.* ("In view of market conditions, we anticipate we may experience further deterioration in the portfolio over the next several quarters."); Q1 Earnings Call 27 ("Everybody is just looking for extensions, waiting for the market to get better."); Q1 Form 10-Q 18 ("Conditions in the residential real estate market nationally and in Florida continued to deteriorate during the first quarter of 2007."); Q2 Earnings Call 31 ("[W]hat we just have in the

marketplace is the music stopped."). The Defendants argue that putting these disclosures together, a reasonable investor would have a clear and accurate picture of the risks presented to the non-BLB loans.

The Court is not convinced of this proposition. Upon review of the relevant disclosures, the Court notes that while the "total mix" of the information relevant to Levan's alleged misrepresentations might reflect that the Defendants had concerns about the general deterioration of the Florida real estate market, this "total mix" only serves to place in relief Levan's alleged statements expressly indicating that this general downturn was *not* significantly affecting the non-BLB loans. The Court cannot rule as a matter of law that a reasonable investor would obviously appreciate the risks presented to the entire CR portfolio in the face of repeated alleged statements to the contrary. The SEC alleges that the extensions granted before the earnings call for Q1 2007 (almost all of which were for non-BLB loans) represented over 25% of the CR portfolio's book value, and that by the earnings call for Q2 2007, the extensions to non-BLB loans *alone* represented 33% of the portfolio's value. In light of these allegations, the Court finds that the SEC has sufficiently alleged a substantial likelihood that alleged misrepresentations could have significantly influenced a reasonable investor's decision to invest in Bancorp. Therefore, the SEC has alleged that Levan's alleged misrepresentations in the earnings calls were sufficiently material for the purposes of the present Motion.

### ii. Material Misrepresentations: Forms 10-Q

As stated above, the Complaint generally alleges that the Defendants omitted the alleged "trend" of numerous extensions and downgrades of loans in the CR portfolio in Q1 and Q2 2007. The Defendants have not directed the Court to any statements in either of the Forms disclosing the number of extensions granted to loans in the CR portfolio, nor disclosing the number of loans downgraded by the MLC from passing to non-passing status. Therefore, the SEC has sufficiently alleged that the Defendants omitted the fact of the extensions and downgrades from the Forms 10-Q.

The gravamen of the Defendants' arguments in this regard is that these alleged omissions, even if omitted in fact, were not material. The Defendants point to numerous statements made by the Defendants and their officers over the relevant period, and argue that they disclosed all of the relevant risks associated with the loans in the CR portfolio, and that the alleged trend of

extensions and downgrades were only internal details that the Defendants took into account in arriving at its ultimate disclosures.  *See generally* Defs.' Reply 5–8, ECF No. 22.  Asserting that these disclosures effectively covered and practically disclosed the alleged internal trend of extensions and downgrades, the Defendants conclude that any omission of the details of their internal monitoring of the CR portfolio was not material.

As a preliminary analytical matter, the SEC has sufficiently alleged that the numerous alleged extensions and downgrades constituted a growing trend that continued throughout Q1 and Q2 2007.  According to the Complaint, by the earnings call for Q1 2007, the MLC had granted extensions on 11 loans constituting over 25% of the CR portfolio, 10 of which were non-BLB loans.  Compl. 16 ¶ 70.  By the filing of the Form 10-Q for Q1 2007, the MLC had also allegedly downgraded nearly 25% of the CR portfolio to a non-passing grade.  *Id.* at 18 ¶ 76.  Before the earnings call for Q2 2007, the MLC had allegedly granted extensions on 39.1% of the CR portfolio, including $177.1 million worth of non-BLB loans (33% of the CR portfolio).  *Id.* at 20 ¶ 84.  By the filing of the Form 10-Q for Q2 2007, the MLC had also allegedly downgraded to a non-passing status nearly 40% of the CR portfolio, almost half of which consisted of non-BLB loans.  *Id.* at 20 ¶ 87.  The Court finds that these detailed allegations of the extensions and downgrades over the relevant period sufficiently constitutes an alleged trend.

The Defendants do not dispute that the law requires the MD&A section of periodic filings such as Form 10-Q to contain "information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a).  This requirement includes a description of "any known *trends* . . . that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Id.* at § 229.303(a)(3)(ii) (emphasis added).  The Defendants argue that the SEC has not sufficiently alleged that the trend was (1) known to the Defendants; or (2) reasonably likely to have a material effect on Bancorp's financial condition.

With respect to whether or not the Defendants allegedly knew of the alleged trend, the Complaint alleges that the MLC—allegedly comprised of Levan, a member of the board of directors, and various managing officers—approved all modifications to major loans in the CR portfolio.  Levan allegedly controlled the MLC's decisions through his "hard no" vote.  Compl. ¶¶ 26–28.  The Complaint also alleges that the MLC determined the internal loan grades relevant

to the alleged downgrades.  *Id.* ¶ 30.  Given the allegation that all of the above extensions and downgrades required approval of this committee of officers and directors—on which Levan sat and which he allegedly controlled—the Court finds that the SEC has sufficiently alleged that the trend of extensions and downgrades was known to the Defendants.

As to whether or not the Complaint sufficiently alleges that this trend was reasonably likely to have a material effect on Bancorp's financial condition, the Eleventh Circuit has interpreted the SEC 's regulations as requiring "an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment. . . . Item 303(a)(3)(ii) essentially says to a registrant:  If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change . . . .  The obvious focus is on preventing the latest reported results from misleading potential investors."  *Oxford Asset Mgmt.*, 297 F.3d at 1191.  In this context, the SEC has done more than allege that the extensions and downgrades were likely to affect Bancorp's financial condition; the Complaint alleges that the trend *did* in fact affect its financial condition.  *See* Compl. ¶¶ 59–65 (alleging that loss in Q3 2007 was caused "almost entirely due to an increase in the bank's provision for loan losses associated with . . . loans in the [CR portfolio]," and alleging that Levan subsequently stated that the losses were caused by borrowers missing payments).  Accordingly, the Court cannot hold as a matter of law that the allegedly known trend of extensions and downgrades could not reasonably have an effect on Bancorp's financial condition such that the predictive value of its Forms 10-Q, which omitted the alleged trend, was diminished.

Nor can the Court hold as a matter of law that no reasonable investor's decision would have been significantly influenced by the inclusion of the omitted information.  The Defendants argue that the details of the extensions and downgrades were subsumed into the financial results which were disclosed.  However, the Defendants' argument that they disclosed results that somehow took into account the alleged trend is not tantamount to disclosure of the trend itself. The Court in *Oxford Asset Mgmt.* recognized this distinction in its interpretation of the SEC's disclosure requirements, finding that their essential purpose was to bring to light any patterns whose continuation might impact the predictive value of reported results.  *Oxford Asset Mgmt.*, 297 F.3d at 1191.

For example, the disclosures referenced by the Defendants either address general phenomena not specifically referencing the alleged trend of extensions and downgrades, or, as alleged in the Complaint, do not disclose the pattern.  The Defendants' statement in the earnings call for Q1 2007 that homebuilders "have either walked away from their deposits, have sued to get their deposits back, or are renegotiating contracts" addresses the activity of the builders rather than the actual borrowers of the loans, and further references the state of such arrangements in the context of the general state-wide real estate market.  Earnings Call Q1 2007 4.  The disclosures relating to the general exposure of Bancorp to the Florida real estate market omit the specific actions the Defendants took with respect to the loans that—more than being susceptible to extended maturities—actually did require extensions or receive downgrades to non-passing status.  *See, e.g.*, Form 8-K Q1 2007 4 ("[W]e expect that we *may* experience further deterioration in the portfolio during 2007." (emphasis added)); Form 8-K Q2 2007 4, ECF No. 13-10 ("[W]e *may* have additional downgrades and additional provisions relating to the portfolio *if* the housing market does not improve." (emphasis added)).   Similarly, the Defendants' statements regarding the slowing down of housing sales and the fact borrowers were "looking for more time" and "looking for extensions" did not disclose the number of extensions that had already been granted.  *See generally* Earnings Call Q1 2007.  Illustratively, the Defendants claim that their suggestion that non-BLB borrowers had relative "staying power" compared to BLB borrowers implies that the term of repayment for those borrowers was going to be extended.  *See* Defs.' Reply at 7.  Contrary to the Defendants' assertions, the Court does not find that the inevitability of extensions was the *only conclusion* a reasonable investor could draw from the statement that a segment of the CR portfolio had staying power.

In any event, under both the SEC's regulations and the materiality standard set forth by the applicable law, the Court cannot find as a matter of law that a reasonable investor would not have found a disclosure of the alleged extensions and downgrades of loans in the CR portfolio significant in making an investment decision.  Therefore, in summary, the SEC has sufficiently alleged that the Defendants made misrepresentations and omissions of material fact.

## B.  Bespeaks Caution Doctrine

Related to the materiality of the alleged misrepresentations and omissions, the Defendants argue that the statements are rendered immaterial as a matter of law under the

"bespeaks caution" doctrine.  The Eleventh Circuit adheres to the bespeaks caution doctrine "in assessing the materiality of *forward-looking* statements."  *Merch. Capital*, 483 F.3d at 767 (emphasis added).  When such forward-looking statements, or "projections," "are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the omissions or misrepresentations immaterial as a matter of law." *Id.* (citing *Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 399 (11th Cir. 1995)).

This doctrine, however, has notable limitations.  In particular, the bespeaks caution doctrine applies only to affirmative, *forward-looking* statements, as opposed to statements of known, historical, or existing fact.  *See, e.g.*, *Huddleston v. Herman & Maclean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983); *Dolphin and Bradbury Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("[c]autionary words about future risk cannot insulate from liability for failure to disclose that the risk had already transpired." (internal quotation omitted)); *Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1274 n.5 (S.D. Fla. 2000) (Lenard, J.) (quoting *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996)).

With this principle in mind, the Court finds that the Defendants' alleged misrepresentations and omissions are not based on forward-looking projections, but matters of allegedly known and existing fact.  The SEC alleges that Levan misrepresented that non-BLB loans *were* "*proceeding* in the normal course" and that those loans *had performed* and *were performing* "extremely well."  These statements clearly address existing occurrences, not future projections.  Similarly, in light of the SEC's allegation that builders involved with BLB loans *had already* walked out on their options contracts, the Form 10-Q's statement that such walk-outs "may" occur "purport[s] to be forward looking when in fact the risks were already present." *Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1179 (S.D. Fla. 2005) (Dimitrouleas J.).

Finally, the alleged omission of the fact that the MLC *had already* downgraded and extended numerous specific loans by specific dates does not allege a forward-looking projection. The Defendants recast the alleged omissions regarding loan grades as forward-looking by arguing that they are inherently composed of a series of considerations, some of which

contemplate future contingencies.  However, the SEC's Complaint alleges that the Forms 10-Q omitted the allegedly material known fact that the loans *had already been* downgraded and *had already been extended* at the time of the filing of the Forms 10-Q.  The SEC alleges that the fact of the extensions and downgrades *itself* was omitted, and that this allegedly *known fact* was material.  These alleged omissions plainly relate to allegedly existing facts, and as alleged, are not subject to the bespeaks caution doctrine.

### C.  Scienter

The Defendants argue that, as to the alleged disclosure fraud, the Complaint does not assert sufficient facts to allege the element of scienter as required to state a claim for a § 10(b) and Rule 10b-5 violation.  To sufficiently allege scienter, a plaintiff must allege "either an intent to deceive, manipulate or defraud, or severe recklessness."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (internal quotation omitted).  "Severe recklessness" is defined as "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Huff*, 758 F. Supp. 2d at 1348 (quoting *Mizzaro*, 544 F.3d at 1238).

The Defendants argue that the SEC does not plead any facts suggesting scienter, that at best the SEC merely alleges that the Defendants misjudged the relative risks to BLB and non-BLB loans, and that the overall weight of the Defendant's disclosures undermines any inference of scienter.  *See Ziemba*, 256 F.3d at 1211 ("[W]e believe that the disclosures actually made by [defendant] undermine any hint of fraud.").

In contrast, the SEC contends that the Defendants "entirely ignore the numerous and detailed factual allegations establishing that Levan (and therefore Bancorp) had actual knowledge of, or was at minimum extremely reckless in not knowing, information establishing that by the first two quarters of 2007, the credit quality of the bank's [CR portfolio] had already been negatively impacted."  In fact, the Complaint alleges that Levan, as Chairman and CEO of Bancorp, sat on and allegedly controlled the MLC that approved all loan extensions and downgrades.  Compl. ¶¶ 25–28.  The Complaint alleges that in this capacity, Levan was aware that by the time Bancorp filed its Form 10-Q for Q1 2007, the MLC had already granted

extensions on loans constituting over 25% of the CR portfolio (10 of 11 of which were non-BLB loans).  This subjective awareness is further alleged by Levan's alleged observation that they constituted a "parade of land loans" giving rise to "a long sustained problem."  *Id.* ¶¶ 44–47.  Nevertheless, in the earnings call for Q1 2007, Levan allegedly made the material misrepresentation as to the financial stability of the non-BLB loans, discussed above. *Id.* ¶¶ 67–68.  Similarly, the Defendants allegedly filed a Form 10-Q for Q1 2007 omitting the builder walk-outs, extensions, and downgrades, of which the SEC alleges they had subjective knowledge.  *Id.* ¶¶ 71–79.

The Complaint also alleges that by the time Bancorp filed its Form 10-Q for Q2 2007, Levan and Bancorp were aware that the MLC had extended loans representing over 39% of the CR portfolio (15 of 17 of which were non-BLB loans), and had downgraded nearly 40% of the portfolio.  *Id.* ¶ 87.  Nevertheless, in the earnings call for Q2 2007, Levan allegedly made the material misrepresentation regarding the performance of the non-BLB loans discussed above.  Finally, the Complaint alleges that the Defendants filed a Form 10-Q for Q2 2007 containing alleged material omissions similar to those alleged with respect to the Form 10-Q for Q1 2007.

In summary, the Complaint sufficiently alleges that the Defendants *knowingly* made allegedly material misrepresentations and omissions.  In light of the Complaint's sufficient allegations that the misrepresentations and omissions were material, such alleged knowing acts and omissions suggest intent to deceive, or, at a minimum, they infer an extreme departure from the standards of ordinary care amounting to severe recklessness for the purposes of a motion to dismiss.  While the Defendants' argue that their disclosures as a whole undermine this inference, the Court finds that the above-demonstrated disconnect between the general disclosures as *presented* and the specific misrepresentations and omissions as *alleged* does not support a finding of diminished scienter on the face of these allegations and disclosures.  *See supra* Part III.a.1.A.  Accordingly, the SEC has sufficiently alleged facts to support an inference of scienter for the purposes of the present Motion.

### D.  Conclusion:  Disclosure Fraud

In sum, the Court finds that the Complaint sufficiently alleges that Bancorp and Levan made misrepresentations and omissions of material fact, in connection with the purchase or sale of a security, with scienter.  Accordingly, the SEC has sufficiently stated a claim against the

Defendants for a violation of § 10(b) and Rule 10b-5 under Count I with regard to the alleged disclosure fraud for the purposes of a motion to dismiss.

### 2.  Count I:  The Alleged Accounting Fraud Theory

Regarding the SEC's allegations of accounting fraud, the Defendants argue:  (1) that the Complaint fails to allege the Defendants made any material misrepresentations or omissions of material fact, further arguing that the Complaint does not allege (i) the decision was ever made to sell the relevant loans (i.e., there was no misrepresentation) or (ii) the "indications of interest" received by JMP constituted "fair value" for the purposes of GAAP (i.e. that any misrepresentation was not material); and (2) that the Complaint fails to assert sufficient facts to allege scienter.

### A.  Material Misrepresentations or Omissions

SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  *See also Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1225 n.2 (S.D. Fla. 2007) (Dimitrouleas, J.) ("GAAP comprise a set of basic postulates and broad accounting principles pertaining to business enterprises.  These principles . . . establish guidelines for measuring, recording, and classifying the transactions of a business entity.").  The SEC also has the statutory authority for the promulgation of GAAP for public companies, which it has delegated to the Financial Accounting Standards Board ("FASB") and the American Institute of Certified Public Accountants ("AICPA").  These organizations issue various literature defining GAAP.  In particular, AICPA Statement of Position 01-6, which promulgates uniform accounting practices for lending and financing activities, states that "[o]nce a decision has been made to sell loans not previously classified as held for sale, such loans should be transferred into the held-for-sale classification and carried at the lower of cost or fair value." AICPA Statement of Position 01-6, Accounting by Certain Entities (Including Entities with Trade Receivables) that Lend to or Finance the Activities of Others 20,954–56  (2001), available at

http://www.fasb.org/cs/BlobServer?blobcol=urldata&blobtable=MungoBlobs&blobkey=id&blob where=1175820923895&blobheader=application%2Fpdf  (last  visited  May  25,  2012).   The

Statement of Position "applies to any entity that lends to or finances the activities of others." *Id.* at 20,951.

The Defendants do not dispute that they did not re-classify the loans as held for sale in the Form 10-K for 2007 or on Bancorp's books. Instead, they make two arguments related to "material misrepresentations." First, the Defendants contend that the Complaint does not sufficiently plead that retaining the loans on the books and Form 10-K as "held for investment" was a misrepresentation, arguing that the SEC does not allege sufficient facts showing that a decision had actually been made to sell the loans.

In fact, as noted above, the SEC's Complaint alleges that BankAtlantic "began efforts" to sell certain loans in Q4 2007. Compl. 21 ¶ 90. It alleges that it communicated these efforts to JMP and formed a relationship to "inquire about selling" the loans, and used the term "sale" to describe the engagement in early discussions. *Id.* at 22 ¶ 92. According to the Complaint, the contract that arose out of these early discussions discussed "opportunities to sell," set forth JMP's obligations in developing those opportunities, including "closing any sale that resulted from the process," and provided for a percentage-based commission on loans sold. *Id.* at 22 ¶ 93. The Complaint alleges that Levan internally discussed his desire to get the loans off of the bank's financial statements, referring to the JMP engagement again as "a sale of the loan portfolio." *Id.* at 22–23 ¶ 94. The Complaint also alleges that Levan "approved marketing materials that reflected the bank was trying to sell the loans." *Id.* at 24 ¶ 98. The Defendants allegedly told potential bidders that JMP had the exclusive rights to the "sales process" regarding the loans, and JMP allegedly prepared presentation materials—which Levan and others at Bancorp allegedly reviewed—describing a "potential sale," that Bancorp was "considering offering its interests," that it would "sell servicing to the buyer," and further providing a specific "targeted closing" of January 31, 2008. *Id.* at 26 ¶¶ 106–109. The Complaint also alleges that during the JMP engagement, BankAtlantic itself entered into "specific agreements to sell at least four loans," which did not close despite the bank's allegedly aggressive marketing. *Id.* at 28–29 ¶¶ 119–122. Finally, the Complaint alleges that the basis for these efforts to sell was an eagerness to get the loans off of the books, which continued into 2008, as evidenced by the Defendants' eventual transfer of several of the loans to a subsidiary with no assets. *Id.* at 27 ¶ 113.

Contrary to the Defendants' assertions, the Court cannot find that, taken as true, these allegations are insufficient as a matter of law to raise an inference that the Defendants had decided to sell the loans.  The Defendants' proffered allegations do not contradict this plausible inference.  While the JMP contract allegedly included a provision for a flat fee, it also allegedly included a commission structure related to any sale of the loans.  Moreover, the allegations containing conditional language such as "potential sale" and "considering offering" are met with allegations that the Defendants referred to the engagement as an unqualified "sale" or attempt to sell.  *See, e.g.,* Compl. at 22 ¶ 92; 22–23 ¶ 94; 24 ¶ 98.  The Complaint also alleges in unqualified terms that BankAtlantic entered into "specific agreements to sell at least four loans." *Id.* at 28 ¶ 119.  Additionally, the Complaint expressly alleges that the modification of the JMP contract, while referring to the engagement as a market test, was an attempt to avoid reclassification of the loans despite an alleged decision to sell, and provides factual allegations supporting that assertion, stating that the substantive provisions of the contract allegedly remained the same.  *Id.* at 24 ¶¶ 101–02.

In light of the above allegations, the fact that the SEC alleges that no sale was actually *consummated* is not dispositive as to whether the Complaint raises a plausible inference that the Defendants had *decided* to sell the loans.  GAAP expressly states that reclassification should occur when the decision to sell is made, not upon the closing of a sale.  Defendants contend that they had not *in fact* decided to sell the loans, a finding that may be supported by the record as it is developed.  Taken as true for the purposes of a motion to dismiss, however, the Court cannot rule as a matter of law that the Complaint insufficiently alleges that the Defendants had made such a decision.

The Defendants further argue that any misrepresentation or omission was not material, asserting that the Complaint fails to allege or show that any of the "indications of interest" received by JMP or BankAtlantic were reflective of the "fair value" to which the loans had to be written down pursuant to GAAP.  The Court disagrees.  In fact, the Complaint expressly alleges that the Defendants understated Bancorp's pre- and post-tax losses by 51% "[a]ssuming a fair value measured by the most favorable bids . . . ."  Compl. 29 ¶ 125.  The Court finds that this sufficiently alleges that the fair market value of the loans the Defendants allegedly decided to sell was, or should have been, the price of the most favorable alleged bids the Defendants allegedly received.  Against this allegation, the Defendants argue that these alleged bids were

"low-ball bids at a single point in time in a highly illiquid market," and that the difference between the book value of the loans and the value of the alleged bids shows that they could not accurately reflect "fair value."  Whether or not these loans *in fact* reflect fair value is certainly an issue of fact to be developed on the record, an issue exemplifying why the Eleventh Circuit considers the question of materiality to be a mixed question of law and fact, usually reserved for the factfinder.  *See Merch. Capital*, 483 F.3d at 766; *Oxford Asset Mgmt.*, 297 F.3d at 1189.  Having found that the SEC plainly alleges that the favorable alleged bids represented fair value, the Court cannot rule at this juncture as a matter of law that they did not.  Accordingly, the Court finds that the SEC has sufficiently alleged that the Defendants' failure to re-classify certain problem loans as "held for sale" and to write them down to the lower of cost or fair value in accordance with GAAP constituted a material misrepresentation on Bancorp's books and its Form 10-K for 2007.

### B.  Scienter

The Defendants also argue that, as to the alleged accounting fraud, the Complaint fails to assert sufficient facts to allege scienter.  As explained above, a pleading of scienter requires allegations sufficient to reasonably support "either an intent to deceive, manipulate or defraud, or severe recklessness."  *Id.* (internal quotation omitted).  The Defendants argue that the SEC cannot allege scienter for the alleged failure to reclassify and write down the relevant loans for a number of reasons.  First, the Defendants rely upon the Eleventh Circuit's decision in *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001).  In that case, the Court addressed a § 10(b) claim that an outside auditor's reports were materially misleading because the auditor had allegedly violated GAAP.  After alleging that the defendant "knowingly or recklessly" omitted certain GAAP-required information in the report, the plaintiffs pointed to a number of "red flags" that the auditor allegedly ignored, which the plaintiffs claimed demonstrated that the auditor should have known of its duty.

Determining that the allegations were insufficient to allege scienter, the *Ziemba* Court held that "allegations of violations of GAAS or GAAP, *standing alone*, do not satisfy the particularity requirement of Rule 9(b)."  *Id.* at 1208 (emphasis added).  The Court noted that the allegations begged several "tenuous" inferences:  For instance, the plaintiffs did not allege "any facts suggesting *actual awareness* by [the auditor] of any fraud."  *Id.* at 1209–10 (emphasis

added).  Holding that to sufficiently plead fraud, the plaintiffs must "allege more than mere violations of auditing standards," the Court found that at most, the allegations of the plaintiffs in that case "raise[d] an inference of gross negligence, but not fraud." *Id.* at 1209–10.

The Defendants argue that *Ziemba*'s holding requires dismissal of the present Complaint. The circumstances and allegations in *Ziemba*, however, are distinguishable from the present matter.  There, the plaintiffs alleged the existence of "red flags" that should have been observed by the auditor for the purpose of showing that the auditor *should have been aware of* or *ignored* its duty.  While generally describing the attempted showing of scienter as "fraud," the Court expressly found that the allegations were "too tenuous to amount to one of those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care."  *Id.* at 1210.  Thus, the Court rejected the plaintiffs' theory based upon the "severe recklessness" standard.

The allegations of the present Complaint, however, go beyond mere negligence or severe recklessness.  The Complaint alleges that the Defendants made a decision to sell certain loans in the CR portfolio.  *See supra* Part III.a.2.A.   It alleges that they were made subjectively aware, both by Toalson (Bancorp's CFO) and by an external auditor, of the requirements of GAAP, and that those requirements would apply "if the bank was considering selling [the loans]."  Compl. 23 ¶¶ 95–99.  It alleges that despite this subjective knowledge and the alleged decision to sell the loans, the Defendants failed to reclassify or write down the loans.  *Id.* at 29 ¶ 123.  Moreover, it alleges that this knowledge and inaction was paired with:  (1) the modification of the language of the JMP contract in an *attempt* to avoid the reclassification and write-down of the loans, *Id.* at 24 ¶ 101; and (2) alleged misrepresentations by Levan that the Defendants did not intend to sell the loans, *Id.* at 25 ¶¶ 104–05.  The allegation that the modification of the JMP contract and the statements by Levan to the outside auditor were actually intended to circumvent GAAP is supported by additional allegations that despite the modified language and Levan's statements, the Defendants continued to actively market the loans for sale, including allegedly entering into specific agreements to sell loans.  *Id.* at 28–29 ¶ 116–122.  Viewed as a whole, these allegations go beyond severe recklessness and touch upon intent to deceive.  Thus, the Defendants' argument that the Complaint fails to allege "red flags" sufficient to show scienter ignores both the purpose of such red flags in *Ziemba* and the theory of liability alleged in the Complaint.

Beyond reckless ignorance of GAAP, the SEC alleges that the Defendants actively sought to circumvent GAAP.  The SEC's allegations, taken as true, support a plausible inference that the Defendants acted with intent to circumvent GAAP, which they allegedly knew of and knew applied to their sufficiently-alleged decision to sell the loans.  The Court finds that these allegations are sufficient to raise an inference of scienter.

The Defendants argue that the allegations, in fact, suggest the "opposite of scienter," stating that the alleged "market testing" characterization was "thoroughly vetted" by Toalson and the external auditor.  However, in light of the Courts finding above that the Complaint sufficiently alleges a decision to sell the loans, the allegation that Toalson raised the issue of GAAP requirements to Levan and others also supports an inference that the Defendants were subjectively aware that GAAP required reclassification and write-down upon a decision to sell, which the Complaint sufficiently alleges.  Moreover, the discussions with the external auditor are alleged to have been colored by Levan's affirmative representations—both stated and in a management representation letter—that the Defendants did not intend to sell the loans, a premise which the SEC alleges to be false.  Therefore, these purported disclosures and vetting processes do not diminish the inference of scienter raised by the Complaint's allegations.

### C.  Conclusion:  Accounting Fraud

The Court finds that the SEC's allegations sufficiently raise a plausible inference that Bancorp and Levan made misrepresentations and omissions of material fact by the alleged failure to reclassify and write down certain loans in the CR Portfolio, in connection with the purchase or sale of a security, and with scienter.  Accordingly, the SEC has sufficiently stated a claim against the Defendants for a violation of § 10(b) and Rule 10b-5 under Count I with regard to the alleged accounting fraud for the purposes of the present Motion.  In conclusion, the Court finds that the Defendants' arguments for dismissal of Count I of the SEC's Complaint fail for the reasons stated above.

### 3.  Count II:  Aiding and Abetting Count I

In Count II, the SEC claims that Levan aided and abetted the alleged violations set forth in Count I.  Liability for aiding and abetting a securities violation occurs "if some other party has committed a securities law violation, if the accused party has general awareness that his role was

part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1045 (11th Cir. 1986); *see also S.E.C. v. BIH Corp.*, No. 2:10-CV 577-FTM-29, 2011 WL 3862530, at *6 (M.D. Fla. Aug. 31, 2011) ("To state a claim for aider and abettor liability, the SEC must allege that (1) a principal committed a primary violation; (2) the aider and abettor provided 'substantial assistance' to the violator; and (3) the aider and abettor acted with scienter.")

The Defendants argue that the SEC has not sufficiently alleged Levan's liability under Count II.  They contend that the Complaint fails to plead a primary violation in Count I, and that even if it does state a claim under Count I, the allegations fail to support the requisite level of knowledge or substantial assistance under Count II.  As set forth in Parts III.a.1 and III.a.2 above, the Court finds that the SEC has sufficiently stated a claim for a primary violation of § 10(b) and Rule 10b-5 under Count I.  The claim of a primary violation includes allegations that Levan, as CEO and Chairman of Bancorp, allegedly made misrepresentations in earnings calls, allegedly signed the public filings at issue in Count I, and allegedly made misrepresentations regarding the Defendants' intent to sell or hold for investment certain loans in the CR portfolio. The Court also finds that the SEC sufficiently alleges that Levan acted with sufficient scienter. Taken as true, these allegations alternatively allege with sufficient factual detail that Levan had a general awareness that he was part of an improper and illegal practice, and that he knowingly or recklessly provided substantial assistance in those alleged violations.  Accordingly, the Court finds that the SEC has alternatively sufficiently stated a claim against Levan under Count II for aiding and abetting the alleged violations in Count I.  These allegations are sufficient to withstand the present Motion to Dismiss.

*b.  Counts III, VI, and VII:  Recordkeeping and Internal Control Violations*

In Counts III, VI, and VII of the Complaint, the SEC claims that the Defendants violated various statutory provisions and rules regarding recordkeeping and internal controls in connection with the alleged fraud under Count I.

1.  Count III against Levan:  Section 13(b)5 and Rules 13a-14, 13b2-1, and 13b2-2 Violations

Count III alleges that Levan:  (1) Failed to implement a system of internal accounting controls or falsified records in violation of § 13(b)(5) of the Exchange Act, and Rule 13b2-1

thereunder; (2) made misrepresentations as an officer or director to an accountant in connection with the preparation of an audit in violation of Exchange Rule 13b2-2; and (3) falsely certified in 10-K and 10-Q Forms for 2007 that the reports were complete and did not contain any untrue statement of material fact or omission of material fact necessary to make the statements not misleading given the circumstances in violation of Exchange Rule 13a-14.

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account [§ 13(b)(2)]." 15 U.S.C. § 78m.  Rule 13b2-1 similarly states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to [§ 13(b)(2)]."  17 C.F.R. § 240.13b2-1.  As set forth above, the SEC sufficiently alleges that Levan, as CEO and Chairman of Bancorp, decided to sell certain loans in the CR portfolio, and that he subjectively knew that such a decision required the reclassification and write-down of those loans on Bancorp's records.  The Complaint also alleges that despite this knowledge and alleged decision to sell the loans, Levan, as CEO and Chairman of Bancorp, failed to reclassify the loans or mark them down.  Compl. 23 ¶¶ 95–99, 29 ¶ 123.  The Court finds that the SEC has sufficiently alleged that the failure to reclassify and write down the loans was a material misrepresentation.  *See supra* Part III.a.2.A.  Contrary to the Defendants' arguments that Levan cannot be said to have acted knowingly, the Court has already found that the SEC's allegations relating to the alleged accounting fraud are sufficient to raise an inference of scienter.  *See supra* Part III.a.2.B.  Accordingly, the Court finds that the SEC has sufficiently alleged that Levan knowingly falsified records and caused them to be falsified in violation of § 13(b)(5) and Rule 13b2-1 thereunder.

Rule 13b2-2 provides, in pertinent part, that an officer or director of an issuer may not make or cause to be made any materially misleading statements, or omit material information, to an accountant in connection with a required audit.  17 C.F.R. § 240.13b2-2.  In addition to the allegation that the failure to reclassify or write down certain loans despite an intent to sell them was a material misrepresentation, the Complaint alleges that Levan affirmatively represented to an external auditor that the Defendants had not decided to sell the loans, including a similar alleged misrepresentation in a signed management representation letter.  Compl. 25 ¶¶ 104–05.  Again, the SEC has sufficiently alleged facts raising an inference that these actions, including Levan's alleged misrepresentations to the auditor, were taken with the requisite scienter.  Thus,

the Court finds that the SEC has sufficiently alleged that Levan knowingly made materially misleading statements to an accountant in connection with a required audit in violation of Rule 13b2-2.

Rule 13a–14 requires an issuer's principal executive to certify to the best of his or her knowledge that there are no untrue statements of material fact or omissions of material fact in quarterly and annual reports filed under Section 13(a) of the Exchange Act.  17 C.F.R. § 240.13a-14.  As the Court found above, the Complaint sufficiently alleges that the defendants made omissions of material fact in Bancorp's Forms 10-Q for Q1 and Q2 2007.  Moreover, the Court finds that the SEC has also alleged facts raising an inference that these alleged omissions were made with the requisite scienter.  *See supra* Parts III.a.1.A.; III.a.1.C.  The Complaint alleges that Levan, as CEO and Chairman of Bancorp, made the certifications required by Rule 13a-14 on the Forms 10-Q.  Accordingly, the SEC has sufficiently alleged that Levan falsely certified in the Forms 10-Q that, to the best of his knowledge, the reports did not contain any omission of material fact.[5]

Having found the Complaints allegations sufficient to state a plausible claim under the various statutory and regulatory provisions claimed in Count III, the Court finds that the allegations in Count III are sufficient to withstand the present Motion.

### 2.   Count VI against Bancorp:  Section 13(b)(2)(A) and 13(b)(2)(B) Violations

Count VI alleges that Bancorp failed to make and keep accurate records fairly reflecting the disposition of its assets, and failed to maintain a system of internal accounting controls

---

[5] The Defendants suggest that Rule 13a-14 cannot support a cause of action, relying on *S.E.C. v. Black*, No. 04-cv-7377, 2008 WL 4394891, at *16–17  (N.D. Ill. Sept. 24, 2008).  Beyond this decision, the Defendants cite no law and make no argument supporting their position.  The Court simply notes that various federal courts have permitted SEC claims brought under Rule 13a-14. *See, e.g., S.E.C. v. Rivers*, 272 F.R.D. 607, 610 (M.D. Fla. 2011) (enjoining defendant pursuant to claim under Rule 13a-14);  *S.E.C. v. Das*, No. 8:10CV102, 2010 WL 4615336, at *10 (D. Neb. Nov. 4, 2010) (finding that "the SEC may proceed under Rule 13a–14 because of the language in 15 U.S.C. § 78u(d)(1) which enables the SEC to bring an action in federal district court 'to enjoin' any 'acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder.'");  *S.E.C. v. Brown*, 740 F. Supp. 2d 148, 164–65 (discussing Rule 13a-14 and disagreeing with *Brown*).

sufficiently reasonable to assure that its records and financial statements conformed to GAAP, in violation of §§ 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

Section 13(b)(2) states, in pertinent part, as follows:

> **(2)** Every issuer which has a class of securities registered pursuant to [§ 78L] and every issuer which is required to file reports pursuant to [§ 78O] shall--
>
> > **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> >
> > **(B)** devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
> >
> > > **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with [GAAP] . . . and (II) to maintain accountability for assets;

15 U.S.C. § 78M.

Section 13(b)(2)(A) has been held to have "three basic objectives:  (1) books and records should reflect transactions in conformity with accepted methods of reporting economic events, (2) misrepresentation, concealment, falsification, circumvention, and other deliberate acts resulting in inaccurate financial books and records are unlawful, and (3) transactions should be properly reflected on books and records in such a manner as to permit the preparation of financial statements in conformity with GAAP and other criteria applicable to such statements." *S.E.C. v. Dauplaise*, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *8 (M.D. Fla. Feb. 22, 2006).  In *Dauplaise*, the court found that a violation of § 13(b)(2)(A) was insufficiently alleged to support a claim where the SEC did not allege how the defendant's material misrepresentations and omissions affected any books or records.  *Id.*  Here, by contrast, the Complaint sufficiently alleges that Bancorp's records did not accurately reflect the disposition of its assets, supported by the sufficient allegations that the failure to reclassify and write down certain loans *on Bancorp's records* pursuant to GAAP was a material misrepresentation.  These allegations pertain directly to Bancorp's records.  Therefore, the Court finds that the SEC has sufficiently alleged a violation of § 13(b)(2)(A), for the purposes of the present Motion.

"Section 13(b)(2)(B) addresses, in part, the internal accounting controls element of a company's control system, which is a system specifically designed to provide reasonable, cost-effective safeguards against the unauthorized use or disposition of company assets." *Dauplaise,*

2006 WL 449175, at *9. "Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity." *McConville v. S.E.C.*, 465 F.3d 780, 790 (7th Cir. 2006) (citing *In re Albert Glenn Yesner, CPA,* Initial Decision, Exchange Act Release No. 184, 2001 WL 587989 at *33 (May 22, 2001)).

The Court's review of the allegations in the Complaint regarding Bancorp's alleged failure to maintain a system of internal accounting controls simply re-states the statutory language without supporting factual allegations. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (finding "a formulaic recitation of the elements of a cause of action" insufficient to survive motion to dismiss). The Court cannot find within the Complaint sufficient allegations relating to the types of internal accounting controls contemplated by § 13(b)(2)(B). A complaint will not suffice if it tenders "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557 (2007)). Accordingly, the Court finds that the allegations in Count VI fail to state a claim upon which relief can be granted with regard to the alleged violation of § 13(b)(2)(B). Dismissal without prejudice of the SEC's claims in Count VI as they relate to § 13(b)(2)(B) is therefore appropriate.

### 3.  Count VII against Levan:  Aiding and Abetting Count VI

In Count VII against Levan, the SEC alleges that Levan aided and abetted Bancorp's §§ 13(b)(2)(A) and 13(b)(2)(B) violations set forth in Count VI by knowingly or recklessly providing substantial assistance. As set forth above, a claim for aiding and abetting a securities violation requires that (1) another party is a primary violator; (2) the accused party had a general awareness that his role was part of an overall activity that is improper; and (3) the accused knowingly and substantially assisted the violation. *Rudolph*, 800 F.2d at 1045 (11th Cir. 1986); *see also BIH Corp.*, 2011 WL 3862530, at *6.

With regard to the alleged § 13(b)(2)(B) violations in Count VI, the Court has found that Count VI fails to state a primary violation as to Bancorp. Thus, aider and abettor liability cannot be sufficiently pled as to Levan for an alleged § 13(b)(2)(B) violation. Dismissal without prejudice of the aiding and abetting claim in Count VII as it relates to an alleged § 13(b)(2)(B) violation is therefore appropriate.

As to the § 13(b)(2)(A) claim in Count VI, the SEC alleges that Levan aided and abetted Bancorp's alleged failure to make and keep accurate records fairly reflecting the disposition of its

assets.  The Complaint sufficiently alleges that Bancorp's failure to reclassify and write down certain loans on Bancorp's records pursuant to GAAP was a material misrepresentation.  *See supra* Part III.a.2.A.  Moreover, the Complaint alleges that Levan was subjectively aware of this material misrepresentation, and knowingly provided substantial assistance in the attempt to avoid reclassification and write down of those loans.  *See supra* Part III.a.2.B.  Thus, the Complaint has sufficiently stated a claim against Levan in Count VII for aiding and abetting Bancorp's alleged § 13(b)(2)(A) violations in Count VI for the purposes of the present Motion to Dismiss.

> ### c.  *Counts IV and V:  Reporting Violations*

Counts IV and V of the Complaint allege reporting violations by both Defendants.

> #### 1.  <u>Count IV against Bancorp:  Section 13(a) and Rules 13a-1, 13a-13, and 12b-20 Violations</u>

In Count IV against Bancorp, the SEC alleges that Bancorp knowingly or recklessly filed inaccurate, false, and materially misleading 10-K and 10-Q reports regarding its assets, liabilities, and related party transactions, and omitted material information necessary to make those reports not misleading in light of the circumstances, in violation of § 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder.

Section 13(a) requires issuers to file with the SEC periodic reports that comply "with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security."  15 U.S.C. § 78m(a). Rule 12b–20 provides that "[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b–20. Rule 13a–1 states that "[e]very issuer having securities registered pursuant to section 12 of the Act (15 U.S.C. 78*l*) shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form." 17 C.F.R. § 240.13a–1. Rule 13a–13 deals with the requirements for filing quarterly reports with the SEC. *See* 17 C.F.R. § 240.13a–13.

In response to the SEC's allegations, the Defendants state that a claim under § 13(a) and the rules promulgated thereunder requires proof of a material misrepresentation or a materially misleading omission.  *See, e.g.*, *S.E.C. v. Coffman*, No. 06-CV-00088 REBBNB, 2007 WL 2412808, at *12 (D. Colo. Aug. 21, 2007).  As the Court found above with respect to the alleged disclosure fraud claimed in Count I, the Complaint sufficiently alleges that Bancorp made omissions of material fact in its Forms 10-Q for Q1 and Q2 2007, and its Form 10-K for 2007.  *See supra* Part III.a.1.A, III.a.2.A.  Accordingly, the Court finds that the SEC has pled sufficient facts for its claims in Count IV to withstand a motion to dismiss.

### 2.   Count V against Levan:  Aiding and Abetting Count IV

In Count V against Levan, the SEC alleges that Levan aided and abetted Bancorp's violations set forth in Count IV by knowingly or recklessly providing substantial assistance in Bancorp's alleged knowing or reckless filing of inaccurate, false, and materially misleading 10-K and 10-Q reports.

Applying the standards for aiding and abetting a securities violation set forth above, the Court finds that the SEC has sufficiently alleged that Levan, as Chairman and CEO of Bancorp, knowingly certified and provided substantial assistance in connection with the filing of the Defendants' Forms 10-Q that allegedly contained material misrepresentations or omissions of material fact.  *See supra* Parts III.a.1.A, III.a.1.C.  Moreover, the Court also finds that the SEC has sufficiently alleged that Levan knowingly provided substantial assistance in the Defendants' alleged failure to reclassify and write down certain problem loans in the CR portfolio in accordance with GAAP, which allegedly constituted a material misrepresentation reflected in Bancorp's Form 10-K for 2007 (which Levan allegedly certified).  *See supra* Parts III.a.2.A, III.a.2.B.  Accordingly, the SEC has alleged sufficient facts to withstand a motion to dismiss as to the aiding and abetting claims in Count V.

### IV. <u>CONCLUSION</u>

In summary, based on the foregoing, it is **ORDERED and ADJUDGED** that the Defendants' Motion to Dismiss the Complaint (ECF No. 13) is **GRANTED IN PART and DENIED IN PART** as follows:

1. The Motion to Dismiss is **DENIED** as to Counts I, II, III, IV, and V.

2. The Motion to Dismiss Count is **GRANTED IN PART and DENIED IN PART** as to Counts VI and VII, alleging violations of §§ 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. The Plaintiff's claims regarding § 13(b)(2)(B) are **DISMISSED without prejudice**.

3. The Plaintiff may file an amended complaint re-alleging any claims dismissed herein **within fourteen (14) days** of this Order.

4. The Defendants shall file an Answer to any claims not dismissed herein, or to any amended complaint, within **twenty-eight (28) days** of this Order.

**DONE and ORDERED** in chambers, at Miami, Florida, on May 29, 2012.

_____

**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**

*Copies to:*
Designated U.S. Magistrate Judge
Counsel of record