## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:12-cv-60082-RNS

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

BANKATLANTIC BANCORP, INC. and ALAN
B. LEVAN,

      Defendants.

_____/

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION IN LIMINE TO EXCLUDE THE OPINIONS AND TESTIMONY OF THE SEC'S EXPERT LYNN E. TURNER

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns
Gordon M. Mead, Jr.
Cecilia Duran Simmons
Matthew C. Dates
Andrea N. Nathan
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:   (305) 789-3395

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

1. Turner's opinion was not achieved by application of the required "intellectual rigor" and must be stricken in its entirety. ........................................................... 1

2. Opinions about law or regulation are not appropriately provided to the jury through expert testimony. ....................................................................................... 4

3. Turner's opinion regarding the held for sale claim must be excluded. .............. 6

   a. The elements of the claim the SEC must prove ........................................... 6

   b. Turner cannot be allowed to testify about what BBX or Alan Levan "intended" in the fourth quarter of 2007 with respect to the sale of certain assets as such an opinion requires nothing short of impermissible mind reading. ................................................................................................................. 6

   c. Turner cannot be allowed to testify about the value of loans in the fourth quarter of 2007, based on verbal proposals later made in the first quarter of 2008 that no one took seriously. ............................................................................. 8

4. Turner's opinion on the disclosure claim must be excluded. ............................ 11

   a. Turner's opinion that BBX should have disclosed changes in internal loan grades and additions to watch list must be excluded. ......................................... 11

   b. Turner's opinion that changes in internal loan grades constituted a trend requiring disclosure must be excluded. .............................................................. 12

   c. Turner's opinion that BBX was required to disclose the number and amount of loan extensions in the first and second quarters of 2007 must be excluded. ............................................................................................................. 14

   d. Turner's opinion that BBX's disclosures were misleading because the non-BLB loans were just as risky as the BLB loans must be excluded. .............. 16

   e. Any effort to extend Turner's opinion to a new and unpleaded claim of a failure to disclose "crumbling creditworthiness" must be excluded. ................... 18

   f. Turner's opinion that an issuer that makes full disclosure in an earnings conference call can be liable for intentionally concealing the same information in a Form 10-Q must be excluded. .................................................... 18

CONCLUSION ............................................................................................................... 19

CERTIFICATE OF SERVICE ....................................................................................... 21

SERVICE LIST .............................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006),
  *aff'd, In re Adecco S.A. Sec. Litig.*, 256 Fed. Appx. 74 (Feb. 20, 2007) ............................ 14, 19

*Bailey v. Allgas, Inc.*,
  148 F.Supp.2d 1222 (N.D. Ala. 2000),
  *aff'd*, 284 F.3d 1237 (11th Cir. 2002) ...................................................................................... 2

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ......................................................................................................... 5, 14, 18

*Benkwith v. Matrixx Initiatives, Inc.*,
  467 F.Supp.2d 1316 (M.D. Ala. 2006) ........................................................................................ 2

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) .......................................................................................................... 2

*Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092,
  (11th Cir. 2005) ............................................................................................................................ 1

*Craggs Construction Company v. Federal Insurance Company*,
  2007 WL 1452927 (M.D. Fla. May 15, 2007) ............................................................................ 4

*Dubiel v. Columbia Hosp. Ltd.*,
  2005 WL 5955691 (S.D. Fla. Jan. 11, 2005) .............................................................................. 5

*Eberli v. Cirrus Design Corp.*,
  615 F.Supp.2d 1357 (S.D. Fla. 2009) ......................................................................................... 3

*Guinn v. AstraZeneca Pharmaceuticals*,
  602 F.3d 1245 (11th Cir. 2010) ................................................................................................. 11

*Hubbard v. BankAtlantic Bancorp*,
  688 F.3d 713 (11th Cir. 2012) ................................................................................................... 16

*In re Amdocs Limited Sec. Litig.*,
  390 F.3d 542 (8th Cir. 2004) ..................................................................................................... 18

*In re Denture Cream Products Liab. Litigation*,
  795 F.Supp.2d 1345 (S.D. Fla. 2011) ......................................................................................... 3

*In re Rezulin Prods. Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................................................................................... 6

*In re Xerox Corp. Sec. Litig.*,
  __ F. Supp. 2d __, 2013 WL 1297937 (D. Conn. Mar. 29, 2013) ............................................ 18

*Iron Workers Local 16 Pension Fund v. HILB Rogal & Hobbs Co.*,
    432 F. Supp. 2d 571 (E.D. Va. 2006)..................................................................14, 19

*Kumho Tire Co. v. Carmichel*,
    526 U.S. 137 (1999)..................................................................................................2

*Montgomery v. Aetna Casualty & Surety Company*,
    898 F. Supp. 2d 1537 (11th Cir. 1990)...................................................................4, 5

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) (Alito, J.) ...............................................................14, 19

*Patterson v. Stathas*,
    2007 WL 7647004 (S.D. Fla. July 20, 2007) ...........................................................5

*Perry v. United States*,
    755 F.2d 888 (11th Cir. 1985) .................................................................................2

*SEC v. Big Apple Consulting USA, Inc.*,
    2011 WL 3753581 (M.D. Fla. Aug. 25, 2011) .........................................................5

*Southern Grouts & Mortars, Inc. v. 3M Co.*,
    575 F.3d 1235 (11th Cir. 2009) .............................................................................10

*Tindall v. H&S Homes, LLC*,
    2012 WL 3241885 (M.D. Ga. Aug. 7, 2012) ...........................................................6

*United States v. Masferrer*,
    367 F.Supp.2d 1365 (S.D. Fla. 2005) .....................................................................3

*Viterbo v. Dow Chemical Co.*,
    826 F.2d 420 (5th Cir. 1987) ...................................................................................2

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003).................................................................14, 19

**Rules**

17 C.F.R. § 229.303 ...............................................................................................4, 14

Fed. R. Civ. P. 26(a)(2)(B) .........................................................................................19

Defendants BBX Capital Corporation ("BBX"), successor to BankAtlantic Bancorp, Inc., and Alan B. Levan respectfully submit the following memorandum in support of Defendants' Motion in Limine to Exclude the Opinions and Testimony of the SEC Expert Witness Lynn E. Turner:

## INTRODUCTION

The proponent of expert testimony must show by a preponderance of evidence that "the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).[1]  The SEC cannot meet that burden.

1.     **Turner's opinion was not achieved by application of the required "intellectual rigor" and must be stricken in its entirety.**

In August 2012, without any preparation or analysis, Lynn Turner agreed to testify in support of the SEC's claims in this case.  Ex. A at 6.  By March 1, 2013, eight months later, he had invested a total of three hours in the matter.  Ex. B.  With only three hours of work behind him, he was committed to complex opinions that were to be documented in a report prepared by others filed twenty-five days later.

On March 25, 2013, the Turner Report was provided to defense counsel.  In the twenty-five days between March 1, 2013, and the publication of his Report, Turner invested thirty-five hours on the project.  Ex. B.  Turner's bills do not reflect that he personally billed *any* time to the drafting or preparation of his Rebuttal Report.  Ex. B.

In fact, Turner during his deposition ultimately admitted that what is called the Turner Report was written by two staff persons, neither of whom had any banking or public company disclosure experience.  Ex. A at 7-9.

---

[1]    References to "D.E. __" are references to documents filed and entered on the docket. References to "Ex. __" are references to exhibits attached to this memorandum.  References to "Mead S.J. Decl. Ex. __" are references to the exhibits attached to the previously filed Declaration of Gordon M. Mead, Jr. Submitted in Support of BBX Capital Corporation's and Alan B. Levan's Motions for Summary Judgment dated May 22, 2013. References to "Mead SJ Reply Decl. Ex. __" are references to the exhibits attached to the previously filed Declaration of Gordon M. Mead, Jr. Submitted in Support of Defendants' Replies to Plaintiff's Responses to Defendants' Motions for Summary Judgment dated July 2, 2013.

The role of an expert is not to marshal opinions and then form facts as happened here.  It is to marshal facts and then form opinions.[2]  That Turner first reached the conclusions his employers wanted and then asked others to gather facts to support them is inescapably established by the simple fact that the time he allotted to the effort allowed nothing else.

With the expert witness deadline running out in a complex claim of securities fraud that had been in process for years, the SEC approached the deadline for expert reports with a witness who had signed on to conclusions without a whit of preparation.  Either the SEC had other witnesses who had actually worked the case but reached conclusions the agency did not like, or this unprepared testimony was all it ever had.  Whichever, there can be no genuine issue of material fact that the volume of work necessary to marshal the facts necessary to form an honest opinion in this case regarding the various matters touched upon by Turner's testimony is staggeringly greater than that which he devoted to the task.  The standards of Turner's profession would preclude conclusions under such circumstances.

In *Kumho Tire Co. v. Carmichel*, 526 U.S. 137, 152 (1999), the Supreme Court emphasized that, in considering challenges to opinion testimony, the trial court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Indeed, that is the central purpose of the *Daubert* inquiry.  *See Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1237 (N.D. Ala. 2000), *aff'd*, 284 F.3d 1237 (11th Cir. 2002).  A cursory review lacking independent research or relying on the opinions of counsel fails to meet this standard of professional rigor.  *See id.* at 1238.  For example, doctors serving as expert witnesses who fail to perform reasonable tests or to perform differential diagnoses in the manner they would perform them in a treatment setting do not meet

---

[2] *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) (affirming district court's rejection of expert opinion where expert "had reached a conclusion as to the connection between encephalitis and the vaccine before commencing his research"); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 & n.5 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method"); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 n.2 (5th Cir. 1987) (agreeing with the district court "that an expert who forms an opinion before he begins his research is biased," "lacking in objectivity," and "this could be an additional ground indicating a lack of reliability with his opinion"); *Benkwith v. Matrixx Initiatives, Inc.*, 467 F.Supp.2d 1316, 1325 (M.D. Ala. 2006) (holding that experiment was unreliable and unhelpful because it was performed after the expert had formed his opinion and was "undertaken more to bolster a conclusion than to test a hypothesis.")

this standard, and this Court has excluded such testimony.  *See In re Denture Cream Products Liab. Litig.*, 795 F.Supp.2d 1345, 1366-67 (S.D. Fla. 2011). This Court has similarly excluded the testimony of an expert in airplane engines when that expert failed to test or compare engines before reaching his conclusion.  *Eberli v. Cirrus Design Corp.*, 615 F.Supp.2d 1357, 1366 (S.D. Fla. 2009).  Furthermore, this Court has excluded expert testimony that offers nothing more than what lawyers for the parties can express in closing argument.  *United States v. Masferrer*, 367 F.Supp.2d 1365, 1376 (S.D. Fla. 2005).

To establish the standard of Turner's profession — he is an accountant — one need look no further than the argument the SEC makes about the level of information given by BBX to its external auditors, PricewaterhouseCoopers LLP ("PwC"), who participated in making the accounting decisions about which the SEC complains.  For example, the SEC argues that BBX cannot have relied on the advice of its accountants at PwC with respect to the held for sale issue because PwC was not given every piece of paper that addressed in some fashion the market test conducted by BankAtlantic in the fourth quarter of 2007.[3]  And it argues that PwC's participation in identifying "trends" cannot have been adequate because, even though PwC had access to loan watch lists, loan grades, and impairment analyses, it was not enough.

Using the standard the SEC applies to PwC, Turner's testimony must be excluded because he reviewed virtually nothing before reaching his conclusions.

The absence of the required rigor to have reached honest conclusions about BBX's disclosure decisions in the first and second quarters of 2007 is simply indisputable.  At the time, BBX possessed then current knowledge of its business, its borrowers, its loans, and the market risks that it faced.  BBX had billions in loans supported by staggering volumes of information. It had been working for months as the real estate market trended from positive to uncertain to understand the risks this uncertainty caused to its loans.  BBX was tasked with sifting through huge volumes of information, weighing any negative trends or uncertainties, and making judgment decisions about materiality and risks.

Having taken no time to provide meaningful opinions about anything, Turner provides an unstudied conclusion that, even with the benefit of hindsight, is indisputably wrong, the oddest

---

[3] PwC concluded that the detail it was given was sufficient to make the accounting decisions it made, and after the SEC filed this action, revisited the issue and continued to assert the propriety of that decision. Mead SJ Decl. Ex. 62 at PWC-BA 0004.

kind of "Monday morning quarterbacking."  The Company's risk was the Florida real estate market just as the market had been warned.  The loans most exposed to that "known trend or uncertainty" were the very ones identified by the Company as most at risk.

This is not a case where the harm involved in bringing such a witness can be overcome by cross-examination.  This serious but unfounded claim cannot be reduced to a game of chance.

**2.      Opinions about law or regulation are not appropriately provided to the jury through expert testimony.**

Turner's proffered testimony is also replete with inadmissible opinions about the laws and regulations he claims are applicable to this case.  In Paragraphs 45-56 of his Report, Turner discusses the interpretive guidance provided by the SEC on the Management's Discussion and Analysis (MD&A) section of public filings, explains his view on why MD&A is required disclosure under Item 303 of Regulation S-K, 17 CFR 229.303 ("Item 303"), cites to SEC financial reporting policies that explain "the need for companies to focus on and disclose material trends and uncertainties," and claims that Item 303 and the SEC financial reporting policies, describe appropriate disclosure for MD&A and "whether a significant trend exists within a bank's loan portfolio."[4]  Ex. C ¶¶ 45-56.  With respect to the accounting claim, Turner discusses Statement of Position 01-6 and the Interagency Guidance on Certain Loans Held for Sale (including the comment letter he wrote to the banking agencies in response) stating that this "is the guidance that financial institutions follow when accurately characterizing loans as Held for Sale or Held for Investment."  Ex. C ¶¶ 127- 134.  By opining on the law and regulations he believes are applicable to the SEC's two central claims, Turner attempts to usurp the Court's exclusive role in providing the jury with instructions on matters of law (and in this case, accounting principles adopted by regulatory authorities).  *See Montgomery v. Aetna Casualty & Surety Company*, 898 F.2d 1537, 1541 (11th Cir. 1990) (finding district court abused its discretion by allowing expert to testify about scope of defendant's duty under insurance policy as "the court must be the jury's only source of law");  *see also Craggs Construction Company v. Federal Insurance Company*, 2007 WL 1452927, at *1 (M.D. Fla. May 15, 2007) ("an expert is

---

[4] Later in his Report, Turner also cites to Financial Reporting Release (FRR) No. 36 and claims that BBX's quarterly filings "fail[ed] to allow investors to '. . . look at the company through the eyes of management by providing both a short and long-term analysis of the business . . .' " as required by FRR No. 36.   Ex. C ¶ 123.

4

not allowed to impede on the role of the Court, whose job it is to instruct the jury as to the requirements of law that apply to the particular facts of the case").[5]

Turner's undertaking to tell a fact finder what the law is poses particular problems because of the tension that has long existed between the SEC and federal courts over securities laws.  A long time employee of the SEC, Turner supports the SEC's view of reality that has been squarely rejected in many cases and is inconsistent with *Basic*.  *See* p. 13-14 & n. 10, below.

In the most important instances, Turner masks incorrect legal conclusions as conclusions of fact.  For example, he opines that "a material negative trend related to loan quality existed within BankAtlantic's Commercial Residential loan portfolio that was not adequately disclosed." Ex. C ¶¶ 20, 124.  This statement has imbedded within it Turner's distorted view of two questions of law:  What constitutes a trend or uncertainty requiring disclosure?  What is material?  And in what fashion does the law require disclosure to be made?

Because Turner's legal opinion on these questions is wrong, his opinion that assumes the legitimacy of his incorrect legal conclusions is inadmissible.

Assuming that this case survives summary judgment — it should not — a jury will hear instructions on the law, consider the facts and, if it properly applies the Court's instructions on the law to the evidence, will reach conclusions based on both.  Turner should not be allowed to interfere with the Court's instructions to a jury through imbedded legal conclusions disguised as factual conclusions.  *See Dubiel v. Columbia Hosp. Ltd.*, 2005 WL 5955691 at *3-5 (S.D. Fla. Jan. 11, 2005) (excluding testimony based on what expert identified as what he "believe[d] to be the applicable legal standards to arrive at legal conclusions" because it "invades the province of the Court and the jury"); *see also SEC v. Big Apple Consulting USA, Inc.*, 2011 WL 3753581, at *5 (M.D. Fla. Aug. 25, 2011) (finding expert opinions consisting of legal conclusions inadmissible since such opinions are "not helpful to the jury because they merely tell the jury what result to reach").

---

[5] Turner should also not be permitted to testify as to any of the policy reasons behind why "the SEC created MD&A."   Ex. C ¶ 45.   *See Patterson v. Stathas*, 2007 WL 7647004 at *1 (S.D. Fla. July 20, 2007) (granting motion *in limine* to exclude expert's testimony on the public policy behind differing legal requirements finding such testimony "is not allowed" in accordance with Eleventh Circuit's opinion in *Montgomery*).

3.      **Turner's opinion regarding the held for sale claim must be excluded.**

      a.   **The elements of the claim the SEC must prove**

    Turner describes the issue of whether a company has crossed the line from exploring a market to undertaking to sell into the market as one of intent.  Ex. C ¶ 135.  The first element of the SEC's held for sale claim is proof that, in the fourth quarter of 2007, BBX *decided* to sell certain loans.  Mead SJ Decl. Ex. 47 ¶ .08(c).

    If the SEC establishes that BBX did decide to sell certain loans (as opposed to testing the market to see if a market to sell existed), it then must prove that an orderly market existed that would allow fair values to be established.  Ex. A at 113-14; Mead SJ Decl. Ex. 48 ¶ 75.  If the SEC proved that a decision to sell had been made and that an orderly market existed to establish fair value, then the SEC must prove what that value was at December 31, 2007.[6]  If the SEC proved that BBX made a decision to sell but failed to establish that an orderly market existed at the time, it must then prove the fair value of the loans based on a cash flow analysis.  Ex. D at 3.

      b.   **Turner cannot be allowed to testify about what BBX or Alan Levan "intended" in the fourth quarter of 2007 with respect to the sale of certain assets as such an opinion requires nothing short of impermissible mind reading.**

    It should be self-evident that mind reading is not a recognized field of expertise for which testimony in court is allowed.[7]  If it were to become so, Turner is not one who has the knowledge, skill, training, or experience to engage in it. He is by training an accountant in a profession where judgments must be based on facts, not mindless speculation.   And yet, speculation is the cornerstone of his testimony.

    An example of just how gross this departure is from accepted testimonial standards is found in the following passage in the Report bearing Turner's name.  The Report includes the

---

[6] What no one should seriously dispute is that BBX needed to know *then* what the SEC needs to prove *now*:  was there an orderly market to sell Florida land loans in the fourth quarter of 2007?  If there was none, BBX had no reason to *decide* to dispose of assets to bottom feeders at prices that, because of market conditions, did not represent the fair value BBX had determined based on the impairment analyses it regularly performed.

[7] *Tindall v. H&S Homes, LLC*, 2012 WL 3241885, at *12 (M.D. Ga. Aug. 7, 2012) (prohibiting expert from providing opinions or testimony about defendants' "intent or motive"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony"; "[t]he question of intent is a classic jury question and not one for experts") (citations omitted).

following passage from the testimony of a former bank executive and then draws conclusions from it that are indisputably wrong:

Q.  Again, going back to Exhibit No. 31, you talked on Page 2 of the letter of how ***Mr. Levan coached BankAtlantic people not to use the words "loan sale."*** Do you recall that part of the letter?

A.  Yes.

Q.  How did you know that?

A.  I was in meetings where ***it would come up as a topic of discussion*** when we were going over loan sale activity.  I don't know if it was in this same time period of November 2007, but periodically it would come up as a topic.

Q.  Did it come up with Mr. Levan?

A.  Yes.

Q.  Do you recall anything specific about when it came up?

A.  Just that he was saying ***be very careful about what you put in an email***, that we really want to be clear that these loans are being put out there, but not necessarily we're going to sell them, ***not refer to it as a loan sale***.  And I think later on he told us not to attach — to really not circulation LOIs, letters of intent, and contracts by email.  That we would talk about them as a group.

Q.  Was that told to you personally?

A.  Well, I was in the group when it was discussed.

Q.  So it was told to the entire group?

A.  Yes.

Ex. C ¶ 142 (bolded emphasis in the Report, highlighted emphasis added).

The Report bearing Turner's name concludes that this testimony proves that Levan actually intended to sell loans.  Ex. C ¶ 142.  Of course, the plain reading of the testimony states precisely the opposite.

Similarly, when BBX entered into an agreement with JMP to evaluate "opportunities to sell certain loans and real estate owned" and later altered the language to define JMP's role to "test market" at the suggestion of accountants so that the intent would be free from ambiguity, Turner interprets the words used to mean the very opposite of what they literally say.

Thus, not only does Turner base his conclusions on reading the mind of someone he never met until his deposition, he relies on written materials that affirmatively establish the opposite of what the SEC wants to put before a jury.

Although the admission states the obvious, Turner ultimately conceded that he had no idea what Alan Levan's intent was:

By Stearns:

Q.      Do you know what was in Mr. Levan's mind at the time these documents were signed, sir?

A.      I have no way of knowing what was or was not in his mind.

Ex. A at 184-185.

And, not unimportantly, Mr. Turner ultimately recognized that a process of determining *whether* BBX should *decide* to sell would turn on whether a market existed at all.

By Stearns:

Q.      That's kind of critical, isn't it?  Isn't it, if you can intend to find out whether there's a market or you intend to sell, right, sir?

A.      You can go to sell.  You can also go to see if there is a market for what you have. It would depend upon, you know, what your real intent is here.

Ex. A at 263-264.

BBX or Alan Levan's intent is not a proper subject of expert testimony.

> **c.   Turner cannot be allowed to testify about the value of loans in the fourth quarter of 2007, based on verbal proposals later made in the first quarter of 2008 that no one took seriously.**

In an effort to argue that the actual "fair values" reflected on BBX's financial statements for these loans (achieved through impairment analyses) were overstated, Turner opines that two verbal proposals no one took seriously, submitted at some unknown time during the first quarter of 2008, established a lower "value" for those assets.[8]  This opinion, which parrots the SEC's theory of the case, is incompetent and must be excluded.

FASB Statement No. 157, Fair Value Measurements (FAS 157) defines fair value as "the price that would be received to sell an asset or paid to transfer a liability *in an orderly transaction* between market participants *at the measurement date*."  Mead SJ Decl. Ex. 63 ¶ 5 (emphasis added); *see also* Ex. A at 113-14.  FAS 157 was not required to be applied until 2008,

---

[8] The absence of a market to sell loans does not mean that the Company necessarily could carry them at their face amounts. There is no dispute that during this period BBX subjected these assets to evaluations for impairment, which established their expected cash flows and "fair value." Mead SJ Decl. Ex. 5; Mead SJ Decl. Ex. 82.  Shockingly, Turner did not even bother to evaluate those extensive materials prior to his brief undertaking to accept the conclusions alleged in the SEC's Amended Complaint.

but FAS 157 did not substantively change the earlier definitions of fair value in effect at the time. Mead SJ Decl. Ex. 48 ¶ 54.

### (1) There was no orderly market to sell loans.

There is no dispute in this case that an orderly market to sell loans did not exist in the fourth quarter of 2007. Turner's testimony ignores both the requirement of an orderly market and the consequence of its absence.

In earlier published materials, Turner affirmatively stated that an orderly market never developed to sell bank assets after the 2007 market crash and explained his opinion of why that was the case. Ex. E; Ex. F at 3. In his limited involvement in this case, he made no effort to determine if, at that time and with similar assets *any* purchases or sales were entered into by buyers and sellers, each with the requisite degree of knowledge of the facts and without duress. He admitted that he did not recall "if there was an orderly market for loans in the fourth quarter of 2007," that he did not know one way or another if a single bank sold a loan in the fourth quarter of 2007, and that he did not do any research or analysis to determine the liquidity of that market. Ex. A at 177-78, 208-11.

Turner testified that, although he could not be certain of the relevant accounting standards without looking at them, fair value focuses on "[a]n orderly market between a willing buyer and a willing seller." Ex. A at 113-14. He also testified that the exchange price should not reflect "a forced liquidation" or "other conditions" "[i]t would view as duress or an illiquid market." Ex. A at 114.

Indeed, anyone taking the time to review the economic data derived from that period can possess the perfect clarity of hindsight. It establishes now what BBX learned then: the market for buying and selling assets in the fourth quarter of 2007 and in the years that followed was not just disorderly, it was non-existent. No one who was not under duress who owned assets fairly appraised at cash flow value would *decide* to sell them in those circumstances.

Thus armed with no facts, Turner on the one hand agrees that he does not know that a market existed but then announces market prices that he claims could have been obtained in the market he does not know ever existed. Such an opinion must be excluded.

### (2) The "offers" upon which Turner purports to rely are outside of the "measurement date."

The two verbal "offers" relied upon by Turner to establish his opinion of value were provided not to BBX but to a broker sometime in the first quarter of 2008, *after* the measurement

date.  *See* Mead SJ Reply Decl. Ex. 6.  At this point, the absence of a market to sell loans had been well established. And, in any event, any proposal from anyone at least a month-and-a-half after the end of the fourth quarter of 2007, even a serious written one, would be meaningless information as to the fourth quarter of 2007 as the Florida real estate market, which literally "fell off a cliff" in the third quarter of 2007, Mead SJ Decl. Ex. 3 at 2162-63, 2165-66, continued its decline in the months that followed and over the next many years, Mead SJ Decl. Ex. 1 ¶¶ 46-48; Mead SJ Decl. Ex. 2, Ex. 1. While the continual decline is an undisputed fact in this case, it should also be noted that Turner made no effort to suggest that a market that existed in the first quarter of 2008 was comparable to that which existed in the fourth quarter of 2007.

Turner's testimony about what he did in light of these facts reveals an entirely inappropriate effort to announce a conclusion without even a modicum of evidence to support it:

By Stearns:

Q.     …I'm focusing now on the oral [sic] written down by JMP by those two entities, in February of '08, which was,  at best, I'm talking about only those two, that is, at best, an offer.  At best, right?

A.     It is an offer.

Q.     Okay, there was no acceptance, correct?

A.     That's my understanding.

Q.     So there was, at best, an offer, so maybe a willing buyer, but no willing seller, right, because had there been a willing seller, we would have had a transaction, right?

A.     There wasn't a transaction.  I would agree with that, so there was ultimately no agreement on price…

Q.     Try to listen to my question, sir.  They were not bid prices before December 31, 2007, were they, sir?

A.     I forget exactly when — at this point in time when JMP jotted those down.

Q.     When they jotted them down was at least two months after the close of the quarter, wasn't it?

A.     Yeah, they were going through the sales process at this point in time.

Ex.  A at 265-267.

An expert cannot simply make unsupported statements and claim they are expert opinions.  *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1245 (11th Cir. 2009) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

10

opinion evidence which is connected to existing data only by the *ipse dixit* of the expert")
(internal citation omitted).

### (3) Turner lacks the expertise to opine on the market value of loans secured by Florida real estate in 2007.

In addition to the foregoing deficiencies in Turner's opinion of value, his opinion on market value of loan assets secured by Florida real estate in 2007 suffers another fatal flaw: he has no knowledge of the subject and no basis for testimony other than sheer speculation. He is not an appraiser. He admitted an absence of knowledge of the Florida real estate market. Ex. A at 18-20, 94. He offers no expertise in valuing loans for sale, nor expertise in the state of such markets. He is offered simply as a witness to provide a closing argument without any evidentiary foundation. Lacking qualifications for the task precludes his testimony of value. *Guinn v. AstraZeneca Pharmaceuticals*, 602 F.3d 1245, 1252 (11th Cir. 2010).

### 4.   Turner's opinion on the disclosure claim must be excluded.

#### a.   Turner's opinion that BBX should have disclosed changes in internal loan grades and additions to watch list must be excluded.

Parroting the opinion of the SEC in this case, Turner seeks to testify that BBX should have disclosed its internal loan grades following the first and second quarters of 2007. That is a policy position not an opinion admissible in this Court. It is also not a policy position shared by other federal agencies charged with regulating banking in this country.

Indeed, if this opinion is allowed, it would allow a jury to conclude that a publicly reporting financial institution could be guilty of securities fraud by following the lead of federal banking agencies that supervise its affairs. That is absurd for a claim that requires, as an element, an intention to defraud.

BankAtlantic was regulated by the Office of Thrift Supervision ("OTS"). The OTS required thrifts to file quarterly Thrift Financial Reports ("TFRs") and directed that the reports include the amounts of special mention and substandard loans. Mead SJ Decl. Ex. 2 ¶ 56. The OTS made the TFRs publicly available, but when it did so, it redacted the amount of special mention and substandard loans reported for each institution because it believed that data to be confidential. Mead SJ Decl. Ex. 2 ¶ 56.

Throughout this period, it was the view of all federal banking agencies that the amount of special mention and substandard loans should be held as confidential. That position, opposed by the SEC, led in 2009 to a policy statement joined by every federal banking agency objecting to

proposed new disclosure standards from the Financial Accounting Standards Board ("FASB") that would have disclosed the dollar amount of pass, special mention, and substandard assets. Mead SJ Decl. Ex. 2 ¶ 57. The five banking agencies wrote that this requirement would reveal too much "confidential supervisory information about the condition of an institution." Mead SJ Decl. Ex. 12 at 1.

Defendants' expert Professor Christopher M. James surveyed the SEC filings of forty-three financial institutions in the five states most severely impacted by the housing downturn to determine if it was industry practice to disclose internal risk ratings. None of the five comparable Florida financial institutions disclosed such information in their SEC filings for the second quarter of 2007, and sixty-five percent of the comparable financial institutions from the other four states analyzed did not do so in their SEC filings for the second quarter of 2007. Mead SJ Decl. Ex. 2 ¶¶ 67, 78.

The SEC posts on its website a Form for Statistical Disclosure for Bank Holding Companies that requires the reporting of non-accrual, past due, and restructured loans but nowhere requires the reporting of internally risk-rated special mention (10) or substandard (11) loans. Mead SJ Decl. Ex. 10 at 7-8; Mead SJ Decl. Ex. 11 at 256-260.

If all of that were not bad enough, Turner himself admits that BBX disclosed market driven risks to a magnitude of loans far greater than those ever listed on internal watch lists. Ex. A at 122-23.

Turner cannot be allowed to simply blurt out his uninformed belief that disclosure of loan grades was required under these undisputed circumstances. He presented no qualifications in banking to offer this testimony, did not tie these opinions in any way to his experience, his opinion is contrary to that of banking agencies regulating the Company at the time, and there is no reason that this inadmissible *ipse dixit* assertion would be anything but prejudicial.

      **b. Turner's opinion that changes in internal loan grades constituted a trend requiring disclosure must be excluded.**

In connection with the motions for summary judgment and this motion the Court must determine what the law requires with respect to the obligation of public companies to report "known trends or uncertainties." *E.g.,* BBX Capital Corporation's Reply Memorandum in Further Support of Its Motion for Summary Judgment dated July 2, 2013, at 5-6. On its face, the the applicable rule clearly establishes that a known trend or uncertainty is something then

existing that later could *cause* an impact on the company's earnings.  Thus, BBX believed that, in disclosing the huge uncertainty in the Florida real estate market and in tying that uncertainty to the assets that would be impacted if the market trended downward, investors were told what they needed to know to make informed investment decisions and the Company made precisely the disclosure required of it.

By contrast, Turner is offered as a mouthpiece for the SEC's legal position which turns on an upside down view of the disclosure rules.  Turner's view of the law is that the Company should have disclosed the volume of loans that had been downgraded internally, rather than the real estate market uncertainty that had caused the downgrades.  Because the Florida real estate market was the only common factor impacting all of the loans secured by real estate, the Company's conclusion that it threatened a future adverse impact on other loans similarly exposed simply cannot be assailed from a plain reading of the rules.[9]  Turner's tortured construction of the rule is simply incorrect and for the Court to decide in any event.  That should not be difficult as the applicable rule plainly requires public companies to disclose "known *trends or uncertainties* that have had or that the registrant *reasonably expects will have* a material favorable or unfavorable *impact* on. . . income from continuing operations." 17 C.F.R. § 229.303 (emphasis added).  On its face, this regulation distinguishes between a *cause* and an *effect* (something that then exists — a troubled real estate market — that management expects will have *an impact* on future income — causing losses to loans secured by real estate that are presently fairly valued based on then current values).

Turner's testimony is nothing but an attempt to introduce through the back door a patently incorrect instruction on the law.  It is also stunningly dishonest in light of the fact that, limited by a desire to not run afoul of OTS concerns, BBX found ways to disclose both the cause and the effect, identifying as potential problems a magnitude of loans far beyond those that at that moment in time had been downgraded to watch lists.  Turner's opinion on the ultimate issue that downgrades were a trend requiring disclosure under Item 303, Ex. C ¶¶ 123-125, is an inadmissible opinion on legal issues.  *See* pp. 4-5, above.

---

[9] We always hasten to add that it is undisputed that, at all material times, the Company's financial statements reflected then current values of its assets, including reduced values for assets that, because of market conditions had become impaired.  What the parties are debating is about what should have been disclosed about things that, in the future, could cause losses.

In addition, if allowed, Turner's incorrect legal opinions on the SEC guidance would have the effect of relaxing the burdens that the SEC has under governing securities laws such as the burden of proving materiality. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-34 (1988), for example, requires the SEC to prove materiality in the context of the "total mix" of information included in all disclosures, but Turner cites some SEC guidance that is arguably to the contrary. Ex. C ¶ 54. *Basic* trumps the SEC's interpretive guidance,[10] and Turner certainly should not be able to opine or even suggest the contrary opinion to the jury.

### c.   Turner's opinion that BBX was required to disclose the number and amount of loan extensions in the first and second quarters of 2007 must be excluded.

Turner expresses an opinion about the consequence of certain loan maturity extensions unburdened with any knowledge of those loans or whether the extensions made them more or less likely to suffer a loss. Nor does he offer any experience that would allow him to opine on the financial consequence of the extension of maturities of these loans specifically. Nor, absent any connection to any adverse consequence of extended maturities, does he have any basis in his experience for his opinion that such extensions here constituted a trend. Nor does he, nor can he, identify any regulatory literature suggesting the disclosure of such as trends. Ex. C ¶¶ 75-79. His inability to do more is unsurprising, given that throughout 2007, *forty-one of forty-three* comparable financial institutions in the states hardest hit by the real estate crash *never disclosed extensions*. Mead SJ Decl. Ex. 2 ¶ 67, 81. Again confusing cause and effect, Turner simply asserts that extensions can constitute a material negative trend that should be disclosed, when, of course, the cause of the extensions was a troubled real estate market, the consequence of which was fully disclosed.

Turner does tally the number of extensions based on a review of the Major Loan Committee ("MLC") Minutes. Ex. C ¶¶ 75-79. But an analysis of the MLC Minutes attached to the declaration Turner submitted during the summary judgment briefing shows that BankAtlantic extended strong credits in light of the disclosed slowdown in sales, rather than weak ones, and even

---

[10] *See, e.g., Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 828 (S.D. Cal. 2006), *aff'd, In re Adecco S.A. Sec. Litig.*, 256 Fed. Appx. 74 (Feb. 20, 2007); *Iron Workers Local 16 Pension Fund v. HILB Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003).

obtained additional guarantors, additional collateral, or other consideration for the extension that further strengthened the bank's position.  For example:

- The January 2, 2007 approval of a six-month extension for Brae Burn reflected a loan-to-value ("LTV") ratio of approximately 72%-80%, was conditioned on the sale and closing of 11 homes for sales proceeds of more than $5.7 million, was conditioned on second mortgages on the guarantors' personal residences, and was conditioned on receipt of a new appraisal. D.E. 81-19 at 3-8.[11]

- The January 9, 2007 approval of a six-month extension for Home Devco/Tivoli Lakes, LLC reflected an LTV ratio of approximately 75-80%, guarantors worth more than $24 million, a net decrease to the loan balance of approximately $1.7 million dollars, and was conditioned on the receipt of a new appraisal.  D.E. 81-19 at 10-18.

- The January 23, 2007 approval of an eight-month extension for Taipan VI, LLC was conditioned a reduction of the loan to 75% LTV ratio, supported by guarantors with an adjusted net worth of more than $5 million, and conditioned on receipt of a new appraisal.  D.E. 81-19 at 20-25.

- The January 25, 2007 approval of a thirty-six month extension for Medalist Village Homes, LLC reflected a LTV ratio of *47%* and guarantors with an adjusted net worth of almost $9.5 million.  D.E. 81-19 at 26-29.

- The February 20, 2007 approval of a six-month extension for Sunland Development, Inc. reflected an LTV ratio of less than 73% and was conditioned upon the addition of more guarantors that brought the adjusted net worth for all of the guarantors on the loan to over *$43 million*. D.E. 81-19 at 31-36.

- The March 1, 2007 approval of a twelve-month extension for OLA Realty, LLC reflected an LTV ratio of 60% and guarantors with adjusted net worths of more than $3 million.  D.E. 81-19 at 38-39.

- The March 13, 2007 approval of a nine-month extension for Maguire Roberson, LLC reflected an LTV ratio of 61.4% and guarantors with an adjusted net worth of more than *$225 million*.  D.E. 81-19 at 41-42.

The above bullet points review *all* of the extensions cited by Turner and approved *prior to* Alan Levan's March 14, 2007 email indicating that the criteria for extensions should be further strengthened.   Contrary to Turner's assumptions and assertions, BankAtlantic was extending maturities for its *stronger* credits, where the only weakness was the disclosed

---

[11] BankAtlantic attempted to negotiate first an extension for Brae Burn and then, in the second quarter when it realized the borrowers' situation was more dire, a work-out of this loan. BankAtlantic placed it on non-accrual in the second quarter of 2007 and it was expressly disclosed both in the financials for the second quarter of 2007 and on the second quarter 2007 conference call as a new "acquisition and development" loan on non-accrual.  Mead SJ Decl. Ex. 19 at 18.

slowdown in sales, rather than its weaker credits. The huge mismatch between the evidence relied upon by Turner and his assumptions about that evidence supported by no experience in the subject shows his methodology to be unreliable and his opinion concerning extensions to be not merely unhelpful, but affirmatively misleading. His opinions concerning extensions should be excluded.

> **d.  Turner's opinion that BBX's disclosures were misleading because the non-BLB loans were just as risky as the BLB loans must be excluded.**

Turner in his rebuttal report states that BBX improperly "limits its concerns to the 'Builder Land Loans' (BLB loans)," gave "the impression that the risk of loss due to real estate market declines will affect [only] builder land loans," and that "BankAtlantic's concerns were only with its BLB loans." Ex. G ¶¶ 41, 45, 48-49. Such opinions are contrary to the Eleventh Circuit's prior ruling and BBX's disclosures and should not be admitted.

In *Hubbard v. BankAtlantic Bancorp*, 688 F.3d 713, 729-30 & n.29 (11th Cir. 2012), the Eleventh Circuit concluded that, as a matter of law, BBX had warned investors that its commercial real estate portfolio was primarily in Florida, that the company had hundreds of millions of land development loans, that these loans were subject to the heightened risk of a bad real estate market and that future losses would not be unexpected. The Court cited the March 2007, Form 10-K:

> The national real estate market is showing signs of a slow down, particularly in areas that have seen significant growth, including Florida and California. Our loan portfolio is concentrated in commercial real estate loans (virtually all of which are located in Florida), residential mortgages (nationwide), and consumer home equity loans (Florida). We have exposure to credit losses that may arise from this concentration in what many believe is a softening real estate sector. *Included in the commercial real estate loans are approximately $389 million of land development loans, which are susceptible to extended maturities or borrower default due to a slow-down in Florida construction activity, and $95.1 million of development loans for low and mid-rise condominium projects, in Florida where there is an increasing supply of new construction in the face of falling demand.*
>
> *The majority of BankAtlantic's loan portfolio consists of loans secured by real estate.* BankAtlantic's loan portfolio included $2.2 billion of loans secured by residential real estate and $1.4 billion of commercial real estate, construction and development loans at December 31, 2006. At December 31, 2006, BankAtlantic's commercial real estate, construction and development loans, which are concentrated mainly in Florida, represented approximately 37.6% of its loan portfolio. *The real estate market in Florida is currently exhibiting signs of weakness. If real estate values in Florida were to decline, the credit quality of*

16

*BankAtlantic's loan portfolio and its earnings could be adversely impacted.* (Emphasis added.)

And Turner in his rebuttal expert report, in a desperate attempt to support his misreading of BBX's public filings, turns to the misreading of those filings by Morningstar and Blake Howells. Ex. G ¶¶ 34-35. Defendants' accompanying Motion in Limine to Exclude Evidence and Testimony from Two Analysts Who Misread BBX's Public Filings and Incorporated Memorandum of Law, which is hereby incorporated by reference, shows that those disclosures went well beyond warning about just BLB loans to warn about risks to the entire portfolio. That Motion also recites Howell's testimony conceding over and over again that prior to October 25, 2007, BBX made warnings about its loan portfolios that went well beyond the BLB loans. Just as these analysts should not be able to offer any evidence or testimony contrary to BBX's public filings, Turner should not be able to do so either. Such testimony is not based on any sort of experience and, far from being helpful, would be affirmatively misleading and prejudicial.

At his deposition, Turner was confronted with the fact that in the third quarter of 2007, the BLB loans were, in fact, the hardest hit by the downturn and asked to compare that evidence to BBX's earlier statements that the non-BLB loans were of "relatively lower risk." Ex. A at 99-101. Turner simply asserted, without any explanation, much less an effort to tie his assertion to his experience, that the statement that non-BLB loans were of "relatively lower risk" was not correct. Ex. A at 101. Turner's one-word answer, disclosed for the first time during his deposition, is certainly not competent expert opinion testimony.[12]

---

[12] Many of the factors that placed BLB loans at the greatest risk, Mead SJ Decl. Ex. 18 at 4-5, 24-25; Mead Opp. Decl. Ex. 19 at 10-11; Mead Opp. Decl. Ex. 2 at 594-595, 1924-25, 2434-35, 3377-78, 3382, 3386, 3391-92, 3625; Mead Opp. Decl. Ex. 13 at 61-63, such as the fact that in BLB loans the builder only had an option contract and could walk more easily simply were not addressed by Turner in his reports, declaration, or deposition testimony. In fact, the presentation in Turner's May 21, 2013 declaration concedes that the dollar amount of BLB loans exceeded the dollar amount of the non-BLB loans on the loan watch list by approximately seventy percent as of June 30, 2007 despite the smaller, aggregate amount of BLB loans in the Commercial Residential portfolio. D.E. 81-18 ¶ 9. And the broader significance of downgrades, placing loans on watch list, and the extensions has been discussed above and certainly would not provide a basis for Turner's one-word answer.

17

  **e. Any effort to extend Turner's opinion to a new and unpleaded claim of a failure to disclose "crumbling creditworthiness" must be excluded.**

  The SEC may also attempt to use Turner to support their new and unpleaded claim for "crumbling creditworthiness," in light of the fact that its original case predicated on downgrades and extensions is facing crippling difficulties. Turner's Report does not include the words "crumbling creditworthiness," he did not mention the words "crumbling creditworthiness" during his deposition, and he should not be permitted to testify in support of such a claim for all of the reasons identified in the accompanying Defendants' Motion In Limine to Exclude New, Unpleaded Claim and Incorporated Memorandum of Law, which is hereby incorporated by reference. The SEC also missed its deadline for including such an opinion in Turner's Report despite the requirement that it include a "complete statement of all opinions [Turner] will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B), which is an independent reason to bar Turner from offering an opinion on "crumbling creditworthiness."

  **f. Turner's opinion that an issuer that makes full disclosure in an earnings conference call can be liable for intentionally concealing the same information in a Form 10-Q must be excluded.**

  At Turner's deposition, he was confronted with many of the conference call disclosures made by BBX and Levan. When asked whether if "all those things that were in the conference call, you'd be happy if they had just been in the MD&A" in the Form 10-Q, he testified "*I would be happy if those were in the MD&A*." Ex. A at 286-87 (emphasis added).

  Any testimony by Turner suggesting or insinuating that a fraud claim can be sustained where a defendant publicly discloses all material facts in a timely fashion but does not reproduce those disclosures in its Form 10-Q would obviously be an impermissible legal opinion. More importantly, it would be a legal opinion that misstates the law. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-34 (1988) requires the SEC to prove materiality in the context of the "total mix" of information included in all disclosures, including investor conference calls.[13] And *Basic* trumps

---

[13] *See, e.g., In re Amdocs Limited Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004) (six alleged misrepresentations rendered immaterial in part by disclosures made on "a conference call with securities analysts"); *In re Xerox Corp. Sec. Litig.*, __ F. Supp. 2d __, 2013 WL 1297937, at *40-41 (D. Conn. Mar. 29, 2013) (granting summary judgment rejecting plaintiff's alleged omission based, in part, on CFO's statements at annual investor's conference and "during an earnings release teleconference").

the SEC's interpretive guidance, much less Turner's interpretation of that guidance.[14]   Turner's opinion that disclosures on investor conference calls must be repeated in Form 10-Q's to avoid liability for securities fraud is not only unhelpful, it would mislead the jury and profoundly prejudice the defendants.

## CONCLUSION

The proper exercise of the Court's role as the gatekeeper must lead to an order excluding this testimony which is nothing more than a combination of incorrect instructions on the law and a closing argument without a factual predicate.

---

[14] *See, e.g., Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 828 (S.D. Cal. 2006), *aff'd, In re Adecco S.A. Sec. Litig.*, 256 Fed. Appx. 74 (Feb. 20, 2007); *Iron Workers Local 16 Pension Fund v. HILB Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003).

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

By:    /s/ Eugene E. Stearns
       EUGENE E. STEARNS
       Florida Bar No. 149335
       estearns@stearnsweaver.com
       GORDON M. MEAD, JR.
       Florida Bar No. 49896
       gmead@stearnsweaver.com
       CECILIA D. SIMMONS
       Florida Bar No. 469726
       csimmons@stearnsweaver.com
       MATTHEW C. DATES
       Florida Bar No. 90994
       mdates@stearnsweaver.com
       ANDREA N. NATHAN
       Florida Bar No. 016816
       anathan@stearnsweaver.com
       *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of July, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.


/s/ Matthew C. Dates
MATTHEW C. DATES

## SERVICE LIST

*Securities and Exchange Commission v. BankAtlantic Bancorp, Inc. and Alan B. Levan*
Case No. 0:12-cv-60082-RNS
United States District Court, Southern District of Florida


James M. Carlson
carlsonja@sec.gov
Russell Koonin
kooninr@sec.gov
Brian P. Knight
knightb@sec.gov
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue
Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
*Attorneys for Plaintiff*

22