**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 12-60082-Civ-SCOLA**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

BANKATLANTIC BANCORP, INC. and
ALAN B. LEVAN,

      Defendants.
_____/

### ORDER ON SUMMARY-JUDGMENT MOTIONS

      The SEC sues Defendants BBX Capital Corporation (a bank holding company) and Alan Levan (the Chairman of the Board and CEO of BBX) for allegedly violating various securities laws in connection with loans in a large portfolio.  Principally, the SEC alleges that Defendants' disclosures regarding the health of this portfolio and Defendants' accounting treatment of certain loans in this portfolio violated § 10(b) and Rule 10b-5 of the Exchange Act.  The SEC asserts ancillary violations as well.  Defendants move for summary judgment on all of the SEC's claims. The SEC moves for partial summary judgment on (1) the falsity of certain statements made by Levan during an earnings conference call in July 2007 and (2) Defendants' first affirmative defense that they relied on the professional advice of their accountants.     The SEC's allegations arose principally from the wide gulf between the Defendants' internal assessments of the status of certain loans—a "PILE of ticking time bombs"; "explosive piles of crap"; and "the music has stopped"—and its public disclosures, which significantly downplayed these concerns—"we're not really seeing any difference in those characteristics as we've seen over the last 10 or 15 years"; "the portfolio . . . continues to perform extremely well."

      For the reasons set forth below, the Court **DENIES** each Defendants' summary-judgment motion (DE 82; DE 88) and **GRANTS** both of the SEC's motions for partial summary judgment (DE 81; DE 84).

## BACKGROUND[1]

**A.      BBX, BankAtlantic, and the Commercial Residential Portfolio**

Defendant BBX Capital Corporation (BBX), formerly known as BankAtlantic Bancorp, Inc., is a publicly traded company and was the holding company of BankAtlantic during 2006 and 2007.  BankAtlantic was a federal savings bank offering consumer and commercial banking and lending services throughout Florida and was one of Florida's largest banks in 2007.  BBX's common stock is listed on the New York Stock Exchange and is registered with the Securities and Exchange Commission (SEC) under § 12(b) of the Securities and Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78O(b).  Defendant Alan Levan is the Chairman of the Board and CEO of BBX.  In 2007, he was also the Chairman of BankAtlantic.

As one of Florida's largest commercial banking and lending institutions, BankAtlantic had $1.5 billion in its commercial real estate loan portfolio in 2007.  About $533 million of that amount consisted of loans in its commercial residential real estate land acquisition and development portfolio (hereafter, the Commercial Residential Portfolio).  The loans in the Commercial Residential portfolio consisted of three types:  Builder Land Bank (BLB) loans; Land Acquisition and Development (LAD) loans; and Land Acquisition, Development and Construction (LADC) loans.  BLB loans "were loans where the borrower had an option contract with a builder in which the builder agreed to give a down payment to the borrower and close on the purchase of a minimum number of lots by a certain date."  The other non-BLB loans did not involve such option contracts.

BankAtlantic maintained certain internal policies for approving and monitoring loans in the Commercial Residential portfolio.  It had a Major Loan Committee (MLC) that had to approve any loan in excess of $5 million or any extension to these loans.  In 2007, the MLC consisted of Levan; Jeff Mindling, the Chief Credit Officer; Jay McClung, an Executive Vice President and the Chief Risk Officer; Marcia Synder, Executive Vice President of Commercial Lending; Perry Alexander, a commercial loan officer with experience with large loans, and John Abdo, a member of BBX's board of directors.  At some point in 2007, Levan's son, Jarrett Levan (Jarett), BankAtlantic's President, also joined the MLC.

---

[1] In crafting the undisputed facts set forth below, the Court ignored asserted denials that either failed to cite to record evidence or that failed to deny properly supported facts asserted by the other side.

The process for approving or modifying loans began with the loan officer preparing and presenting loan packages to the MLC.  Committee members reviewed the packages and discussed the loans.  Although Levan did not physically attend every single MLC meeting, he received all the loan packages and the other members of the MLC discussed all of the loan packages with him.  So, he was an active participant in the MLC process even for the meetings that he did not physically attend.

During 2007, the MLC met twice a week.  The loan officers would make oral presentations concerning the loans and answer questions for the MLC at these meetings.  Then, the MLC voted on whether to approve the loans or modifications.  Committee members who were absent also received a vote.  Levan sometimes exercised what was termed a "hard no" vote which permitted him to overrule a committee decision even if he was outvoted.  BankAtlantic did not approve any loans that went through the MLC process without Levan signing off on the loan.

Once a loan was approved, BankAtlantic assigned it a numerical credit-worthiness rating on a scale between 1 and 13.  Grades 1 through 7 were considered passing grades (with 1 being the highest).  BankAtlantic did not use grades 8 and 9 except in special circumstances.  Grades 10 through 13 were nonpassing grades.  In practice, BankAtlantic rarely used grades 12 or 13 because by the time a loan had deteriorated to that degree, BankAtlantic had either done a reserve for the loan, which was equivalent of characterizing it as a grade 12 (doubtful), or written off the loan, which was the equivalent of grade 13 (loss).  According to BankAtlantic's Commercial Real estate and Commercial Loan Policy (hereafter, BankAtlantic's Loan Policy), BankAtlantic established its loan-grading system to, among other things, "determine the collectability of all assets on an ongoing basis"; to "[i]dentify problem assets that deserve classification under the asset classification systems and to initiate a process to improve the collectability of the loan amount"; and to "[e]nsure that adequate reserved have been established and that loan charge offs have been taken where appropriate."  (DE 81-1, Ex. 6 at BBX SECLIT 001 0037568.)

Grade 10 loans were considered "specially mentioned assets."  (*Id.* at BBX SECLIT 001 0037569.)  BankAtlantic defined special-mention loans as "hav[ing] potential weaknesses that deserve management's close attention.  If left uncorrected, these potential weaknesses may result in deterioration of the repayments prospects for the asset or in the institution's credit position at

some future date." (*Id.*)  Grade 11 loans were considered "substandard."  (*Id.*)  BankAtlantic defined substandard loans as being "inadequately protected by the current sound worth and paying capacity of the obligor or the collateral pledged, if any.  Assets so classified have a well-defined weakness or set of weaknesses that jeopardize the liquidation of debt.  They are characterized by the distinct possibility that the bank will sustain some loss."  (*Id.*)  That loss potential, however, need exist only in "the aggregate amount of Substandard assets" rather than in each "individual asset[] classified [as] Substandard."  (*Id.*)

BankAtlantic had a Loan Watch List Committee, also known as the Senior Loan Discussion Group, which was responsible for "identify[ing] and monitor[ing] problem loan situations and those loans [that] exhibit significant potential problems."  (*Id.* at BBX SECLIT 001 0037571; *accord* DE 81-1, Ex. 7 at 168.)  The committee reviewed BankAtlantic's monthly Loan Watch List (LWL) to keep it "apprised of the status of the loan portfolios as well as significant changes in listed credits."  (DE 81-1, Ex. 6 at BBX SECLIT 001 0037571.)  The LWL included all loans graded special mention (10), substandard (11), or worse.  The LWL included all loans BankAtlantic considered to be "criticized."  (DE 81-1 at 3; DE 117 at 2.)

Loans placed on the LWL received heightened scrutiny at BankAtlantic.  BBX's and BankAtlantic's senior management, including Levan, received the LWL every month.  Although Levan would generally not review the LWL when he got it or attend the monthly meetings of the LWL Committee, the "important credits, the larger credits[,] and the [credits] that end up having the most discussion at a [LWL Committee] meeting, generally come to me.  So somebody has a discussion with me independently on it."  (Mead SJ Opposition Decl. Ex. 3 at 203-206.)  People who would attend the Loan Watch List Committee meetings included Mindling, the Chief Credit Officer of BankAtlantic, and McClung, an Executive Vice President and the Chief Risk Officer of BankAtlantic.  Management considered the loans on the LWL to be, at best, potential problem loans.  Henry Barnes, Vice President and Manager of the Loan Review Department, testified that the purpose of the LWL was to monitor potential problem loans:

Q.    [W]hat is the purpose of the Loan Watch List?
A.    The Loan Watch List identifies those loans that are perceived as problems cited in classified assets. . . .
Q.    And the purpose of that list is to identify, as you said, all loans that are problem assets for the bank, is that right?
A.    Correct.
Q.    so if a loan is graded a 10 or higher, it is a problem asset; is that correct?

A.      Yes.

(Mead SJ Opposition Decl. Ex. 4 at 32.)  Barnes also testified that "if you're in the pass grade range [i.e., a grade of 1 through 9], your source of repayment [for the loan] is assured.  When you start having problems, they move into the side of classified status being risk gradings 10 through 13."  (*Id.* at 27.)  BankAtlantic's Chief Credit Officer, Mindling, testified that the loans on the LWL were those with "significant potential problems," though he later clarified that grade 10 loans weren't "necessarily significant, but definitely potential problems."  (DE 81-1, Ex. 7 at 168, 178-79.)

## B.      Facts relevant to the disclosure-fraud theory

### 1.      *In the first quarter (Q1) and the second quarter (Q2) of 2007, BBX experienced a trend of decline in credit quality of BLB and non-BLB loans*

During the first two quarters of 2007, the entire Commercial Residential Portfolio experienced significant declines in credit quality.  In late 2006 and early 2007, BankAtlantic's Loan Review Department noticed three negative trends in the Commercial Residential Portfolio: (1) slowed absorption in the sale of lots or homes by borrowers; (2) depletion of loan-interest reserves; and (3) a downward migration of loan grades.  These negative trends were present in both BLB and non-BLB loans.  The slowed absorption rate resulted in borrowers requesting extensions on their loans.  By the end of Q1 in 2007 (March 31, 2007), the Bank's MLC had granted extensions to nine non-BLB loans valued at approximately $53 million.[2]  Levan himself commented on this development, writing in a March 14, 2007 email to the MLC that the "parade of land loans coming in for extensions recently" was due to declining absorption—"the music has stopped," in his words—and that, as a result, BankAtlantic was "in for a long sustained problem in this sector."  (DE 81-1, Ex. 14 at BBX HUBBARD 008 00078436.)  By the Q1 earnings call on April 26, 2007, the Bank's MLC had granted extensions on one BLB loan valued at approximately $9 million plus the nine non-BLB loans valued at $53 million.  By the Q2 earnings call on July 25, 2007, BBX had extended 13 non-BLB loans valued at approximately $97 million and just 2 BLB loans valued at approximately $29 million.  By extending payments on loans, the Bank prevented them from going into default.

The credit-quality decline in the Commercial Residential Portfolio manifested in more ways than just extensions.  It also manifested in the number of loans graded special mention (10)

---

[2] The loan values are as of September 30, 2007.

or substandard (11).  BankAtlantic downgraded two BLB and two non-BLB loans to substandard by the end of Q1 of 2007.  By the Q1 2007 earnings call, 11 loans were graded 10 or 11: five BLB loans and six non-BLB loans; by May 31 2007, 19 loans were graded 10 or 11: six BLB loans and 13 non-BLB loans.  So by the Q2 2007 earnings call, 13 non-BLB loans had been graded 10 or 11, but only 6 BLB loans had been similarly graded.

The credit-quality decline also manifested in the total dollars of loans that had been downgraded to 10 or 11.  For example, the total amount of loans downgraded to special mention (10) increased from $7.4 million on March 31, 2007 to $67.3 million by April 26, 2007.  By April 30, approximately $105 million in BLB and non-BLB loans had been downgraded to special mention (10) or substandard (11).  Of that $105 million, approximately $77 million was for BLB loans and almost $28 million was for non-BLB loans.  In the roughly four weeks from March 31 to April 30, the value of BLB loans downgraded to special mention or substandard increased by approximately 210%; the value of non-BLB loans similarly downgraded had increased by approximately 250%.  That trend continued.  By May 31, 2007, approximately $154 million in BLB and non-BLB loans had been downgraded to special mention or substandard.  Of that $154 million, approximately $97 million was for BLB loans; approximately $57 million, for non-BLB loans.

## 2.    *BBX's management recognized this trend of declining credit quality*

In late 2006 and early 2007, BankAtlantic's Loan Review Department noticed three negative trends in the Commercial Residential Portfolio: (1) slowed absorption in the sale of lots or homes by borrowers; (2) depletion of loan-interest reserves; and (3) a downward migration of loan grades.  These negative trends were present in both BLB and non-BLB loans.  Synder, BankAtlantic's Executive Vice President of Commercial Lending, echoed these concerns in a January 24, 2007 email: "[i]n recent discussions with loan review, it has become apparent that a number of our residential projects are experiencing slow absorption and have or are close to depleting interest reserves."  (DE 81-1, Ex. 16 at BBX HUBBARD 029 01199978.)

Levan himself similarly expressed his concern about the entire Commercial Residential Portfolio internally as early as November 29, 2006, in an email conversation with Jarrett.  Jarrett had forwarded an article quoting public statements that he had made at an investor conference.  Among other things, Jarrett commented on the credit worthiness of BankAtlantic's loans, stating that "there were no upcoming credit quality trends that gave [BankAtlantic] concerns."  (DE 81-

1, Ex. 13 at BBX HUBBARD 016 00388095-96.)   Jarrett asked his father, "Should I be embarrassed?  Which parts of this wouldn't you have discussed?"  (*Id.* at BBX HUBBARD 016 00388095.)  Levan responded: "[w]e need to discuss—I would approach lots of this differently. I also wouldn't be so bold on the credit front—I think Marcia [Synder, BankAtlantic's Executive Vice President of Commercial Lending] is going to have problems with her land portfolio." (*Id.*)

On March 14, 2007, Levan expanded on his concerns regarding the Commercial Residential Portfolio.  In response to a steady stream of borrowers asking that their loans in the Commercial Residential Portfolio be extended, Levan expressed his concern in an email to the MLC that these requests indicated that the entire portfolio was deteriorating:

> There seems to be a parade of land loans coming in for extensions recently.  It's pretty obvious the music has stopped.  In most cases, the presold contract to a builder has either gone away or is in dispute or being modified.
>
> I'm not sure what the purpose of the extensions are other than hoping that more time will solve their problem (and ours).  Experience tells us that in these markets, it is better to force a resolution early rather than wait for the market to further deteriorate. . . .
>
> I believe we are in for a long sustained problem in this sector.  The sub prime market bust is going to provide an additional burden on housing supply.  We should be more concerned about our security and repayment than the borrower's feelings.

(DE 81-1, Ex. 14 at BBX HUBBARD 008 00078436.)  When Levan wrote that email on March 14, the MLC had extended only non-BLB loans since the start of 2007.  The first BLB loan to be extended in 2007 was extended on April 17, 2007.

More expressions of concern by management followed this email by Levan.  On March 20, 2007 Snyder sent an email to Mindling, BankAtlantic's Chief Credit Officer, and others, reporting that the MLC members had just had a meeting where they

> Spent a great deal of time today discussing our residential land exposure, which is currently in excess of $300 [million].  This includes those loans that are presold to builders [i.e., BLBs] *as well as loans without a presale but being held for future sale* [i.e., non-BLBs].  Obviously, there is *significant concern* about *these loans* given the current state of the market.

(DE 81-1, Ex. 21 at BBX HUBBARD 004 00016851 (emphasis added).)  So by the end of 2007's first quarter, management had repeatedly expressed concern about the credit quality of both BLB and non-BLB loans in internal communications.

Examining management's internal communications for 2007's second quarter yields the same conclusion: management was concerned about the credit quality of the entire Commercial Residential Portfolio.  James White, *BBX's* CFO during the first quarter of 2007, testified that he had concerns with BankAtlantic's entire Commercial Residential Portfolio in the weeks leading up to the Q1 earnings call in April 2007.  White prepared drafts of the comments he was going to make during that call.  One draft expressed concern with the entire Commercial Residential Portfolio and did not distinguish between BLB and non-BLB loans.  White testified that he "didn't see the need to . . . differentiat[e]" between BLB and non-BLB loans in the draft because he was concerned with the entire portfolio.  (DE 81-1, Ex. 23 at 75.)  In preparing for the Q1 earnings call, White emailed McClung, an Executive Vice President and the Chief Risk Officer, and asked for information related to the "risk inherent in the other land loans in the total (the non-land bank loans)" because he thought he might be asked during the earnings call about loans other than BLB loans.  (DE 81-1, Ex. 24 at BBX SEC 019 000183083.)  McClung's concern about loans in the Commercial Residential Portfolio was similarly not limited to BLB loans.

The most graphic illustration of management's internally expressed concern regarding the Commercial Residential Portfolio came about 2 weeks before the July 25, 2007 Q2 earnings call.  On July 9, Amy Engelberg, Senior Vice President and Manager of Special Assets, sent an email referring to the Commercial Residential Portfolio as a "PILE of ticking time bombs."  (DE 81-1, Ex. 29 BBX SEC 026 000211366.)  Six of the loans Engelberg mentioned by name were BLB loans, one was a non-BLB loan.  (*Id.*)  She also referred to the Commercial Residential Portfolio loans in the northern part of Florida as "explosive piles of crap that we're juggling by the handful, slinging it up in the air and covering our eyes, just waiting for the next one to go splat." (*Id.*)

### 3.    *Levan's representations during the April 26, 2007 Q1 earnings call*

On April 26, 2007, BBX held its 2007 Q1 earnings conference call.  In response to investor questions, Levan stated that BBX's $140-$160 million BLB portfolio was the main credit risk.  (Mead SJ Decl. Ex. 18 at 4.)  Levan stated that the other loans in the Commercial Residential Portfolio—that is, the "portfolios that are borrowers that are buying land for their own development," i.e., non-BLB loans—"those are proceeding in the normal course. . . . *And we're not really seeing any difference in those characteristics as we've seen over the last 10 or*

*15 years*." (*Id.* at 24 (emphasis added).)  The SEC contends that the italicized statement misrepresented the health of the non-BLB loans.

### 4.      *Levan's statements during the July 25, 2007 Q2 earnings call*

During this call, an analyst referenced BBX's July 24, 2007 press release, in which BBX disclosed that for some of BankAtlantic's $135 million in BLB loans, the underlying option contracts had been cancelled or modified due to the Florida housing market deteriorating.  The analyst asked whether BBX was concerned about loans in the Commercial Residential Portfolio other than BLB loans: "[b]asically what I'm trying to—ask you is the $135 million in the land loans that you guys are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well."  (DE 81, Ex. 32 at 20.)  Levan answered as follows:

> *There are no asset classes that we are concerned about in the portfolio as an asset class.*  You know, we've reported all of the delinquencies that we have, which actually I don't think are any other than the ones that we've, you know, that we've just reported to you.
>
> *So the portfolio has always performed extremely well, continues to perform extremely well.*  And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that—we've not taken—I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.
>
> *The one category that we just are focused on is this [BLB] portfolio because, you know, just from one day to the next, the entire home building industry, you know, went into a state of flux and turmoil and is impacting that particular class.  But to our knowledge and in—just in thinking through, there are no particular asset classes that we're concerned about other than that one class.*

(*Id.* at 21-22 (emphasis added).)  The SEC contends that the italicized statements are false and groups them into two categories: (1) statements that there were no asset classes that Levan and BBX were concerned with other than the BLB portion of BankAtlantic's Commercial-Residential Portfolio; and (2) statements that that portfolio continued to perform "extremely well."  (DE 81.)

**5.**    *BBX's 10-Q's for Q1 and Q2 of 2007*

In BBX's 10-Q's for Q1 and Q2 of 2007, there is no discussion in the Management Discussion and Analysis section ("MD&A") of the known trend of extensions granted and loans downgraded to nonpassing status.   Nor is there a description of the internal concerns and discussions at BBX related to the overall declining credit quality of the Commercial Residential Portfolio.   With respect to BLB loans, the 10-Q's acknowledge that repaying those loans primarily depends upon the builders' exercise of their options.   The 10-Q's then state that "if" the lots are not acquired as anticipated, then BBX " anticipate[s] that the borrower "may not be in a position to service the loan."   (Mead SJ Decl. Ex. 20 at 18; Mead SJ Decl. Ex. 21 at 22.) With respect to the non-BLB loans, the 10-Q's state that management considers them to be of relatively lower risk than the BLB loans.   The 10-Q's did disclose that if the real-estate market— and the Florida real-estate market in particular—declined, that may result in higher credit losses in the Commercial Residential Portfolio.

**C.    Facts relevant to the accounting fraud**

In October 2007, BankAtlantic identified and discussed a group of 12 loans in the Commercial Residential Portfolio that BankAtlantic would include in a portfolio sale to be conducted by JMP Securities (JMP), an investment bank.   (DE 123, Ex.31; DE 123, Ex. 32.) BankAtlantic engaged JMP to "advise [BankAtlantic] concerning opportunities to sell certain loans and real estate owned . . . by BankAtlantic."   (Mead SJ Decl. Ex. 50 at 1.)   The engagement letter also provided that JMP would receive a percentage based commission if the loans were sold.   Internal and external emails regarding the JMP engagement repeatedly refer to a loan "sale."   JMP drafted "Acquisition & Development Loan Portfolio" presentations describing the project as a loan sale.   (DE 123, Ex. 60.)   At least one of the bidders in the JMP process thought that BankAtlantic's loans were for sale based on the materials they received from and conversations they had with JMP.

When Valerie Toalson, BBX's CFO, learned of the JMP engagement in November 2007, she emailed Levan, raising concerns about the accounting treatment of the loans if they were being considered for sale.   She informed Levan that if loans were set out for sale, then they had to be classified as held-for-sale and recorded on the bank's books at the lower of cost or market value.   She also informed him that market value "is generally defined as the price someone is willing to pay."   (DE 123, Ex. 47.)   She told Levan that "if we set a loan out for sale and get bids

back, my concern is regardless of whether or not we would sell it at the bid prices, those bids would constitute 'market' and we would have to write the loan down to that value." (*Id.*)

In response to the concerns raised by Toalson, Levan received a new engagement letter from JMP in December 2007 that stated that BankAtlantic engaged JMP to "advise [BankAtlantic] concerning opportunities to test market certain loans and real estate owned . . . by BankAtlantic." (Mead SJ Decl. Ex. 51 at 1.)  The engagement letter used the same signature page as the original engagement letter executed in October 2007.

BankAtlantic received bids for the loans that were part of the JMP engagement.  In addition to these loans, BankAtlantic also attempted to sell other loans.  BankAtlantic's efforts, within and outside the JMP engagement, resulted in the negotiation of preliminary contracts for the sale of several of its loans during the fourth quarter of 2007.  But BankAtlantic did not record each of the loans as held-for-sale; it instead recorded them on its books as held-for-investment and valued them consistent with this classification.  Some of the loans included in the JMP engagement were not considered impaired, and thus BankAtlantic held them on its books at the book value of the loans.

## ANALYSIS

### A.      Summary-judgment standard

Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)).  Rule 56 requires a court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

The Court must view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue material fact remains.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.  A court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.  *Skop v. City of Atlanta, Georgia*, 485 F.3d 1130, 1140 (11th Cir. 2007).

**B.      The SEC's motion for partial summary judgment as to the falsity of certain statements**

The SEC moves for partial summary judgment, asking the Court to rule that certain statements made by Levan during BBX's July 25, 2007 earnings-conference call are false.  (DE 81.)  This motion relates to Counts I and II of its Amended Complaint.  In Count I, the SEC alleges that Defendants violated § 10(b) and Rule 10b-5 of the Exchange Act when they (1) failed to disclose known trends and made misrepresentations regarding BankAtlantic's Commercial Residential Portfolio in BBX's periodic filings for the first and second quarters of 2007; (2) misled investors and analysts in BBX's Q1 and Q2 earnings conference calls by suggesting that BankAtlantic was only concerned, if at all, about BLB loans in its Commercial Residential Portfolio; and (3) failed to accurately account for loans as held-for-sale in the fourth quarter of 2007.  The first two theories above constitute the SEC's disclosure-fraud theory; the third, its accounting-fraud theory.  Count II charges Levan with aiding and abetting BBX's violations of § 10(b) and Rule 10b-5.

"The scope of liability under Section 10(b) and Rule 10b–5 is the same." *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 n.17 (11th Cir. 2007) (citing *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) ("The scope of Rule 10b-5 is coextensive with the coverage of § 10(b).")); *S.E.C. v. U.S. Pension Trust Corp.*, No. 07-22570-CIV, 2010 WL 3894082, at *20 (S.D. Fla. Sept. 30, 2010) (Martinez, J.).   The elements of a § 10(b) violation are (1) a material misrepresentation or materially misleading omission; (2) made in connection with the purchase or sale of a security; (3) made with scienter. *S.E.C. v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. May 2, 2012) (citing *Merch. Capital*, 483 F.3d at 766 (same)); *S.E.C. v. U.S. Pension Trust Corp.*, No. 07-22570-CIV, 2010 WL 3894082, at *20 (S.D. Fla. Sept. 30, 2010) (Martinez, J.).

The SEC contends that certain statements made by Levan during BBX's July 25, 2007 earnings conference call are false.  (DE 81.)  During that call, the analyst referenced BBX's July 24, 2007 press release, in which BBX disclosed that for some of BankAtlantic's $135 million in BLB loans, the underlying option contracts had been cancelled or modified due to the Florida housing market deteriorating.  The analyst asked whether BBX was concerned about loans in the CRE portfolio other than BLB loans: "[b]asically what I'm trying to—ask you is the $135 million in the land loans that you guys are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well."  (DE 81, Ex. 32 at 20.)  Levan answered as follows:

> *There are no asset classes that we are concerned about in the portfolio as an asset class.*  You know, we've reported all of the delinquencies that we have, which actually I don't think are any other than the ones that we've, you know, that we've just reported to you.
>
> *So the portfolio has always performed extremely well, continues to perform extremely well.*  And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that—we've not taken—I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.
>
> *The one category that we just are focused on is this [BLB] portfolio because, you know, just from one day to the next, the entire home building industry, you know, went into a state of flux and turmoil and is impacting that particular class.  But to our knowledge and in—just in thinking through, there are no particular asset classes that we're concerned about other than that one class.*

(*Id.* at 21-22 (emphasis added).)  The SEC contends that the italicized statements are false and groups them into two categories: (1) statements that there were no asset classes that BBX was concerned with other than the BLB portion of BankAtlantic's Commercial-Residential Portfolio; and (2) statements that the non-BLB portion of the portfolio continued to perform "extremely well."  (DE 81.)  Because the Court agrees that there is no genuine dispute that these statements are false as a matter of law, the Court **GRANTS** the SEC's motion for partial summary judgment (DE 81).

As the undisputed facts recounted above demonstrate, Levan's statements in this call were inconsistent with the true state of affairs in several respects.  By July 25, 2007, BBX was concerned about the entire Commercial Residential Portfolio, not just the BLB loans.  White testified that by April 2007, there was no need for him to distinguish between BLB and non-BLB loans because he was concerned with the entire portfolio as a whole.  Similarly, Synder's March 20 email stated that there were "significant concerns" with the BLB and non-BLB loans.  Levan himself commented in March 2007 that the "parade of land loans coming in for extensions recently" demonstrated that the "music has stopped" and that "we [i.e., BBX] are in for a long sustained problem in this section."  These comments demonstrate a concern on his part with the entire CR portfolio, especially since the only loans to be extended in 2007 when he made this statement were non-BLB loans.  In sum, Levan's own statements before the earnings conference call and the statements of other managers demonstrate that it is undisputedly false to claim that BBX was concerned only with BLB loans in July 2007.

The statement that the non-BLB portion of the Commercial Residential Portfolio continued to perform extremely well is also false.  If it were true, managers would not have raised the concerns described above.  Moreover, a growing number of non-BLB loans had been granted extensions and downgraded to nonpassing status by July 2007.  These downgrades and extensions demonstrate that the entire portfolio had deteriorated significantly.  Asserting that these loans were performing extremely well in the face of this evidence is false.

The SEC is also entitled to partial summary judgment with respect to Count II, which alleges that Levan aided and abetted BBX's securities-fraud violations.  Liability for aiding and abetting a securities violation occurs "if some other party has committed a securities law violation, if the accused party has general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the

violation." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1045 (11th Cir. 1986); *see also S.E.C. v. BIH Corp.*, No. 2:10-CV 577-FTM-29, 2011 WL 3862530, at *6 (M.D. Fla. Aug. 31, 2011) ("To state a claim for aider and abettor liability, the SEC must allege that (1) a principal committed a primary violation; (2) the aider and abettor provided 'substantial assistance' to the violator; and (3) the aider and abettor acted with scienter.")  Because the first element of aiding-and-abetting liability depends on the principal committing a primary violation, it follows that falsity—a necessary element for proving that BBX committed the underlying securities-fraud violation—is also something that must be proved under Count II.  So the Court's conclusion that there is no genuine issue that Levan's statements in the Q2 earnings conference call are false also applies to Count II.

## C.   BBX's summary-judgment motion

### 1.   *The disclosure-fraud theory under Count I*

In Count I, the SEC alleges that Defendants violated § 10(b) and Rule 10b-5 of the Exchange Act when they (1) failed to disclose known trends and made misrepresentations regarding BankAtlantic's Commercial Residential Portfolio in BBX's periodic filings for the first and second quarters of 2007; (2) misled investors and analysts in BBX's Q1 and Q2 earnings conference calls by suggesting that BankAtlantic was only concerned, if at all, about BLB loans in its Commercial Residential Portfolio.

The elements of a § 10(b) violation are (1) a material misrepresentation or materially misleading omission; (2) made in connection with the purchase or sale of a security; (3) made with scienter.  *S.E.C. v. Morgan Keegan & Co., Inc.*, 678 F.3d at 1244.  To show materiality, the statement or omission must be "'*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc.*, 485 U.S. at 238.  In the Eleventh Circuit, the test for materiality in securities fraud actions is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *Merch. Capital*, 483 F.3d at 766 (citing *S.E.C. v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)); *see also U.S. Pension Trust Corp.*, 2010 WL 3894082, at *18 (same).   In other words, a misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix

of information made available." *Morgan Keegan & Co.*, 678 F.3d at 1245 (internal quotation marks omitted).

Notably, in the Eleventh Circuit materiality is considered at least a mixed question of law and fact involving "assessments peculiarly within the province of the trier of fact." *Mech. Capital*, 483 F.3d at 766. So "[t]he trier of fact usually decides the issue of materiality." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).

With these principles in mind, the Court addresses BBX's arguments on the disclosure fraud theory. There is a genuine dispute of material fact about whether BBX's disclosures in the 10-Q's and during the earnings conference calls contained materially misleading statements or omissions. Turning first to the Q1 earning call, Levan stated that the BLB portfolio was the main credit risk and that the non-BLB loans were "proceeding in the normal course," without "any difference in those characteristics as we've seen over the last 10 or 15 years." But there is evidence that the non-BLB loans were not proceeding in the normal course and that the credit quality of these loans was different than before. A negative trend had emerged of granting extensions and downgrading these loans to a nonpassing status. This trend was also material: management's internal communications show that they were aware of it and considered it important themselves. With respect to the Q2 earning call, the Court has already determined that Levan made misleading statements during this call. These statements were material for the same reason that the statements during the Q1 earning call were material. Management repeatedly expressed its concern about the extensions and downgrades to the non-BLB loans. And this concern makes sense: the level of extensions and downgrades indicated a trend of declining creditworthiness in the non-BLB loans.

There is also evidence that the 10-Q's for Q1 and Q2 were materially misleading. In the MD&A section of those filings, BBX informed investors that declines in the real-estate market could, in the future, negatively affect the entire loan portfolio. The disclosure of the possibility of a future risk does not disclose the existing, observed decline in credit quality in the Bank's Commercial Residential Portfolio. That portfolio was already negatively impacted by slowed absorption, depleted interest reserves, and requests for extensions. These negative trends manifested in the rapidly increasing number of loan downgrades. A significant number and value of loans was downgraded to nonpassing status. Although BBX was aware of these trends—indeed, management was closely monitoring these trends with increasing degrees of

concern—BBX uttered nary a peep about them.  BBX argues that later events show that it was correct in disclosing that BLB loans were riskier than non-BLB loans.[3]  But even if that's true, that does not excuse failing to disclose the negative trends that affected the entire portfolio.  That management was concerned about these undisclosed trends creates a fact issue about whether a reasonable investor would view these trends as material.

There are also genuine disputes of material fact about whether BBX's relevant statements and omissions were made with scienter.  To establish scienter the SEC must show "either an intent to deceive, manipulate or defraud, or severe recklessness."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (internal quotation marks omitted).  "Severe recklessness" is defined as "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Huff*, 758 F. Supp. 2d at 1348 (quoting *Mizzaro*, 544 F.3d at 1238).  It is undisputed that Levan and BBX were aware of the trend of declining credit quality in the entire Commercial Residential Portfolio.  And, as shown above, this trend was not disclosed.  The volume and tone of the internal discussions between Levan and other managers regarding this trend also create, at the very least, a fact question as to whether BBX and Levan were aware of the materiality of this trend which was not disclosed.  Levan himself stated his belief that the increase in loan extensions meant that BBX was in for a long sustained problem with its loans.  Despite knowing about the declining credit quality in the entire portfolio, Defendants deliberately obscured problems the credit problems in the non-BLB portfolio.  The 10-Q's distinguished between BLB and non-BLB loans and gave the erroneous impression that the currently existing credit problems were limited to the former group.  And in the earnings calls, Levan stated that the non-BLB loans were "proceeding in the normal course" (Q1 call) and "perform[ing] extremely well" (Q2 call).  In fact, Levan's relevant comments in the Q2 call, which completely misrepresented the credit quality of the non-BLB loans, was in response to an analyst's question about whether BBX was concerned about loans in

---

[3]  When the statements about non-BLB loans being less risky are coupled with Levan's statements about the credit quality of non-BLB loans in earnings calls, the disclosure regarding the non-BLB loans' comparatively positive and less risky characteristics would only contribute to an investor's misimpression that the Bank's non-BLB loans were unaffected by the economic downturn during the first two quarters of 2007.

the Commercial Residential Portfolio besides BLB loans.  In other words, Levan knew that this information was relevant to investors because they were asking him about it.  These facts thus create a genuine fact as to whether BBX and Levan were aware that not disclosing the declining credit quality of the entire Commercial Residential Portfolio and the non-BLB loans would likely mislead investors.

### 2.      *The accounting-fraud theory under Count I*

In Count I's accounting-fraud theory, the SEC alleges that Defendants violated § 10(b) and Rule 10b-5 of the Exchange Act when they failed to accurately account for loans as held-for-sale in the fourth quarter of 2007.  BBX makes four arguments for why it should be granted summary judgment on this claim: (1) there was no decision to sell the JMP loans, and therefore no misrepresentation; (2) there was no market to sell the loans in Q4 2007; (3) BBX booked certain loans at fair value, thereby rendering any misrepresentation not material; and (4) there was no scienter.  The Court analyzes each argument in turn.

Turning to whether there was a decision to sell the JMP loans, the record is replete with evidence suggesting that there was such a decision.  The initial, signed JMP engagement letter indicated a loan sale.  Several internal and external communications reference a loan sale.  And at least one of the bidders in the JMP process thought that BankAtlantic's loans were for sale based on the materials they received from and conversations they had with JMP.  A clear fact dispute exists on this question.

But was there a market to sell the loans in Q4 2007?  BBX argues that there was not and that as a consequence, the bids received on the loans do not reflect the actual market value of the loans.  Determining whether the bid prices reflected the fair value of the loans is thus inextricably intertwined with determining the fair value of the loans.  As the Court reasoned in rejecting BBX's motion to dismiss, determining the fair value of the loans "is certainly an issue of fact . . . usually reserved for the factfinder."  (DE 27 at 27.)  So determining whether the bid prices actually reflected the fair value of the loans is not appropriate to determine at summary judgment.  But even if this were not the case, there would be still be a fact question on this issue.  In Toalson's email to Levan, she suggested that the bid prices would constitute a market for the loan and would require BankAtlantic to write down the loan to that value.  And Lynn Turner, the Commission's expert, concurred with Toalson, stating that "[t]he bids received by JMP represent what sophisticated, knowledgeable buyers were willing to pay for the assets at the time."  (DE

123, Ex. 2 at 33-35.)  Moreover, the market for selling loans actually functioned: it generated bids to purchase the loans from the bank.  (DE 123, Ex. 42.)   And BBX also entered into preliminary contracts to sell distressed loans during this period, further supporting the notion that there was a market for the loans.  So there is at least a fact question with respect to whether there was a market for the loans in Q4 2007.

BBX next argues that it booked the loans at fair value anyways, so there was no material misrepresentation.  BBX contends that the methods it used to value it assets—which did not consider the bid prices received—were the appropriate ones to use and thus it properly valued its assets.  But this argument assumes that there was not a functioning market in Q4 2007 that could reveal a loan's fair value.  Since the Court has already concluded that there is a fact question as to whether a functioning market existed in Q4 2007, it follows that there is a fact question as to whether BBX booked the loans at fair value.  Moreover, the October 2007 whitepaper from the American Institute of Certified Public Accountants (AICPA) Center for Audit Quality cautions against disregarding market prices as a means to determine fair value:

> Because the objective of a fair value measurement is to determine the price that would be received to sell the asset at the measurement date (an exit price)—such a measurement, by definition, requires consideration of current market conditions, including the relative liquidity of the market.  *It would not be appropriate to disregard observable prices, even if that market is relatively thinner as compared to previous market volume.  Even if the volume of observable transaction is not sufficient to conclude that the market it "active," such observable transactions would still constitute Level 2 inputs that must be considered in the measurement of fair value.*

(DE 123, Ex. 67 at 4 (emphasis added).)

BBX's final argument is that it lacked scienter.  To establish scienter the SEC must show "either an intent to deceive, manipulate or defraud, or severe recklessness."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d at 1238 (internal quotation marks omitted).   Usually, a violation of generally accepted accounting principles (GAAP) "is insufficient, without more, to support a finding of scienter."  *SEC v. Todd*, 642 F.3d 1207, 1218 (9th Cir. 2011).   "Violations of GAAP standards can also provide evidence of scienter."  *In re Daou Systems, Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005).  When a violation of GAAP is coupled with evidence that the defendant knows about the violation, scienter is established.  *Todd*, 642 F.3d at 1218-19 (holding that there was substantial evidence to permit the jury to find that the defendant possessed scienter because the

defendant understood that the "transaction was not a complete sale, and therefore acted recklessly by improperly recording revenue that [the defendant] knew was not yet realized").

There is a fact question as to whether BBX possessed scienter. The GAAP violation asserted by the SEC is significant (the SEC alleges that the violation led BBX to understate the loss in its 2007 10-K by $57.6 million, or 51%). And the top management officers at BBX knew about the held-for-sale issue, but BBX did not cease its attempts to sell the loans and did not properly account for them, despite receiving bids and entering into preliminary contracts to sell some of the loans. Because BBX knew about the held-for-sale issue and yet still continued conduct that a factfinder could conclude violated GAAP, there is a fact question as to whether BBX acted with scienter. BBX's counterargument that its consultation with its outside auditor PricewaterhouseCoopers (PwC) negates scienter is unavailing because BBX failed to fully disclose the held-for-sale accounting issue to PwC.

### 3.      *Counts IV, VI, and VIII*

In Count IV, the SEC alleges reporting violations by BBX in connection with the alleged fraud in Count I. Specifically, the SEC alleges that Bancorp knowingly or recklessly filed inaccurate, false, and materially misleading 10-K and 10-Q reports regarding its assets, liabilities, and related party transactions, and omitted material information necessary to make those reports not misleading in light of the circumstances, in violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a-1, 13a-13, and 12b-20 thereunder, 17 C.F.R. §§ 240.13a-1, 240.13a-13, and 240.12b-20. An issuer violates these provisions when it files a report containing materially false or misleading information. *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978). Scienter is not required to violate these provisions. *Id.* at 1167. Because the Court has concluded that there is a fact dispute with respect to whether BBX's 10-Q's were misleading, there is fact dispute on this issue under Count IV as well. And because the Court has concluded that there is fact dispute with regard to the accounting-fraud theory of Count I, it follows that there is fact dispute with respect to BBX's 2007 10-K because BBX recorded certain loans that it arguably tried to sell as held-for-investment rather than held-for-sale. And this affected the size of BBX's loss reported in the 2007 10-K.

Count VI alleges that BBX failed to make and keep accurate records fairly reflecting the disposition of its assets in violation of § 13(b)(2)(A) of the Exchange Act; Count VII alleges that BBX failed to maintain a system of internal accounting controls sufficiently reasonable to assure

that its records and financial statements conformed to GAAP, in violation of § 13(b)(2)(B) of the Exchange Act.  Because of the Court's conclusion on the held-for-sale issue, which ultimately manifested itself on BBX's books, there is a dispute of fact as to whether BBX violated § 13(b)(2)(A) and § 13(b)(2)(B) as alleged in Counts VI and VIII.

Because the Court concludes that all the arguments in BBX's summary-judgment motion are unpersuasive, the Court **DENIES** the Motion (DE 82).

## D.     Levan's summary-judgment motion

### 1.     *The disclosure fraud under Count I*

Levan argues that there it is undisputed that he lacks the necessary scienter.  Scienter is a mental state embracing "either an intent to deceive, manipulate or defraud, or severe recklessness."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d at 1238 (internal quotation marks omitted).  Ordinarily, scienter is left to the trier of fact because it is a fact-specific issue.  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).  Scienter may be established by a showing of knowing misconduct or severe recklessness.  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  Proving a defendant's severe recklessness requires showing that his or her conduct was "an extreme departure from the standards of ordinary care . . . that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Huff*, 758 F. Supp. 2d at 1348 (quoting *Mizzaro*, 544 F.3d at 1238).  Levan's scienter can be proven through direct or circumstantial evidence. *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004).

There are genuine disputes of material fact about whether Levan's relevant statements and omissions were made with scienter.  It is undisputed that Levan was aware of the trend of declining credit quality in the entire Commercial Residential Portfolio.  And, as shown above, this trend was not disclosed.  The volume and tone of the internal discussions between Levan and other managers regarding this trend also create, at the very least, a fact question as to whether Levan was aware of the materiality of this trend which was not disclosed.  Levan himself stated his belief that the increase in loan extensions meant that BBX was in for a long sustained problem with its loans.  Despite knowing about the declining credit quality in the entire portfolio, Levan deliberately obscured the credit problems in the non-BLB portfolio.  The 10-Q's distinguished between BLB and non-BLB loans and gave the erroneous impression that the currently existing credit problems were limited to the former group.  And in the earnings calls,

Levan stated that the non-BLB loans were "proceeding in the normal course" (Q1 call) and "perform[ing] extremely well" (Q2 call).  In fact, Levan's relevant comments in the Q2 call, which completely misrepresented the credit quality of the non-BLB loans, was in response to an analyst's question about whether BBX was concerned about loans in the Commercial Residential Portfolio besides BLB loans.  In other words, Levan knew that this information was relevant to investors because they were asking him about it.  These facts thus create a genuine dispute as to whether BBX and Levan were aware that not disclosing the declining credit quality of the entire Commercial Residential Portfolio and the non-BLB loans would likely mislead investors.

Levan's counterarguments do not undermine these fact disputes.  Levan argues that future events showed that he was correct to emphasize BLB loans because BLB loans were the loans most impacted by the continued downward slide of the real-estate market in late 2007 and beyond.  But even if the future showed that BLB loans were the most affected by the continued economic downturn, that does not excuse Levan's failure to disclose a presently existing trend of declining credit quality in the entire Commercial Residential Portfolio.  For even stronger reasons, it does not excuse his statements in the earnings calls that non-BLB loans were proceeding in the normal course and performing extremely well.  Levan next argues that he lacked scienter with regard to BBX's disclosures because he oversaw a "robust system of checks and balances" developed to make sure that the disclosures were as accurate as possible.  But Levan cites no authority for the proposition that establishing a system of internal controls rebuts scienter, regardless of the defendant's conduct or knowledge.  And the fact that Levan and BBX failed to disclose the trend of declining credit quality in the entire portfolio belies the effectiveness of the system Levan now seeks shelter under.  Moreover, the SEC's expert disputes the conclusions drawn by Defendants' expert.  As the SEC argues, Levan has at best raised fact issues surrounding BBX's internal controls.  He is certainly not entitled to summary judgment based on these internal controls.

Levan next argues that PwC's review of BBX's disclosures prove that he did not act with scienter.  First, this argument applies only to the disclosures in the 10-Q's; it does not apply to Levan's statements during the earnings calls.  So this does not undercut the fact dispute regarding his scienter when making statements during the earnings call.  Second, PwC's review of 10-Q's was limited.  PwC did not certify the accuracy of these disclosures.  And, in contrast to PwC's review of 10-K's, PwC relied more heavily on management representations when it was

reviewing 10-Q's.   PwC did not receive all the underlying source documents that BBX management used in fashioning the disclosures.   For example, there is no evidence that PwC received any loan files, appraisals, or real-estate market analysis.   With respect to the disclosures that non-BLB loans were less at risk than BLB loans, PwC did not go behind those statements to see if there was adequate support for such a statement.   Statements at that level of detail were ultimately management's call.   For all these reasons, PwC's review of these disclosures does not negate the fact dispute regarding Levan's scienter with respect to misleading statements or omissions in these disclosures.

Levan's argument that his increased holdings in BBX stock during the relevant time period show that he lacks scienter is also unpersuasive.   Levan does not dispute the SEC's evidence that his increased stock holdings were part of his compensation package.   This fact makes the inference that his increased BBX holdings demonstrate his desire to be compensated with company stock at least as plausible as the inference that he had an independent desire to further invest in BBX.   Moreover, case law does not support the proposition that scienter cannot exist without suspiciously timed stock sales.   *Mizzaro* explicitly emphasizes that such stock sales are not necessary to create a strong inference of scienter.   544 F.3d at 1253 n.3.   In the circumstances of this case, his increased holdings do not remove the fact dispute regarding his scienter.

### 2.   *Accounting fraud under Count I*

Levan argues that there it is undisputed that he lacks the necessary scienter with respect to the held-for-sale issue.   He is mistaken.

As described previously, a violation of generally accepted accounting principles (GAAP) is usually "insufficient, without more, to support a finding of scienter."   *SEC v. Todd*, 642 F.3d 1207, 1218 (9th Cir. 2011).   "Violations of GAAP standards can also provide evidence of scienter."   *In re Daou Systems, Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005).   When a violation of GAAP is coupled with evidence that the defendant knows about the violation, scienter is established.   *Todd*, 642 F.3d at 1218-19.

There is a fact question as to whether Levan possessed scienter on this issue.   The GAAP violation asserted by the SEC is significant (the SEC alleges that the violation led BBX to understate the loss in its 2007 10-K by $57.6 million, or 51%).   And there is ample evidence in the record supporting the conclusion that BankAtlantic was trying to sell loans.   Levan knew

about the held-for-sale issue, but BBX did not cease its attempts to sell the loans and did not properly account for them, despite receiving bids and entering into preliminary contracts to sell some of the loans.  Because Levan knew about the held-for-sale issue and yet still authorized conduct that a factfinder could conclude violated GAAP, there is a fact question as to whether Levan acted with scienter.  Levan's counterargument that his consultation with PwC negates scienter is unavailing because BBX failed to fully disclose the held-for-sale accounting issue to PwC.

Levan also argues that the revising of the JMP engagement letter after Toalson alerted him to the held-for-sale issue shows that BankAtlantic did not intend to sell its loans.  But another inference that could be drawn from this revision is that Levan and BBX were attempting to circumvent the GAAP principles that would require them to record the loans at issue as held-for-sale while still attempting to sell the loans.  In other words, another plausible inference is that Levan and BBX were trying to disguise their intent to sell loans to circumvent GAAP.  The signature page of the revised JMP engagement letter—which was signed by both parties before Levan learned of the held-for-sale issue—and the date remained the same in both agreements.  The language was simply tweaked slightly to hedge more about whether BankAtlantic was attempting to sell its loans.  This inference—namely, that Levan was involved in creating a document that he knew was false to circumvent GAAP—if correct would certainly establish scienter for the accounting-fraud theory.  Since it is a plausible inference, there is a dispute of fact as to whether Levan had scienter with respect to this theory.

### 3.        The officer-and-director bar against Levan

The SEC seeks to impose an officer-and-director bar against Levan.  Levan asks the Court to hold that such a remedy is inappropriate and enter summary judgment in his favor on this issue.  Because material issues of fact remain as to liability, the Court concludes that it would be premature to resolve this remedies issue now.  *SEC v. Smith*, 2005 WL 2373849, at *11 (S.D. Ohio September 27, 2005) (granting partial summary judgment to the SEC but reserving ruling on the appropriate remedies until after trial); *SEC v. Sands*, 902 F. Supp. 1149, 1158, 1168 (C.D. Cal. 1995).  Reserving ruling is especially appropriate in this case because a finding of liability is a prerequisite to the bar.  The Court can therefore conserve judicial resources by not ruling on this relief issue until after trial.  If the issue should come before the court following trial, the Court will then have the benefit of the factfinder's findings of fact to guide the analysis.

But even if the Court were to consider Levan's motion for summary judgment on this issue, the Court would conclude that it cannot determine as a matter of law that the remedy is inappropriate.  First, there is a fact dispute as to the egregiousness of Levan's conduct.  There is evidence supporting the view that Levan was involved in several material misrepresentations and omissions, and accounting fraud.  And this conduct occurred over a one year period.  It was not an isolated event.  Second, there is also a factual dispute regarding Levan's repeat-offender status.  A factfinder could conclude that Levan broke the law multiple times in a one-year period. *See Sands*, 902 F. Supp. at 1158 (reasoning that the defendant's conduct of filing numerous forms with the SEC containing material misrepresentations created a genuine issue as to whether the nature of his infraction was "isolated or recurrent").  Third, Levan's role as BBX's CEO and Chairman, when coupled with the leading role he played with respect to several misrepresentations, at the very least creates a fact dispute as to whether this factor supports an officer-and-director bar.  Levan played a leading role in the allegations of accounting fraud, and he was the person who is alleged to have made material misrepresentations during the earnings calls.  If a factfinder were to conclude that Levan violated securities law in these instances, then that would mean that a person who controls a large financial institution had used that authority to violate federal law.  Fourth, there is fact dispute as to whether Levan possesses the necessary scienter.  Given that he was the one assuring investors that there were no problems with non-BLB loans during the Q1 and Q2 calls—when evidence shows he knew that this was highly misleading—a factfinder could conclude that Levan's degree of scienter is high.  Fifth, one could reasonably infer that Levan's economic stake in BBX, which was substantial, gave him a motive to deceive investors about the true risks of BBX's stock in the hopes that BBX would come out of its problems unscathed.  Sixth, a factfinder could conclude that there is a significant potential for Levan to violate securities law in the future.  Levan has not admitted to any wrongdoing and his current position as CEO of BBX gives him the opportunity to violate the law in the future.

### 4.       *Section 13(b)(5) and other claims in Count III*

In Count III, the SEC alleges that Levan violated § 13(b)(5), 15 U.S.C. § 78m(b)(5), which provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [§ 13(b)(2)]."  The SEC must prove that Levan acted knowingly to prove that he violated this section. *SEC v. Kelly*, 7645 F> Supp.2d 301, 323 (S.D.N.Y. 2011).  The related

Exchange Act Rules—Rule 13b2-1 and Rule 13b2-2—prohibit any person from directly or indirectly falsifying any book, record or account required to be kept by a reporting company under § 13(b)(2)(A), and prohibit an officer or director of an issuer from making or causing to be made any materially misleading statements or from omitting any material information to an accountant in connection with a required audit.  The SEC also alleges in Count III that Levan violated Rule 13a-14, which requires an issuer's principal executive to certify to the best of his or her knowledge that there are no untrue statements of material fact or omissions of material fact in quarterly and annual reports filed under § 13(a) of the Exchange Act.

There are material issues of fact as to whether Levan violated each of these provisions.  There is evidence that Levan decided to sell certain loans in the Commercial Residential Portfolio.  And Levan knew that loans that were being sold need to be accounted for as held-for-sale under GAAP.  But he failed to reclassify them accordingly.  So there is evidence that Levan knowingly violated § 13(b)(5) and Rule 13b2-1 by causing others to falsify BBX's books and records with respect to the held-for-sale loans.[4]  There is also evidence that Levan failed to fully disclose the held-for-sale issue to PwC, thereby violating Rule 13b2-2.  Finally, there is evidence that Levan violated Rule 13a-14 by omitting material information in BBX's 10-Q's—namely, the existing trends regarding the decline in credit quality of the entire Commercial Residential Portfolio.

### 5.   *Levan's aiding-and-abetting liability under Counts II, V, VII, and IX*

Levan argues he is entitled to summary judgment on these claims because it is undisputed that there is no primary violation, that Levan substantially assisted the primary violator, and that Levan acted with Scienter.  These arguments are meritless.  As demonstrated above, there is a fact question as to whether BBX violated securities law, and this would constitute a primary violation with respect to Levan.  Levan, as CEO of BBX, also substantially assisted BBX in accomplishing what are arguably fraudulent acts.  For example, Leven knew about the trend of declining credit quality in the Commercial Residential Portfolio, but he failed to disclose this information in BBX's public filings and he (arguably) lied about it during the earnings conference call.  The analysis above regarding Levan's scienter applies equally here.

---

[4] To the extent that BBX had an internal accounting control mandating that loans be classified as held-for-sale when BBX was trying to sell them, there would also be evidence that Levan violated § 13(b)(5) by circumventing that accounting control.

Because the Court concludes that all the arguments in Levan's summary-judgment motion are unpersuasive, the Court **DENIES** the Motion (DE 88).

**E.   The SEC's motion for partial summary judgment on Defendants' first affirmative defense**

Both Defendants assert as an affirmative defense that they "relied in good faith upon the professional judgment of their accounting professionals."  (DE 76 at 19.)  Defendants apply this affirmative defense to all counts of the SEC's Amended Complaint.  The SEC asks the Court to grant summary judgment in favor of it on the affirmative defense.

To establish a reliance-on-professional-advice affirmative defense in the case of an accountant, a defendant must show that he (1) completely disclosed the issue to an accountant; (2) "sought [professional accounting] advice as to the legality of his conduct"; (3) "received advice that his conduct was legal"; and then (4) "relied on that advice in good faith."  *SEC v. Huff*, 758 F. Supp. 2d 1288, 1349 (S.D. Fla. 2010) (Rosenbaum, J.) (quoting *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994).  The burden of establishing an affirmative defenses lies with the defendant.  *Singleton v. Department of Corrections*, 277 F. App's 921, 923 (11th Cir. 2008).  The Court considers whether there is no dispute of fact that Defendants have not met their burden with respect to the accounting fraud and the disclosure fraud.

*1.   The affirmative defense and the accounting-fraud theory*

Defendants have not created a genuine issue of fact with respect to their ability to show the four essential elements of their reliance-on-accountants affirmative defense with respect to the accounting-fraud theory.  In other words, it is undisputed that Defendants have failed, as a matter of law, to meet all the elements of their affirmative defense.  The SEC is therefore entitled to summary judgment on the affirmative defense with respect to the held-for-sale issue.

Defendants' first fundamental problem is that they failed to completely disclose the issue to PwC, their accountants.  Levan learned from Toalson on November 15, 2007 that if loans were set out for sale, then they had to be classified as held-for-sale and recorded on BankAtlantic's books at the lower of cost or market value.  She also informed him that market value "is generally defined as the price someone is willing to pay."  (DE 123, Ex. 47.)  She told Levan that "if we set a loan out for sale and get bids back, my concern is regardless of whether or not we would sell it at the bid prices, those bids would constitute 'market' and we would have

to write the loan down to that value." (*Id.*)  By that time, BankAtlantic had already engaged JMP to advise it on opportunities to sell certain loans.  (Mead SJ Decl. Ex. 50.)

 After Levan became aware of the held-for-sale issue, various high level managers such as Levan, Toalson, and David Friedman, who was BBX's Controller at that time and is the current Chief Accounting Officer, had discussions with Kevin Young, a PwC account regarding that issue.  Internal PwC emails in November show that PwC originally thought that BankAtlantic was considering hiring a consulting firm to gauge market prices.  (At this point, BankAtlantic had already engaged JMP, which is altogether different from considering engaging a consulting firm.)  PwC communicated to Defendants that the key question in deciding whether loans had to be classified as held-for-sale was management intent.  If management intended to sell the loans, they needed to be classified as held-for-sale.  But if management intended to hold the loans for the foreseeable future, then they were classified as held-for-investment.  Defendants did later disclose to Young and PwC that BankAtlantic had hired an investment bank to test the market interest in obtaining certain loans.  But there is no dispute that Defendants never disclosed to PwC the actual JMP engagement letter (either the original October 2007 version, or the later December 2007 version), the marketing materials that JMP provided to third parties, or the specific emails or representations BankAtlantic employees made or provided to third parties. Moreover, when Toalson and Friedman spoke to Young on November 29, 2007, they did not ask him any specific questions relating to the JMP engagement.  Since the intent of management with respect to the loans in question is the crucial issue, Defendants needed to disclose all the documents relating to the engagement so the accountants could judge that intent in light of all the facts.  Because there is no dispute that Defendants did not do so, they cannot establish their affirmative defense.

 This problem in turn poses fundamental problems on some of the other essential four elements.  For example, by failing to completely disclose the issue, Defendants were precluded from truly seeking advice as to the legality of their conduct (the second essential element of their defense), and PwC was prevented from giving advice that their conduct was legal (the third essential element of the affirmative defense).  To truly seek advice as to the legality of their conduct, Defendants needed to provide PwC all the relevant documents and communications. Without these documents, PwC could not discern Defendants' intent regarding the loans in

question and thus could not advise Defendants as to whether they were properly classifying the loans as held-for-investment.

2.      *The affirmative defense and the disclosure-fraud theory*

Defendants also have not created a genuine issue of fact with respect to their ability to show the four essential elements of their reliance-on-accountants affirmative defense with respect to the disclosure-fraud theory.  In other words, it is undisputed that Defendants have failed, as a matter of law, to meet all the elements of their affirmative defense.  The SEC is therefore entitled to summary judgment on the affirmative defense with respect to the disclosure-fraud theory.

Defendants' first problem is their failure to completely disclose the disclosure issues to PwC.  PwC received a copy of the LWL and attended a quarterly credit meeting before the filing of each 10-Q at which the number of loans on the LWL and the number of loans graded special mention (10) or substandard (11) was discussed.  But PwC did not receive all the underlying source documents that BBX management used in fashioning the disclosures.  For example, there is no evidence that PwC received any loan files, appraisals, or real-estate market analysis.  And PwC did not receive the internal communications between BankAtlantic and BBX's managers where management disclosed its internal concern over the trend of declining credit quality of the entire Commercial Residential Portfolio.  Management's concern over this trend is significant information.  Without PwC knowing it, they were not keyed into analyzing whether this was a trend that needed to be disclosed and could not give advice about the key disclosures at issue in the SEC's lawsuit.  This concern is magnified by the undisputed evidence that PwC's review of 10-Q's was limited.  In contrast to PwC's review of 10-K's, PwC relied more heavily on management representations when it was reviewing 10-Q's than on the underlying source documents.  Unfortunately, management's representations to each other about the declining credit quality of the Commercial Residential Portfolio were not shared with PwC.  Because it is undisputed that Defendants did not completely disclose the disclosure issue to PwC, Defendants cannot establish the affirmative defense.

There is also no dispute that Defendants did not receive actual accounting advice from PwC with regard to their disclosures.  Young testified that PwC did not provide accounting advice to the Defendants regarding the MD&A.  Defendants' contention is that PwC's failure to object to the disclosures means that PwC was providing accounting advice that the disclosures

were adequate.  Young expressly contradicted this contention: not only did he testify that failing to object to disclosures did not constitute accounting advice, he testified that "[i]n my view, I'm not sure there was any accounting advice offered there with respect to that disclosure."  (Mead SJ Decl. Ex. 84 at 240-41.)  He further testified that the nature of PwC's review of the 10-Q's was "more inquiry as opposed to verification of underlying comments and statements by management."  (*Id.* at 17-18.)  With respect to the disclosures that non-BLB loans were less at risk than BLB loans, PwC did not go behind those statements to see if there was adequate support for such a statement.  Statements at that level of detail were ultimately management's call.

That PwC did not give advice on whether the disclosures of risks between BLB and non-BLB loans is not surprising because Defendants never asked PwC for advice concerning whether they should disclose adverse trends in the Commercial Residential Portfolio.  Young testified that no one from BBX or BankAtlantic asked him or the members of his group at PwC who worked on BBX's public filings whether there needed to be additional disclosures of adverse trends in the Commercial Residential Portfolio in the second quarter of 2007.  The same was true with Levan.  Young testified that Levan did not ask him for his advice regarding the sufficiency of the disclosures during any of the quarters of 2007.  Moreover, Young testified that discussions about the adequacy of disclosures were typically not part of the conversations they had. Unsurprisingly then, PwC did not certify the accuracy of the disclosures in the 10-Q's.

For these reasons, Defendants are not entitled to rely on their affirmative defense with respect to the allegations of disclosure fraud.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** each Defendants' summary-judgment motion (DE 82; DE 88) and **GRANTS** both of the SEC's motions for partial summary judgment (DE 81; DE 84).

**DONE and ORDERED** in chambers, at Miami, Florida, on October 10, 2013.

**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**