## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-60082-CIV-SCOLA/OTAZO-REYES

SECURITIES AND EXCHANGE
COMMISSION,

$\qquad$ Plaintiff,

v.

BANKATLANTIC BANCORP, INC. and
ALAN B. LEVAN,

$\qquad$ Defendants,

_____/

### ORDER RE: D.E. 148, 155, 159 & 156

THIS CAUSE came before the Court upon the following motions:  (1) Plaintiff's <u>Daubert</u>

Motion to Exclude the Opinion and Testimony of John J. Huber ("Huber") (hereafter, "Huber

Motion") [D.E. 148]; (2) Plaintiff's <u>Daubert</u> Motion to Exclude the Opinion and Testimony of

Christopher M. James ("James") (hereafter, "James Motion") [D.E. 155]; (3) Plaintiff's <u>Daubert</u>

Motion to Exclude the Testimony of Linda A. MacDonald ("MacDonald") (hereafter,

"MacDonald Motion") [D.E. 159] (collectively, "Plaintiff's <u>Daubert</u> Motions"); and (4)

Defendants' Motion in Limine to Exclude the Opinions and Testimony of Expert Witness Lynn

E. Turner ("Turner") (hereafter, "Turner Motion" or "Defendants' <u>Daubert</u> Motion") [D.E.

156]).[1]

Plaintiff's <u>Daubert</u> Motions and Defendants' <u>Daubert</u> Motion were referred to the

undersigned by the Honorable Robert N. Scola, Jr., United States District Judge, "*to be heard*

*and determined* in accordance with [] 28 U.S.C. § 636(b)(1)(A) and Rule 1(c) of the Local

Magistrate Judge Rules" [D.E. 169].  The undersigned held an evidentiary hearing on the

_____

[1]  The undersigned will issue a separate Order on Plaintiff's <u>Daubert</u> Motion to Exclude the Testimony of
David Friedman and Jeff Mindling [D.E. 149].

motions, which took place on September 23-25, 2013.   For the reasons stated below, the undersigned hereby DENIES the Huber Motion, the MacDonald Motion and the Turner Motion; and GRANTS IN PART and DENIES IN PART the James Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Defendant BankAtlantic Bancorp, Inc. ("Bancorp" or "BBX") is a publicly traded company.   During 2006 and 2007, Bancorp was the holding company for BankAtlantic, a federal savings bank offering consumer and commercial banking and lending services throughout Florida.  Bancorp's common stock is listed on the New York Stock Exchange and registered with the Securities and Exchange Commission ("SEC" or "Plaintiff") under Section 12(b) of the Securities and Exchange Act of 1934 (hereafter, "Exchange Act"), 15 U.S.C. § 78o(b). Defendant Alan Levan ("Levan") is the Chairman of the Board and CEO of Bancorp, and in 2007 he was also the Chairman of BankAtlantic.

In 2007, BankAtlantic was one of Florida's largest commercial banking and lending institutions with $1.5 billion in its commercial real estate loan portfolio.  Approximately $533 million of this portfolio consisted of loans in BankAtlantic's commercial residential real estate land acquisition and development portfolio ("Commercial Residential Portfolio" or "Portfolio"). The loans in the Portfolio consisted of Builder Land Bank ("BLB") loans and non-BLB loans.[3] In managing the Portfolio, Bancorp assigned to the loans, and reassigned as necessary, internal grades of 1 to 13, based on their individual creditworthiness.  Grades 10-13 were considered non-passing grades.

The SEC brings this action against Bancorp and Levan (collectively, "Defendants") for alleged securities laws violations, arising from:  (1) Defendants' public disclosures regarding the

---

[2]  A detailed factual recitation is found in Judge Scola's Omnibus Order on Summary Judgment [D.E. 234 at 2-11].

[3]  BLB loans were loans made to land investors after they had sold to homebuilders options to purchase lots in the land holdings.  For non-BLB loans, the land investors did not have pre-loan option contracts.

health of the Commercial Residential Portfolio; (2) Bancorp's accounting treatment of a portion of the Portfolio; and (3) Bancorp's maintenance of internal controls.  The SEC alleges the following as to each of these three violation categories.

### 1.  Public Disclosures:

The SEC alleges that Defendants failed to provide appropriate disclosures in the Management Discussion and Analysis ("MD&A") section of Bancorp's Forms 10-Q for the first and second quarter of 2007.[4]  The SEC also alleges that Defendants made material misrepresentations during Bancorp's first and second quarter earnings conference calls in 2007.[5] According to the SEC, Defendants had knowledge of serious problems within BankAtlantic's Commercial Residential Portfolio during the first two quarters of 2007, yet did not disclose those problems until the third quarter of 2007.  The SEC further alleges that Defendants, by misrepresentations and omissions, failed to alert investors to a known trend of loan extensions and internal loan downgrades in the Commercial Residential Portfolio.

### 2.  Accounting:

The SEC alleges that Defendants committed accounting fraud violations in connection with Bancorp's 2007 Form 10-K.[6]  According to the SEC, Bancorp engaged an investment bank, JMP Securities, Inc. ("JMP"), in 2007 to sell some of the problem loans in the Commercial Residential Portfolio (the "JMP Loans"), yet Bancorp did not reclassify the JMP Loans from

---

[4]  Form 10-Q is a report that must be filed by publicly traded companies for each of their first three fiscal year quarters.  See http://www.sec.gov/answers/form10q.htm (last visited on October 31, 2013). "The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year." Id.

[5]  "The earnings conference call is a way for companies to relay information to all interested parties, including institutional and individual investors, as well as buy- and sell-side analysts." See http://www.investopedia.com/ask/answers/04/052104.asp (last visited October 31, 2013).

[6]  Form 10-K is an annual report that must be filed by publicly traded companies.  See http://www.sec.gov/answers/form10k.htm (last visited on October 31, 2013). "The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." Id.

"held-for-investment" to "held-for-sale" in accordance with Generally Accepted Accounting Principles ("GAAP").  As a result, Bancorp avoided writing down the JMP Loans to the lower of cost or fair value and reporting a materially significant loss for 2007 in the Form 10-K.

    3.  *Controls:*

The SEC alleges that Bancorp failed to maintain or follow adequate internal Disclosure Controls and Procedures ("DC&P") in violation of Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).  According to the SEC, the DC&P that were maintained by Bancorp were usurped by Levan, were never properly in place, or failed.

Defendants have retained MacDonald, James and Huber, all of whom are nonscientific expert witnesses, to testify at trial concerning these allegations of securities laws violations.  The SEC has retained a single nonscientific expert witness, Turner, for the same purpose.  In their respective Daubert Motions, Plaintiff and Defendants do not challenge the overall professional qualifications of these expert witnesses.[7]  However, each side argues that the other's proposed expert testimony raises serious concerns about: the reliability of the testimony; whether the testimony will assist the trier of fact; and whether the testimony will invade the province of the Court to instruct the jury.

## II. <u>LEGAL STANDARDS</u>

A party who seeks to admit expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence.  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).  Thus, before expert testimony may be admitted as evidence at trial pursuant to Rule 702 of the Federal Rules of Evidence, the district court must act as a gatekeeper and screen the proffered evidence.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  In the Eleventh Circuit, this gatekeeping function must be performed as

---

[7]  Defendants do object to Turner's lack of expertise in a particular area, as more fully discussed below.

follows:

> [I]n determining the admissibility of expert testimony under Rule 702, [the court must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).   See also, McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (The gatekeeping function requires the trial court "to conduct an exacting analysis of the proffered expert's methodology" to ensure it meets the standards of admissibility under Daubert.).

However, a "district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (citing Allison, 184 F.3d at 1311).   Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Allison, 184 F.3d at 1311.

## A.  First **Daubert** Inquiry - Expert's Qualifications

"While scientific training or education may provide possible means to qualify [an expert], experience in a field may offer another path to expert status." United States v. Masferrer, 367 F. Supp. 2d 1365, 1372 (S.D. Fla. 2005) (citing Frazier, 387 F.3d at 1260-61).   "[I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." United States v. Augustin, 661 F.3d 1105, 1125 (11th Cir. 2011) (citing Frazier, 387 F.3d at 1261).   In this case, all of the proffered experts

are nonscientific and rely primarily on their experience in their respective professional fields to justify their opinions.  Therefore, although the experts' overall professional qualifications have not been challenged, those qualifications are a factor to take into consideration when assessing the reliability of their opinions.  Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261.

### B.  Second Daubert Inquiry - Reliability of Expert's Opinion

"For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)).  Thus, "[a] district court may decide that nonscientific expert testimony is reliable based upon [the expert's] personal knowledge or experience."  Schoenthal, 555 F.3d at 1338 (citing Kumho, 526 U.S. at 150).   In the context of nonscientific experts, therefore, the main purpose of the Daubert reliability inquiry is to determine whether the expert who is "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1255 (11th Cir. 2005) (citing Kumho, 526 U.S. at 152).

### C.  Third Daubert Inquiry - Helpfulness/Relevance of Expert's Testimony

"To be admissible, expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.  This condition goes primarily to relevance."  Johnson v. Bush, Case No. 00-3542-CIV, 2002 WL 34355950, at *1 (S.D. Fla. Apr. 19, 2002).  Put another way, the proposed testimony must "fit" the case.  Id.  See also, Allison, 184 F.3d at 1312 ("[T]he court must ensure that the proposed testimony is relevant to the task at hand, i.e., that it logically advances a material aspect of the proposing party's case.").

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding

of the average lay person." Frazier, 387 F.3d at 1262.  However, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).  In the Eleventh Circuit, "an expert may offer opinion testimony on an ultimate issue of fact, Fed. R. Evid. 704, [but] an expert may not [] merely tell the jury what result to reach." United States v. Caro, 454 F. App'x 817, 843 (11th Cir. 2012) (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)).  Further, "while an expert may testify as to his opinion on an ultimate issue of fact, [he or she] may not testify to the legal implications of conduct; the court must be the jury's only source of law.'" Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. P'ship, Case No. 04-80283-CIV, 2005 WL 5955691, at *5 (S.D. Fla. Jan. 11, 2005) (citing Montgomery, 898 F.2d at 1541).

While an expert may opine "as to whether one party or another acted in compliance with industry standards, an expert cannot permissibly opine on whether a party had a right to do what it did under *legal* standards.  Instead, this area is reserved for the Court." R&R Int'l, Inc. v. Manzen, LLC, Case No. 09-60545-CIV, 2010 WL 3605234, at *19 (S.D. Fla. Sept. 12, 2010). See also, United States v. Long, 300 F. App'x 804, 814-16 (11th Cir. 2008) (finding it admissible for a forensic expert witness to testify that the actions of the defendant "bore the hallmarks of a Ponzi Scheme" because it "was a factual, and not a legal conclusion," but excluding an expert who used the language "artifice or scheme to defraud").

### III. THE EVIDENTIARY HEARING

On September 23-25, 2013, the undersigned heard the testimony of MacDonald, James, Huber and Turner regarding their proposed expert opinions.  Defendants tendered MacDonald on the subject of Defendants' alleged failure to reclassify the JMP Loans from "held-for-

investment" to "held-for-sale pursuant to GAAP; James on the subjects of Defendants' alleged failure to provide appropriate disclosures in the MD&A section of Bancorp's 2007 first and second quarter Forms 10-Q and Defendants' alleged misrepresentations during the 2007 first and second quarter earnings conference calls; and Huber on the subjects of Bancorp's allegedly inadequate DC&P and misleading public disclosures.[8]   The SEC tendered Turner as its sole expert witness with respect to all of these issues.

By agreement of the parties, the initial and rebuttal report of each expert were deemed to constitute that expert's direct examination.  See Order Setting Evidentiary Hearing [D.E. 216]. Thus, the live testimony at the evidentiary hearing was limited to cross-examination and re-direct examination of each witness.  Having considered the expert witnesses' proposed trial testimony (as expounded at the Daubert Evidentiary Hearing), the pertinent portions of the record and the applicable law, the undersigned concludes with regard to Defendants' experts that MacDonald and Huber satisfy the Daubert requirements and that James also satisfies them, except for two of his opinions.  The undersigned also concludes that the SEC's expert, Turner, passes muster under Daubert.

## IV. MACDONALD

At trial, MacDonald would offer the following opinions:  (1) Defendants were not required by GAAP to reclassify the JMP Loans from "held-for-investment" to "held-for-sale;" and (2) even if the loans had to be reclassified as "held-for-sale," the resulting write down of the loans should not be calculated using the fair value approach proposed by the SEC's expert. McDonald Expert Report [D.E. 171-20 at ¶ 10].

---

[8]   Judge Scola has ruled that certain statements made by Levan during the second quarter earnings conference call were false as a matter of law.  See Omnibus Order on Summary Judgment [D.E. 234 at 12-15].

### A. Reclassification of the JMP Loans

MacDonald began her analysis by evaluating the relevant GAAP principles applicable to determining whether the JMP Loans should have been reclassified from "held-for-investment" to "held-for-sale." Id. at ¶¶ 11-17. The first GAAP source she consulted was the American Institute of Certified Public Accountants' Statement of Position 01-6 ("SOP 01-6"). See Transcript of Daubert Evidentiary Hearing on September 23, 2013 (hereafter, "Trans. 9/23") [D.E. 243 at 10, 24-25]. According to MacDonald, SOP 01-6 provides that loans previously classified as "held-for-investment" should be reclassified as "held-for-sale" at the lower of cost or fair value only after a decision has been made to sell them. MacDonald Expert Report [D.E. 171-20 at ¶ 12]. Because SOP 01-6 does not explain how to determine whether "a decision to sell" has been made, Trans. 9/23 [D.E. 243 at 11], MacDonald then turned to Financial Accounting Standard 144 ("FAS 144") for further guidance. MacDonald Expert Report [D.E. 171-20 at ¶ 13].[9]

Although FAS 144 does not pertain to loans, Trans. 9/23 [D.E. 243 at 15], MacDonald, as the primary author of FAS 144, reasoned by analogy from that source because there was a void in GAAP with respect to loans, and FAS 144 supplied guidance for long-lived assets, the most analogous asset to loans. Id. at 56-60. According to MacDonald, FAS 144 provides that intent to sell is not sufficient to classify a long-lived asset as "held-for-sale." MacDonald Expert Report [D.E. 171-20 at ¶ 14].

In MacDonald's opinion, the factual record did not reflect that Bancorp, through Levan or otherwise, had made a decision to sell the JMP Loans. Id. at ¶ 18. Specifically, MacDonald opined that Bancorp's engagement with JMP regarding the JMP Loans constituted a market test

---

[9] The FAS promulgated by the Financial Accounting Standards Board ("FASB") were the highest GAAP authority in 2007 and 2008. Trans. 9/23 [D.E. 243 at 54].

and not a decision to sell. Id. at ¶¶ 19-50.[10]  MacDonald testified that, under FAS 144, when "there [are] indicia that you are test marketing [] long-lived assets, you will not call it Held-for-Sale even if all of the other conditions [for a sale] are met." Trans. 9/23 [D.E. 243 at 60].  When asked whether a jury could just as easily undertake the same review of the record that she had conducted to reach her conclusions, MacDonald responded that her review had been conducted through the lens of her understanding of GAAP, and based on her professional experience. Id. at 23.

### B.  The SEC's Expert's Fair Value Approach

According to MacDonald, even if the JMP Loans should have been reclassified as "held-for-sale," the fair value approach utilized by the SEC's expert was not valid under GAAP. MacDonald Expert Report [D.E. 171-20 at ¶¶ 51-83].  MacDonald looked to FAS 157, which addresses fair value measurements, for guidance on determining fair value. Id. at ¶¶ 53-54.[11] FAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Trans. 9/23 [D.E. 243 at 64].  Thus, an orderly transaction is one of the bases for determining fair value. Id. at 65.

In MacDonald's opinion, bids in a proposed sales transaction that reflect distressed pricing cannot qualify as a measurement of fair value under FAS 157 because the sale would not constitute an "orderly transaction."   MacDonald Expert Report [D.E. 171-20 at ¶ 75]. MacDonald further testified that, for purposes of reclassifying the JMP Loans as "held-for-sale," the applicable fair value "measurement date" under FAS 157 would have been December 31,

---

[10]  In MacDonald's view, the following are indicia of a decision to sell: "the plan of sale must be approved by management having the authority to take such action;" the "actions needed to complete the plan of sale . . . must be initiated;" and "the actions needed to complete the plan of sale must indicate that it is unlikely that . . . the plan will be withdrawn." Id. at ¶ 14].

[11]  MacDonald testified that she had led the team that developed FAS 157 and that she was the primary author for the final rule. Trans. 9/23 [D.E. 243 at 64].

2007. Trans. 9/23 [D.E. 243 at 30]. However, all of the bids relied upon by the SEC were received at some point after that date, MacDonald Expert Report [D.E. 171-20 at ¶¶ 55-63], and, in any event, an unaccepted offer cannot form the basis for a transaction date. Trans. 9/23 [D.E. 243 at 65-66].[12]

MacDonald testified that the SEC's proposed approach for determining fair value of the JMP Loans was missing a number of steps required under GAAP. Id. at 38-39. Though MacDonald admitted that she did not undertake these steps herself, including reviewing the underlying appraisals, performing a discounted cash flow analysis or confirming the findings of Bancorp's external auditors, id. at 40-44, she saw no signs that the SEC's expert, Turner, who actually valued the JMP Loans, carried out any of these tasks when computing their fair value. Id. at 66-68.[13] According to MacDonald, the only two bids upon which Turner relied, which were received after the measurement date in a disorderly transaction, could not provide a legitimate basis to determine fair value under GAAP. Id.

**C. Challenges to MacDonald's Opinions**

The SEC challenges the reliability and helpfulness/relevance of MacDonald's opinions. As to reliability, the SEC argues (i) that MacDonald's first opinion on GAAP compliance is not reliable because she applied no real methodology and did nothing more than weigh the factual evidence, which is a task solely reserved to the jury, and (ii) that her second opinion is not reliable because she failed to carry out her own valuation of the JMP Loans. MacDonald Motion [D.E. 159 at 3]. As to helpfulness/relevance, the SEC argues (i) that MacDonald's first opinion

---

[12] Additionally, MacDonald opined that, while an orderly transaction is fundamental to a determination of fair value, there would be no orderly transaction where only six out of fifty potential bidders responded to JMP's solicitation and at least three of those bids contemplated distressed debt pricing. Id. at 65-66.

[13] While MacDonald conceded on cross-examination that there is no mathematical formula to determine fair value, Trans. 9/23 [D.E. 243 at 34], she clarified that, under GAAP, one is expected to conduct a comprehensive approach and that, while a certain amount of artistry is involved in the process, it has more to do with the precision of the valuation rather than the methodology used in conducting the valuation. Id. at 67-68.

on GAAP compliance is ultimately a legal conclusion, which is improper and intrudes on the Court's role; and (ii) that in rejecting the SEC's expert's determination of fair value in her second opinion, MacDonald reached an improper legal conclusion and provided no coherent alternative theory of her own. Id.

### 1. Reliability

Because MacDonald is a nonscientific expert, consideration of her qualifications is part of the inquiry into the reliability of her methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. MacDonald is a Certified Public Accountant with over thirty years of professional experience in financial accounting and reporting, including her present position as a Senior Managing Director in the forensic and litigation consulting practice of FTI Consulting, Inc. and as a past Director of the Financial Accounting Standards Board ("FASB"). MacDonald Expert Report [D.E. 171-20 at ¶¶ 4-8]. MacDonald also worked at the SEC's Enforcement Division on investigations into fraud and GAAP violations associated with public companies' financial statements. Id. at ¶ 6.

### (i)   MacDonald's first opinion on GAAP compliance

The SEC contends that MacDonald applied no real methodology and did nothing more than a jury would do with respect to this opinion. However, as discussed above, MacDonald testified that she consulted the GAAP guidance that she found to be relevant to the classification of loans as "held-for-sale;" applied that guidance, viewed through the lens of her extensive experience in financial accounting and reporting, to the factual record; and opined that the JMP Loans were correctly classified under GAAP as "held-for-investment" rather than "held-for-sale." Because her methodology was informed by and conducted in accordance with her professional experience, MacDonald's opinion as a nonscientific expert meets the Daubert reliability prong. Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255. Moreover, because

she applied her professional experience to formulate her opinion, MacDonald did not just weigh the facts as a lay jury would.

*(ii)     MacDonald's second opinion on fair value*

The SEC challenges MacDonald's second opinion as unreliable because, while criticizing the SEC's expert's valuation, she did not perform one herself.  However, the impact of such failure simply goes to the weight to be given by the jury to MacDonald's opinion, rather than its admissibility.  <u>Rosenfeld v. Oceania Cruises, Inc.</u>, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

## 2.     <u>Helpfulness/Relevance</u>

The SEC also seeks to exclude both of MacDonald's opinions under the helpfulness/relevance inquiry as improper legal conclusions.

*(i)     MacDonald's first opinion on GAAP compliance*

The SEC argues that MacDonald's first opinion constitutes an impermissible legal opinion because the "clear risk here is the jury will likely confuse MacDonald's opinion that the Defendants followed GAAP as a determinative conclusion, if not exactly the same as, finding the Defendants did not violate the federal securities laws."  MacDonald Motion [D.E. 159 at 7]. However, expert testimony as to the interpretation of GAAP and its application to the facts of a case is permissible and does not, without more, constitute improper legal conclusions.  <u>See e.g.</u>, <u>In re Novatel Wireless Sec. Litig.</u>, Case No. 08cv1689, 2011 WL 5827198, at *3 (S.D. Cal. Nov. 17, 2011) (admitting expert testimony of "whether Defendants complied with SEC and GAAP requirements" but excluding testimony about what their contracts permitted); <u>S.E.C. v. Leslie</u>, Case No. C 07-3444, 2010 WL 2991038, at *7-9 (N.D. Cal. July 29, 2010) (admitting expert's interpretation of GAAP but excluding testimony about judicial opinions and Securities Exchange

Rule quotations); S.E.C. v. Retail Pro, Inc., No. 08cv1620, 2011 WL 589828, at *4 (S.D. Cal. Feb. 10, 2011) (finding that evidence regarding GAAP and revenue recognition was a proper basis for expert testimony). Therefore, so long as MacDonald's testimony does not veer into the subject of securities laws violations, her opinion that GAAP did not require Defendants to reclassify the JMP Loans from "held-for-investment" to "held-for-sale" is not impermissible, even if GAAP compliance is an element of the securities laws violations alleged by the SEC.

Further, the Eleventh Circuit has "recognized that an instruction may be used to prevent a jury from placing too much weight on an expert's legal conclusions." Maiz, 253 F.3d at 667. See also, United States v. Gold, 743 F.2d 800, 817 (11th Cir. 1984) (upholding the district court's decision to admit expert testimony about an ultimate legal issue in the case because the court was "careful to instruct the jury about the weight that should be given expert testimony such as [this]"). Indeed, the Eleventh Circuit has ruled that in such instances "[i]f the district court takes a curative measure, [the appellate] court will reverse only if the evidence is so prejudicial as to be incurable by that measure." United States v. Pacheco, 426 F. App'x 832, 835 (11th Cir. 2011). Thus, the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on MacDonald's opinion regarding GAAP compliance.

### (ii)   MacDonald's second opinion on fair value

The SEC argues that MacDonald's second opinion "attempts to 'rule' on the adequacy of support for the [SEC]'s 'held-for-sale' claim, and, in doing so, seeks to reach an impermissible legal conclusion." MacDonald Motion [D.E. 159 at 10]. However, MacDonald's criticism of Turner's approach to computing the fair value of the JMP Loans is neither a "ruling" nor an "impermissible legal conclusion." Novatel, 2011 WL 5827198, at *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Moreover, the SEC may seek an

appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on MacDonald's opinion regarding the SEC's proposed fair value calculation.  Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 F. App'x at 835.

Therefore, the MacDonald Motion is denied.

## V. JAMES

At trial, James would offer the following opinions relating to Defendants' public disclosures:  (1) the credit market crisis unexpectedly and negatively impacted real estate prices and market conditions for lenders beginning in the third quarter of 2007; (2) The MD&A disclosures in Bancorp's 2007 first and second quarter Forms 10-Q were consistent with regulatory requirements and industry practice; (3) Bancorp's loan performance during that time was consistent with Defendants' specific disclosures as well as the market trends they disclosed; and (4) several analysts thought that Bancorp was conservative in disclosing negative trends and addressing problem loans.  James Expert Report [D.E. 155-1 at 2-4].  James testified that, in preparing his expert report, he "followed the same procedures that [he] does in his research . . . [and] that are commonly used by economists" and that those procedures are the same as "the scholarly standard and the scientific standard that [are] applied when [he does his] own published research."  Transcript of Daubert Evidentiary Hearing on September 24, 2013 (hereafter "Trans. 9/24") [D.E. 244 at 187, 196].[14]

### A. The credit market crisis

According to James, the credit markets dramatically and unexpectedly declined in August 2007 and the real estate sector deteriorated significantly amid this crisis.  James Expert Report [D.E. 155-1 at ¶¶ 19-46].  James opined that Florida was more affected by the real estate

---

[14]   In response to repeated inquiries into the methodology underlying his market observations, James explained that methodology in detail and occasionally corrected SEC's counsel's articulation of it.  Trans. 9/24 [D.E. 244 at 150-68].

downturn than almost all other states. Id. at ¶ 39.  When asked why he focused on trends in the Florida real estate market when the SEC did not allege such a trend in its complaint, James responded that Defendants' "disclosing their business and its exposure to the real estate market [was], in [his] opinion, disclosing an important trend that is common to their business model and the loans they make." Trans. 9/24 [D.E. 244 at 168-69].

### B.  Consistency of disclosures with regulatory requirements and industry practice

According to James, Defendants' public disclosures were adequate in that they disclosed: (1) known trends in the real estate market and the risks in BankAtlantic's loan portfolio; (2) the fact that problem loans existed throughout the portfolio; (3) risks consistent with regulatory requirements; and (4) risks that were more comprehensive than those of most comparable banks. James Expert Report [D.E. 155–1 at ¶¶ 47-84].  The SEC asked James whether he was aware of any evidence supporting Defendants' non-disclosure of Bancorp's internal loan grades.  Trans. 9/24 [D.E. 244 at 172-77].  James responded that he relied on the deposition testimony of bank employees, id., and his own experience as a director of a bank for 16 years in concluding that this type of information is not commonly disclosed because such level of disclosure is discouraged by bank regulators.  Id. at 197-98.  The SEC also questioned whether James had actually compared Bancorp's disclosures with the other banks' disclosures in terms of what was happening in their loan portfolios, and, in particular, their own internal loan grades.  Id.  at 176-77.  James responded that he did look at the other banks' disclosures, but acknowledged that, because internal loan grades are not generally publicly available, he was not able to review them. Id.[15]

---

[15]  Judge Scola has ruled that evidence that the Office of Thrift Supervision prohibits the disclosure of internal loan grades in the MD&A section of 10-Q's is admissible because it is relevant and material to Defendants' overall state of mind.  See Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 10(F)].

**C. Consistency of Bancorp's loan performance with Defendants' specific disclosures and the market trends they disclosed.**

According to James, Bancorp's actual loan performance was consistent with Defendants' specific disclosures as well as the market trends they disclosed. James Expert Report [D.E. 155–1 at ¶¶ 85-91]. In formulating this opinion, James reviewed the deterioration of BankAtlantic's Commercial Residential Portfolio through the fourth quarter of 2008. Id. at ¶¶ 85-86. James also looked to performance data for the loan portfolios of other, purportedly similarly situated Florida and non-Florida banks through the fourth quarter of 2008. Id. at ¶¶ 87-91. After noting that Defendants reported worse than average losses in the third quarter of 2007, James observed that most of the other banks he considered eventually reported similar losses to Bancorp's and caught up to Bancorp's reported losses by the end of 2008. Id. at ¶¶ 86-91. Based on these observations, James concluded that, "throughout the first half of 2007 [Defendants] warned about the negative market trend" and that "[t]he losses [Bancorp] reported in [the third quarter of 2007] therefore can be described as the realization of a disclosed risk, the magnitude of which was unforeseeable by most market[] participants" and "in line with that experienced by comparable banks." Id. at ¶ 85. To put it in simpler terms, the gist of this third opinion by James is that the events that occurred after the first and second quarters of 2007, both with respect to Bancorp's and other banks' loan performances, show that Defendants' public disclosures in those two quarters were "par for the course."

**D. Analysts' Reports**

According to James, several analysts indicated that Bancorp was conservative in disclosing negative trends and problem loans in 2007, that Bancorp recognized the negative trend in Florida real estate, and that Bancorp was one of the most proactive banks in addressing and disclosing market concerns and regarding the deterioration of Bancorp's real estate loan portfolio. Id. at ¶¶ 92-100. In support of these observations, James quoted and summarized the

underlying analysts' reports. Id.  When challenged regarding his "expertise in reading an analyst's report and providing a one-sentence summary" of it, Trans. 9/24 [D.E. 244 at 186], James acknowledged that he did not possess such expertise, but explained that those reports are of the same type as those on which he would rely in his published research. Id.

### E.  Challenges to James' Opinions

The SEC objects to James testifying on the grounds that: (1) James' opinion that the credit crisis unexpectedly and negatively impacted real estate prices and market conditions for lenders beginning in the third quarter of 2007 is irrelevant, based on flawed methodology, and will confuse the jury; (2) James' opinion that Defendants' disclosures appear consistent with regulatory requirements and industry practice is a legal opinion that improperly invades the province of the Court and jury, and is also irrelevant and unreliable; (3) James' opinion that Bancorp's loan performance was consistent with Defendants' specific disclosures and the market trends they disclosed is irrelevant and unreliable; and (4) James' opinion reporting the contents of analysts' reports regarding Bancorp's disclosures is hearsay.  James Motion [D.E. 155 at 5-18].  Thus, the SEC's challenges to James' opinions fall into three categories: the reliability of James' methodology; the helpfulness/relevance of his opinions; and, as to the fourth opinion, that it is hearsay.

### 1.  Reliability

Because James is a nonscientific expert, consideration of his qualifications is part of the inquiry into the reliability of his methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. James is the William H. Dial/Sun Bank Eminent Scholar and Professor of Finance and Economics at the University of Florida, as well as a visiting scholar at the Federal Reserve Bank of San Francisco.  James Expert Report [D.E. 155-1 at 1].  James has authored or co-authored numerous peer-reviewed articles on economics and banking. Id. at App. A.  In 1995 and 1998,

James served as a consultant to the Federal Reserve Board of Governors. Id. Additionally, from 1989 to 2006, James served on the Board of Directors and the Advisory Board to SunTrust Banks of Florida. Id. James testified that the methodology for all of his opinions was grounded in the same level of intellectual rigor that undergirds the work of professional economists in the field. Trans. 9/24 [D.E. 244 at 187, 198]. Hence, the SEC's challenge to the reliability of James' methodology fails. See McClain, 401 F.3d at 1255 (an expert basing testimony upon professional studies or personal experience must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field); Maiz, 253 F.3d at 665-66 (finding an economists' theories and methodology sufficiently reliable where his model was not unusually complex and his use of a broad-based index to estimate the performance of U.S. real estate was not without foundation).

### 2. Helpfulness/Relevance

The SEC challenges the helpfulness/relevance of James' first three opinions.

#### (i) James' first opinion on the credit market crisis

The SEC argues that this opinion is not relevant because it will not help the trier of fact understand a fact in issue, as there is no requirement for the SEC to prove loss causation. Plaintiff's Reply Memorandum in Support of its Daubert Motion to Exclude the Opinion and Testimony of Christopher M. James (hereafter, "James Reply") [D.E. 201 at 4]. In order to prevail on its securities fraud claims, the SEC must show that Defendants knowingly, willingly or recklessly made untrue statements or omissions of material fact. See Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.[16] Significantly, the SEC must show that the allegedly misleading statements or omissions made by

---

[16] Thus, the SEC's burden here is different from that of plaintiffs in a private securities class action that was based on the same events, namely, Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713 (11th Cir. 2012). There, in addition to the foregoing elements, plaintiffs needed to prove loss causation and damages. Id. at 725.

Defendants were *material*. Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988). A fact is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32. The credit market crisis' impact on real estate prices and market conditions for lenders would arguably have been part of the "total mix" of information considered by reasonable investors in the first half of 2007. Therefore, James' first opinion is not unhelpful or irrelevant.

> *(ii) James' second opinion on consistency of disclosures with regulatory requirements and industry practice.*

The SEC argues that James' second opinion is an impermissible legal opinion and that disclosures made by other banks are irrelevant to whether Defendants made adequate disclosures. James Motion [D.E. 155 at 9]. However, in addition to materiality, the SEC must prove scienter by showing that Defendants acted with, at a minimum, severe recklessness, when making the alleged misleading statements or omissions in their public disclosures. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008). Severe recklessness is "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. Adherence to, or departure from, industry standards can be probative of whether ordinary care was observed in conducting business. Messer v. E.F. Hutton & Co., 847 F.2d 673, 677-78 (11th Cir. 1988). Because James' opinion on regulatory requirements and industry standards goes to an element of the SEC's securities fraud claims, it is not irrelevant. Allison, 184 F.3d at 1312.[17]

---

[17] Judge Scola has ruled that testimony comparing Bancorp's disclosures and performance to that of other banks will only be admissible at trial to rebut scienter to the extent that Levan or anyone else at Bancorp knew of the disclosures and performance of other banks and relied upon that knowledge in their activities

Moreover, expert testimony on regulatory requirements and industry practices is permissible and does not, without more, constitute improper legal conclusions. <u>Novatel</u>, 2011 WL 5827198, at *3; <u>Leslie</u>, 2010 WL 2991038, at *7; <u>Retail Pro</u>, 2011 WL 589828, at *4. Therefore, so long as James' testimony does not veer into the subject of securities laws violations, his second opinion is not impermissible.   And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on James' second opinion. <u>Maiz</u>, 253 F.3d at 667; <u>Gold</u>, 743 F.2d at 817; <u>Pacheco</u>, 426 F. App'x at 835.

> *(iii) James' third opinion on consistency of Bancorp's loan performance with Defendants' specific disclosures and the market trends they disclosed.*

As noted above, James' third opinion is, essentially, that the events that occurred after the first and second quarters of 2007, both with respect to Bancorp's and other banks' loan performances, show that Defendants' public disclosures in those two quarters were "par for the course."  The SEC contends that this opinion is irrelevant and unreliable.  According to the SEC, the opinion would mislead or confuse the jury because the performance of other banks is not relevant to the SEC's claims, and because, without access to the other banks' internal loan portfolios, any such comparisons would be unreliable.   James Motion [D.E. 155 at 15-16]. Defendants counter that the fact that comparable banks eventually reported the same types of losses as Bancorp, demonstrates that Bancorp responded more aggressively to the crisis by reporting those losses in the third quarter of 2007, and that "[s]uch evidence undercuts any claim that there was any intention to mislead investors," which is critical for the establishment of scienter.  Defendants' Memorandum in Opposition to Plaintiff's *Daubert* Motion to Exclude the Testimony of Christopher M. James (hereafter, "James Response") [D.E. 178 at 20, 23]. Defendants also argue that specific knowledge of the comparable banks' internal loan portfolios

---

and decision-making process.  <u>See</u> Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 10(E)].  Logically, James' second opinion is subject to this same restriction.

was unnecessary since the loans in question were not an "exotic type of loan only made by [Bancorp]." Id. at 24.

The undersigned fails to see how James' third opinion, which is wholly predicated on after-the-fact events involving not only Bancorp but other banks, would be relevant to rebutting the element of scienter in the SEC's securities fraud claims. Additionally, Defendants failed to meaningfully address the SEC's contention that the data from other banks utilized by James is incomplete, given his lack of access to those banks' internal loan portfolios. Therefore, the undersigned agrees that James' third opinion is both irrelevant and unreliable and finds that it should be excluded.[18]

### 3. Hearsay Objection

The SEC argues that James' fourth opinion does nothing more than recite the contents of analysts' reports regarding Bancorp's disclosures, hence is inadmissible hearsay. James Motion [D.E. 155 at 16-18]. Defendants contend that James' opinion and the analysts' reports are admissible under Fed. R. Evid. 703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. See also, Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co., Case No. 07-CIV-21404, 2009 WL 2208166, at *2 (S.D. Fla. July 24, 2009) (admission of hearsay evidence through an expert creates a danger that the testifying expert will serve as a conduit for the opinions of others).

Defendants argue that, James, as an expert, was entitled to rely on the analysts' reports in

---

[18]   Although the undersigned has found that James utilized an acceptable overall methodology, this particular opinion is unreliable due to the lack of complete data.

forming his own opinion notwithstanding their hearsay status. James Response [D.E. 178 at 19]. Defendants further argue that the reports may be disclosed directly to the jury "because…they are a contemporaneous assessment…that directly undercut[s] the SEC's theory of fraud." Id. at 19-20. As noted above, James did testify that these analysts' reports are of the type that he would rely on in his own research. However, James' purported fourth opinion consists of nothing more than a summary of the analysts' reports. James Expert Report [D.E. 155–1 at ¶¶ 92-100]. Because James did not actually render an opinion, the probative/prejudicial prong of Rule 703 does not come into play and Defendants' attempt to gain admissibility of the hearsay analysts' reports through Rule 703 to rebut the SEC's securities fraud claims fails.

Therefore, the James Motion is denied as to his first and second opinions but granted as to the third and fourth ones.

## VI. HUBER

At trial, Huber would offer the following opinions:  (1) during the relevant period, Bancorp's relevant DC&P were adequate under the circumstances; and (2) Bancorp's disclosures in its 2007 first and second quarter Forms 10-Q concerning known trends or uncertainties were adequate under the circumstances, and the statements made during the 2007 first and second quarter earnings conference calls were not misleading. Huber Expert Report [D.E. 148-1 at 13].

### A. Adequacy of Bancorp's relevant DC&P.

According to Huber, during the period in question, Bancorp's relevant DC&P were adequate under the circumstances. Huber Expert Report [D.E. 148–1 at ¶¶ 22-69]. Huber further opined that adjustments made by Bancorp to its DC&P during the period from January 1 through November 9, 2007 enabled Bancorp to respond to evolving market conditions, id. at ¶¶ 27-52; that Bancorp's DC&P incorporated reviews conducted by external third parties, id. at ¶¶ 53-58; that Bancorp's public disclosures were drafted in an atmosphere of open communication

and cooperation, id. at ¶¶ 59-62; and that Bancorp's internal certification process by its senior management provided an additional check to ensure that its DC&P were complete and accurate. Id. at ¶¶ 63-68.  Huber also opined that Bancorp had adequate DC&P in place before the credit crisis, and that Bancorp was proactive in adjusting and adapting its DC&P to address the downturn in the Florida real estate market.  Id. at ¶¶ 27-52.  "As conditions deteriorated in 2007, [Bancorp] enhanced its processes . . . and senior . . . executives were proactive and ordered measures to refine [Bancorp's] disclosure, controls and procedures as conditions deteriorated." Id. at ¶ 15.  In concluding that the DC&P were adequate throughout the crises, Huber thoroughly analyzed Bancorp's formal and informal credit approval and loan monitoring functions.  Id. at ¶¶ 53-68.

### B.  Adequacy of Defendants' disclosures

Huber testified that the existence of adequate DC&P would also be relevant to determining whether there was intent to deceive or mislead by Defendants in their public disclosures, and that, in this case, the DC&P "facilitate[d]…disclosure being made."  Transcript of Daubert Evidentiary Hearing on September 25, 2013 (hereafter "Trans. 9/25") [D.E. 245 at 61-62].  Huber further testified, in response to various examples posed by Defendants' counsel, that the public disclosures made by Defendants matched the internal commentary at Bancorp.  Id. at 68-81, 85.

According to Huber, Bancorp's disclosures in the 2007 first and second quarter 10-Q's regarding known trends or uncertainties in BankAtlantic's Commercial Residential Portfolio were adequate under the circumstances.  Huber Expert Report [D.E. 148–1 at ¶¶ 68-87].  Huber further opined that, considering the total mix of information, Defendants' disclosures in the 2007 first and second quarter earnings conference calls were not misleading, id. at ¶¶ 88-103, and that "disclosing downgraded and extended loans could have confused, rather than informed,

investors." Id. at ¶ 17.  Huber clarified that his opinion reflects how he, as a professional who

works in the field of disclosure, would have advised management to disclose the trend it

identified, and such level of disclosure would have been preferable because it was more general

and easily understood by investors than "complex specifics that might be included within the

general." Trans. 9/25 [D.E. 245 at 43-46].[19]

The SEC asked Huber to confirm his opinion that management did not appear to believe

that extensions or downgrades in the first and second quarters constituted a known trend

requiring disclosure, id. at 52, and his opinion that the total mix of information indicated that

Levan did not intentionally mislead investors during the first and second quarter earnings

conference calls. Id. at 53.  Huber confirmed his opinions, and indicated that they were based

on his experience as an expert in the field of securities disclosure, combined with his review of

the record. Id. at 52-55.

### C. Challenges to Huber's Opinions

The SEC objects to Huber's methodology based on how Huber structured his team of

assistants, how he divided the work, and for "not analyzing much of the material he purported to

base his conclusions on." Huber Motion [D.E. 148 at 9].  The SEC further contends that Huber

offers no sound methodology for his conclusions and that those conclusions are nothing more

than a biased recitation of facts. Id. at 1, 4.  Finally, the SEC argues that Huber's testimony will

confuse the jury as it is nothing more than a legal opinion. Id. at 1.  As with MacDonald and

James, the SEC challenges the reliability and helpfulness/relevance of Huber's testimony.

### 1. Reliability

Because Huber is a nonscientific expert, consideration of his qualifications is part of the

---

[19]  Huber repeatedly characterized Defendants' disclosures regarding Bancorp's loan exposure in the
deteriorating Florida real estate market as "putting up a flare," that is, warning the market of a serious
issue. Trans. 9/25 [D.E. 245 at 64-66, 78].

inquiry into the reliability of his methodology.  Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261.  Huber is currently a Senior Managing Director at FTI Consulting, Inc.  Huber Expert Report [D.E. 148-1 at App. A].  Huber previously served as Deputy Director and Director of the SEC's Division of Corporation Finance and was responsible for the Division's rule-making program.  Id.[20]  Huber was also a senior partner at Latham & Watkins, LLP, where he advised clients on securities regulation issues, including compliance with securities laws and internal control over financial reporting.  Id.  Huber is an editor of The Practitioner's Guide to the Sarbanes-Oxley Act, published by the American Bar Association in 2004.  Id.

With regard to Huber's use of assistants, how he divided the work between himself and his staff, and the extent of his own personal analysis of the materials underlying his opinions, Huber testified at his deposition that he closely supervised the work of his team of two certified public accountants, that he did his own review of the documents as needed, that he conducted research independently of his team, and that he and his team generated over twenty drafts of his expert report.  Huber Deposition pp. 29-32 [D.E. 171-1 at 30-33].  This testimony refutes the SEC's contention that Huber's expert work was not his own.

The SEC's argument that Huber simply recites the facts in the record and provides no explanation for his conclusions is similarly refuted by Huber's testimony.  At the Daubert Evidentiary Hearing, Huber explained his reasoning for extensively quoting portions of the record in his expert report as being in keeping with his methodology for writing disclosures in his professional practice.  See e.g., Trans. 9/25 [D.E. 245 at 20-21] (explaining that in writing disclosures he balances "yes or no with respect to putting out all of the facts in a true, accurate, and complete fashion").  At his deposition, Huber testified that his opinion regarding the

---

[20] The Division of Corporation Finance is the division that: drafts the SEC's rules concerning disclosure by companies that report to the SEC; provides interpretive guidance concerning disclosure by public companies; and reviews and comments on filings by public companies.  See http://www.sec.gov/divisions/corpfin/cfabout.shtml (last visited on October 31, 2013).

adequacy of the changes in Bancorp's DC&P was based on his experience in private practice doing DC&P and restatement work, participating in panels with SEC officials, and testifying at SEC hearings.  Huber Deposition pp. 104-05 [D.E. 171-2 at 27-28].  Huber also laid out the twelve factors that he used in deriving his conclusions regarding Bancorp's DC&P.  Huber Deposition pp. 122-28, 145-46 [D.E. 171-2 at 45-51, 68-69].  Further, with respect to his opinion on the adequacy of Defendants' disclosures in the 2007 first and second quarter Forms 10-Q, Huber described in his expert report his analysis of the SEC regulation on MD&A and its application to the facts of this case.  Huber Expert Report [D.E. 148–1 at ¶¶ 69-75].  Similarly, with respect to his opinion regarding the first and second quarter earnings conference calls, Huber outlined his familiarity and experience with the informality of those calls and the importance of considering their content in light of the total mix of information, and explained how he considered these factors in forming his opinion.  Id. at ¶¶ 89-103.

Based on the foregoing, the undersigned finds sufficient record support for Huber's methodology of applying his professional experience to the facts of this case.  Because his methodology was informed by and conducted in accordance with his experience, Huber's opinion as a nonscientific expert meets the reliability prong.  Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255.

### 2. **Helpfulness/Relevance**

The SEC seeks to exclude Huber's opinions under the helpfulness/relevance inquiry as improper legal conclusions on the grounds that they embrace an ultimate legal issue and would tell the jury how to decide the case.  Huber Motion [D.E. 148 at 15-17].  However, expert testimony as to the interpretation of the SEC's requirements relating to DC&P and public disclosures and the application of those requirements to the facts of a case, does not, without more, constitute improper legal conclusions.  Novatel, 2011 WL 5827198, *3; Leslie, 2010 WL

2991038, at *7; Retail Pro, 2011 WL 589828, at *4.  Therefore, so long as Huber's testimony

does not veer into the subject of securities laws violations, his opinions regarding the adequacy

of Bancorp's DC&P and Defendants' public disclosures are not impermissible legal opinions.

And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the

weight the jury may place on Huber's opinions.  Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817;

Pacheco, 426 F. App'x at 835.

> Therefore, the Huber Motion is denied.

## VII. TURNER

> At trial, Turner would provide the following opinions:  (1) during the first and second

quarters of 2007, a material downward trend related to loan quality existed within BankAtlantic's

Commercial Residential Portfolio that was not adequately disclosed in the MD&A section of

Bancorp's 10-Q's and the earnings conference calls for those quarters; (2) Bancorp's lack of

disclosure of this trend failed to inform the investing public of the negative developments; (3)

Bancorp incorrectly categorized certain loans as "held-for-investment;" and (4) due to the failure

to appropriately report certain loans at market value, Bancorp's assets and income before taxes

were overstated by $53 million for the year ended December 31, 2007.  Turner Expert Report

[D.E. 162-3 at ¶¶ 19-24, 113-16].

### A.  Turner's Methodology.

> At the Daubert Evidentiary Hearing, Defendants questioned the number of hours that

Turner devoted to the preparation of his expert report and asked him to confirm the fact that 8

days before his expert report was due, he had billed only 3 hours to the SEC.  Trans. 9/24 [D.E.

244 at 20, 56-57].  Turner confirmed this fact, id., and the additional fact that, in total, he only

billed the SEC 38 hours for the preparation of his expert report.  Id. at 21.  Turner explained that

he worked many additional hours that he did not bill out of "a notion of public service." Id.[21]

Defendants also questioned Turner's independence, given that he was donating time to one party in the case. Trans. 9/24 [D.E. 244 at 21]. Turner responded that "just because you don't bill for all your hours doesn't mean that you're not independent" and that other members of his accounting profession do not see providing this type of public service to be in conflict with their independence. Id. at 22. Turner also stated that he makes it clear on any engagement that his opinions are his own, and that he also takes his ethical responsibilities seriously. Id. at 103-05.[22]

In response to an inquiry as to how many hours he actually spent on the engagement, Turner testified, "I don't recall. . . . I can tell you it was a fair amount of hours." Id. at 22-23. Turner further testified that he approaches the task of providing an expert opinion in the same manner as preparing for an audit. Id. at 24-25, 106-07. Turner explained that "[y]ou plan it up front. You direct the staff as to what you want . . . and then it becomes an iterative process. . . . At the end of the day . . . the audit is signed by the audit partner. It is [his] opinion, . . . not the opinion of the staff." Id. at 25.[23]

### B. Defendants' disclosures.

At the Daubert Evidentiary Hearing, Turner agreed with the proposition that a "collapsing Florida real estate market" was a negative trend, but explained that "if you've got, in a particular part of your loan portfolio . . . some significant positive or negative trends . . . you would need to say that . . . the disclosure needs to run to the particulars of the company, not a

---

[21] Turner testified that public service is "near and dear to [his] heart" and "an important thing in this country." Trans. 9/24 [D.E. 244 at 109]. Furthermore, Tuner provided a sworn declaration attesting to the appropriateness of the time billed and the reliability of his methodology. [D.E. 186-1 at ¶¶ 4-13].

[22] Turner further explained that he doesn't care about his billable hours because he has done "very well in life" and "just enjoy[s] what [he's] doing." Id. at 108.

[23] Turner added that, for professional accountants practicing in the field, in a typical audit staffing, only "about five percent" of the total time billed by the team on the project is billed by the audit partner. The rest of the time is billed by an "audit manager" and "by other staff." Id. at 106.

broad general [statement of] what's happening to everyone." Id. at 43, 45.  Turner opined that Defendants' disclosure of the real estate market trend was not sufficient for MD&A purposes because one has "to put [the disclosure] in the context of what's going on in that particular bank so that the investors can see the bank through the eyes of management." Id. at 121.[24]  Turner stated, "The cause of [Bancorp's loss] was . . . I wouldn't say just the Florida real estate market. Certainly that might have been part of the cause." Id. at 53.

According to Turner, the disclosure in Bancorp's 2007 first quarter 10-Q that non-BLB Loans were "of relatively lower risk than the [BLB] loans" did not correctly identify the trend with respect to the non-BLB loans, albeit he acknowledged that he had not reviewed Bancorp's 2007 third quarter losses to determine if they matched Defendants' earlier disclosures with respect to both the BLB and the non-BLB Loans. Id. at 48-49, 52.  Defendants' counsel asked Turner whether Bancorp had to disclose individual internal loan downgrades and extensions. Id. at 57.  In response, Turner explained that, though trends of downgrades or extensions in a portfolio should be described, it was not necessary to mention specific loans. Id. at 58.  Finally, Defendants' counsel asked Turner if he was aware that banking regulators "unanimously objected to disclosure of internal loan grades." Id. at 60.  Turner confirmed his understanding that bank regulators "didn't like to see the loan grades disclosed," id. at 61, but added that companies would still need to disclose the general trend of these occurrences. Id. at 116.

### C. Reclassification of the JMP Loans

In his testimony, Turner explained his reliance on two offers for establishing his valuation of the JMP Loans. Id. at 75.  Turner clarified that there were actually 6 bids and that he used the 2 highest ones in computing the fair value of the JMP Loans, but could not recall whether these two bids were oral or written or when they were received. Id. at 75-76.

---

[24]  According to Turner, a bank should disclose in its MD&A concerns about creditworthiness within the respective subsections of its loan portfolios. Id. at 115.

Defendants' counsel asked Turner whether the market was "orderly" at the December 31, 2007 measurement date. Id. at 81.  Turner did not respond directly, but opined that, under FAS 157, an orderly transaction is a transaction in which information is available to the buyer and seller to make an informed bid at a fair price. Id. at 82.  In response to Defendants' contention that one of the bids he relied on was from a vulture fund looking for distressed sales in a market under duress, id. at 83-84, Turner disagreed with Defendants' understanding of the term "duress," and explained that, in the context of a FAS issued by the FASB, duress is a term of art that refers only to involuntary sale or liquidation, as in bankruptcy. Id. at 84.

Turner testified that, in opining that Bancorp had made a decision to sell the JMP Loans, he relied, as would an auditor in private practice, on the engagement letter between Bancorp and JMP because it was a legal agreement. Id. at 86.  Defendants' counsel asked Turner if someone else could read the contract language of the engagement letter as meaning something other than that Bancorp was offering the JMP Loans for sale. Id. at 92.  Turner responded that, as a former CFO and corporate executive, he could only read it as a decision to sell loans. Id.

Turner testified that he was not asked to opine regarding the fact that Bancorp still failed to properly account for the JMP Loans in the first quarter of 2008 because "[w]hat [Bancorp] did in the first...quarter [of 2008], at least in [his] mind, [wasn't] relevant to whether they did the accounting right at the end of the fourth quarter of [2007]." Id. at 74-75.

**D. Challenges to Turner's Opinions**

Defendants argue that Turner must be precluded from offering expert testimony at trial on several grounds. First, Defendants argue that Turner did not employ any intellectual rigor in reaching his conclusions. Turner Motion [D.E. 156 at 2].  Specifically, Defendants contend that Turner lacks the qualifications to opine regarding the Florida real estate market; that he billed only 38 hours for the generation of his expert report; that he improperly relied on unqualified

assistants to conduct the underlying research and draft the report; and that he used his team's research to support his preconceived conclusions in favor of the SEC.  Defendants' Reply Memorandum in Further Support of Their Motion in Limine to Exclude the Opinions and Testimony of Lynn E. Turner (hereafter, "Turner Reply") [D.E. 211 at 1-3].

Second, with respect to the "held-for-sale" issue, Defendants argue that Turner's opinions that Bancorp intended to sell the JMP Loans in the fourth quarter of 2007 and that a sufficiently orderly market existed for Bancorp to sell loans at that time; and his calculation of the fair value of the JMP Loans in the fourth quarter of 2007, must all be excluded because they are unreliable. Turner Motion [D.E. 156 at 2].

Third, Defendants argue that Turner's opinions on what a law or regulation says or means cannot be presented to a jury because they are improper legal conclusions and it is the exclusive function of the Court to address, resolve, and instruct on matters of law.  Id.

Fourth, in challenging Turner's opinions that during the first and second quarters of 2007, a material downward trend related to loan quality existed within BankAtlantic's Commercial Residential Portfolio that was not adequately disclosed in the MD&A section of Bancorp's 10-Q's and the earnings conference calls for those quarters and that Bancorp's lack of disclosure of this trend failed to inform the investing public of the negative developments, Defendants parse these two opinions into the following list of sub-opinions, which they argue must be excluded as a matter of law:

    a.    His opinion that BBX violated securities laws by failing to disclose changes in internal loan grades (it is an undisputed fact that the vast majority of publicly reporting banks declined to publish loan grades at the urging of all federal bank regulators and it is undisputed that disclosing the substance of what would be learned from internal loan grades, which BBX did, is perfectly appropriate);

    b.    His opinion that changes in internal loan grades for some land loans constituted a trend requiring disclosure;

  c. His opinion that BBX was required to disclose the number and amount of loan extensions in the first and second quarter of 2007 (the vast majority of financial institutions do not make such disclosures and Turner has no knowledge of the condition of the loans that were extended thus he fails to provide any connection between a loan extension and an increased risk of loss);

  d. His opinion that non-BLB commercial real estate loans were just as risky as BLB loans and that the market should have been told as much (it is indisputable that the risk was not the same and the Company correctly weighed the relative risks and advised the market accordingly and timely);

  e. Any opinion that the Company failed to disclose "crumbling creditworthiness of the loans within BankAtlantic's commercial real estate land acquisition and development portfolio in Q 1 and Q2 of 2007";

  f. His opinion that a company can be guilty of violating securities laws for failing to include in a Form 10-Q information disclosed in an earnings conference call (Turner's opinion is nothing but a legal conclusion and an incorrect one at that); and,

  g. His opinion regarding BBX's and Levan's alleged intent to defraud or deceive (another's intent is not a proper subject of expert testimony).

Id. at 3-4.

 In their first and second arguments, Defendants challenge the reliability of Turner's opinions. In their third argument, they challenge their helpfulness/relevance. Defendants' fourth argument is predicated on parsing Turner's opinions that Defendants failed to disclose a material downward trend in the quality of BankAtlantic's Commercial Residential Portfolio and that the lack of disclosure of this trend failed to inform the investing public of the negative developments.

## 1. **Reliability**

 Because Turner is a nonscientific expert, consideration of his qualifications is part of the inquiry into the reliability of his methodology. Augustin, 661 F.3d at 1125; Frazier, 387 F.3d at 1261. Turner is currently a Managing Director at LitiNomics. Turner Expert Report [D.E. 162-3, Ex. C, at 60]. Turner has over thirty-five years of business, regulatory and academic

experience concerning accounting, auditing and financial reporting matters. Id. From 1996 to 1998, Turner was Vice President and CFO of a high-technology semiconductor and storage systems manufacturing company. Id. From July 1998 to August 2001, he served as Chief Accountant for the SEC. Id. From 2001 until 2003, he was as a professor at Colorado State University where he taught courses in accounting and auditing, including MBA-level classes. Id.

### (i) Turner's intellectual rigor

Defendants first challenge Turner's lack of qualifications to opine regarding the Florida real estate market. In response, the SEC argues that Turner's expertise in the Florida housing market is irrelevant because the "true trend at issue in this case" is not the Florida real estate market, but the "crumbling creditworthiness within the [Commercial Residential] Portfolio as reflected by the multiple loan downgrades and extensions. Response in Opposition re Defendants' Motion in Limine to Exclude the Opinions and Testimony of the SEC's Expert Witness Lynn B. Turner (hereafter, "Turner Response") [D.E. 186 at 15]. However, as discussed above with respect to James, the collapse of the Florida real estate market is not irrelevant to the SEC's claims. Further, at the Daubert Evidentiary Hearing, Turner testified that, while he did not believe that Bancorp's loss was just due to the downturn in the Florida real estate market, that factor might have been part of the cause. But the fact that Turner is not versed in the Florida real estate market does not merit striking him as an expert as Defendants contend; it simply goes to the credibility and weight of his testimony. Rosenfeld, 654 F.3d at 1193 ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility."). Defendants also challenge Turner's reliability based on his having billed the SEC for only 38 hours of his time and for the way he utilized his assistants in rendering his expert report. But Turner testified extensively as to the hours he billed, the independence of his opinion, and the preparation of his expert report in the

34

same fashion as he would conduct an audit. Based on the foregoing, the undersigned finds sufficient record support for Turner's methodology of applying his professional experience to the facts of this case. Because his methodology was informed by and conducted in accordance with his experience, Turner's opinion as a nonscientific expert meets the reliability prong. Schoenthal, 555 F.3d at 1338; McClain, 401 F.3d at 1255.

>    *(ii) The held-for-sale issue*

Defendants argue that Turner's opinions with respect to this issue are unreliable. At the same time, Defendants are attacking those opinions through their own expert on this issue, MacDonald. Therefore, rather than exclude Turner's opinions as Defendants propose, the Court should defer to the jury the task of weighing the testimony of these two opposing experts. Allison, 184 F.3d at 1311 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence.").

## 2.   **Helpfulness/Relevance**

Defendants argue that Turner's opinions on what a law or regulation says or means cannot be presented to a jury as it is the exclusive function of the Court to address, resolve, and instruct on matters of law. However, expert testimony on legal and regulatory requirements is permissible and does not, without more, constitute improper legal conclusions. Novatel, 2011 WL 5827198, *3; Leslie, 2010 WL 2991038, at *7; Retail Pro, 2011 WL 589828, at *4. Additionally, because securities laws constitute a complex topic that is outside the understanding of the average juror, courts have allowed the testimony of experts in this area. See e.g., S.E.C. v. Big Apple Consulting U.S., Inc., No. 6:09–cv–1963–Orl–28GJK, 2011 WL 3753581, at *4 (M.D. Fla. Aug. 25, 2011) (acknowledging that testimony by securities experts is often admitted to assist the jury in understanding complex securities terms, practices and regulations); S.E.C. v.

Sky Way Global, LLC, Case No. 8:09-cv-455-T-23TBM, 2010 WL 5058509, at *4 (M.D. Fla. Dec. 6, 2010) (attorneys can testify in securities cases and offer opinions on securities industry customs and practices).

Therefore, so long as Turner's testimony does not veer into the subject of securities laws violations, his opinions are not impermissible legal opinions.   And the SEC may seek an appropriate curative instruction to alleviate its concerns regarding the weight the jury may place on Turner's opinions.  Maiz, 253 F.3d at 667; Gold, 743 F.2d at 817; Pacheco, 426 F. App'x at 835.  Moreover, given that MacDonald, James and Huber will be permitted to testify regarding Defendants' conduct vis-à-vis SEC laws and regulations, it would be unfair to exclude Turner. United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir. 1992) ("It is an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.").

### 3.  Parsing of Turner's Disclosure Opinions

As noted above, Defendants' fourth argument is predicated on parsing Turner's opinions that Defendants failed to disclose a material downward trend in the quality of BankAtlantic's Commercial Residential Portfolio and that the lack of disclosure of this trend failed to inform the investing public of the negative developments.

With regard to trends in the Commercial Residential Portfolio, Defendants challenge the following: Turner's purported opinion that Bancorp violated securities laws by failing to disclose changes in internal loan grades; his opinion that changes in internal loan grades for some land loans constituted a trend requiring disclosure; and his opinion that Bancorp was required to disclose the number and amount of loan extensions in the first and second quarter of 2007. However, Turner explained at the Daubert Evidentiary Hearing that, though trends of downgrades or extensions in a portfolio should be described, it was not necessary to mention

specific loans.  Turner also confirmed his understanding that bank regulators did not like to see loan grades disclosed, but opined that companies would still need to disclose the general trend of these occurrences.  To the extent that Defendants disagree with these opinions, they will have the opportunity to challenge them at trial.  Allison, 184 F.3d at 1311 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence.").

Defendants also challenge Turner's opinion that non-BLB commercial real estate loans were just as risky as BLB loans and that the market should have been told as much because, according to Defendants, it is indisputable that the risk was not the same and Bancorp correctly weighed the relative risks and advised the market accordingly and timely.  Here, Defendants are simply disagreeing with Turner's opinion and they will be able to do so at trial.  Allison, 184 F.3d at 1311.

Defendants seek to exclude any opinion that Bancorp failed to disclose "crumbling creditworthiness" of BankAtlantic's Commercial Residential Portfolio.  However, this argument has been forestalled by Judge Scola's ruling that "crumbling creditworthiness" does not constitute a new and unpleaded claim.  See Omnibus Order on Pending, Non-Referred Motions in Limine [D.E. 242 at ¶ 6].

Defendants argue that Turner should not be allowed to opine that a company can be guilty of violating securities laws for failing to include in a Form 10-Q information disclosed in an earnings conference call because this is nothing but a legal conclusion and an incorrect one at that.  Initially, it is not clear from Turner's expert report that he intends to opine on violations of securities laws.  In any event, as more fully discussed above, expert testimony on legal and regulatory requirements is permissible, particularly in such a complex area as securities laws.

Finally, Defendants seek to exclude Turner's purported opinion regarding BBX's and

Levan's alleged intent to defraud or deceive because another's intent is not a proper subject of expert testimony.  However, Defendants have not pointed to any particular statement by Turner indicating that he is intending to proffer any such testimony.

Therefore, the Turner Motion is denied.

## VI. CONCLUSION

Having considered the parties' arguments and the applicable law, the undersigned concludes that MacDonald, James, Huber and Turner may provide expert testimony at trial within the parameters discussed herein.  Accordingly, it is

ORDERED AND ADJUDGED that:

1.    The MacDonald Motion [D.E. 159] is DENIED.

2.    The James Motion [D.E. 155] is DENIED as to James' first and second opinions and GRANTED as to James' third and fourth opinions.

3.    The Huber Motion [D.E. 148] is DENIED.

4.    The Turner Motion [D.E. 156] is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida this _14th_ day of November, 2013.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    U.S. District Court Judge Honorable Robert N. Scola, Jr.
       Counsel of Record

38