## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:12-cv-60082-DPG

SECURITIES AND EXCHANGE COMMISSION,      **ORAL ARGUMENT REQUESTED**

      Plaintiff,

v.

BANKATLANTIC BANCORP, INC. and
ALAN B. LEVAN,

      Defendants.

_____/


## DEFENDANTS' POST-TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW


STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns
Gordon M. Mead, Jr.
Jenea M. Reed
Cecilia D. Simmons
Matthew C. Dates
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................ 1

    (1)   The Disclosure Claims ................................................................... 1

    (2)   Held-for-Sale Claim: ..................................................................... 4

JUDGMENT AS A MATTER OF LAW STANDARD ........................................... 5

BBX IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE SEC'S
CLAIMS UNDER SECTION 10(B) AND RULE 10B-5 ........................................ 5

I.     BBX Is Entitled to Judgment as a Matter of Law on the Vestiges of the SEC's
      Disclosure Fraud Claim—Questions 5a, 5b, 8a, and 8b. ................................. 6

      A.   The Court's Summary Judgment and Instruction of Objective Falsity Was
           Erroneous ............................................................................................. 6

      B.   The SEC Cannot Retry the Factual Issues it Tried and Lost in the Jury's
           Resolution of those Disclosure Claims Where an Erroneous Instruction of
           Falsity Was Not Given ........................................................................... 9

      C.   Viewed as They Must be in the Context of the Total Mix of Information
           Provided by BBX to Investors, No Reasonable Jury Could Determine that
           the Three Sentences Were Materially False or Misleading ..................... 10

           1.   The Surrounding Contemporary Disclosure Precludes any Reasonable
                 Jury from Determining that Any of the Three Sentences Were
                 Materially False or Misleading. .................................................. 10

           2.   The Housing Market Crash Caused the Third Quarter Losses to the
                 Non-Builder Land Bank Loans and Objectively Established the Truth
                 of Alan Levan's Three Sentences. .............................................. 15

           3.   The SEC's Silence About the Florida Real Estate Market Crash in the
                 Third Quarter of 2007 Speaks Volumes. ..................................... 16

      D.   No Intent to Deceive or Severe Recklessness ....................................... 16

      E.   The Three Sentences Were Immaterial Statements of Opinion. ............. 19

II.    Defendants Are Entitled to Judgment as a Matter of Law on the SEC's Held-for-
      Sale Securities Fraud Claim—Questions 2a, 2b, 7a, 7b, 9a, and 9b. ............... 19

      A.   No Material Misrepresentations or Omissions ...................................... 19

i

1.   No Proof of any Decision to Sell the JMP Loans ............................................19

2.   The SEC Offered No Competent Evidence that the JMP Loans Should Have Had a Materially Different Value at December 31, 2007. ...................20

B.   The SEC Did Not Introduce Any Evidence of Scienter ..........................................23

DEFENDANTS ARE ENTITLED JUDGMENT AS A MATTER OF LAW ON THE SEC'S OTHER CLAIMS—QUESTIONS 19, 22, 23, 24, 27, 31, 30,  32, 33, AND 34..............24

CONCLUSION.............................................................................................................25

REQUEST FOR ORAL ARGUMENT.......................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abel v. Dubberly*,
   210 F.3d 1334 (11th Cir. 2000) ................................................................................5

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................................10

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
   489 F.3d 1129 (11th Cir. 2007) ................................................................10

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011)................................................................17

*Collado v. UPS*,
   419 F.3d 1143 (11th Cir. 2005) ................................................................5

*Cutsforth v. Renschler*,
   235 F. Supp. 2d 1216 (M.D. Fla. 2002) ................................................23

*Duchateau v. Camp, Dresser & McKee*, Inc.,
   713 F.3d 1298 (11th Cir. 2013) ................................................................10

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
   466 F.3d 1 (1st Cir. 2006) ................................................................18

*Feliciano v. City of Miami Beach*,
   707 F.3d 1244 (11th Cir. 2013) ................................................................6, 7

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ................................................................24

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ................................................................11, 15

*In re Donald J. Trump Casino Sec. Litig*,
   7 F.3d 357 (3rd Cir. 1993)................................................................16

*In re John Alden Financial Corp. Sec. Litig.*,
   249 F. Supp. 2d 1273 (S.D. Fla. 2003)................................................24

*Malin v. IVAX Corp.*,
   17 F. Supp. 2d 1345 (S.D. Fla. 1998),
   *aff'd*, 226 F.3d 647 (11th Cir. 2000) ................................................23

*Messer v. E.F. Hutton & Co.*,
   847 F.2d 673 (11th Cir. 1988) ................................................................18

iii

*Meyer v. St. Joe Co.*,
   2012 WL 94584 (N.D. Fla. Jan. 12, 2012),
   *aff'd*, 710 F.3d 1189 (11th Cir. 2013) ...................................................................23, 24

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neil & Partners, L.P.*,
   761 F.3d 1109 (10th Cir. 2014) ...................................................................................19

*Mizzaro v. Home Depot,* Inc.,
   544 F.3d 1230 (11th Cir. 2008) ........................................................................ 16, 18, 24

*Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enter.*,
   572 Fed. Appx. 713 (11th Cir. 2014) ...........................................................................19

*Platsis v. E.F. Hutton & Co.*,
   946 F.2d 38 (6th Cir. 1991) ..........................................................................................18

*Saltzberg v. TM Sterling/Austin Assocs., Ltd.*,
   45 F.3d 399 (11th Cir. 1995) ........................................................................................16

*Schlifke v. Seafirst Corp.*,
   866 F.2d 935 (7th Cir. 1989) ........................................................................................17

*SEC v. Coffman*,
   2007 WL 2412808 (D. Colo. Aug. 21, 2007)................................................................24

*SEC v. Gane*,
   2005 WL 90154 (S.D. Fla. Jan. 4, 2005).......................................................................16

*SEC v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ........................................................................................5

*SEC v. Patel*,
   2008 WL 781914 (D.N.H. Mar. 24, 2008) ....................................................................25

*SEC v. Solow*,
   2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ..................................................................25

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ......................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................16

*United Food and Commercial Workers Union Local 880 Pens.*
   *Fund v. Chesapeake Energy Corp.*,
   __ F.3d __, 2014 WL 6725435 (10th Cir. Aug. 8, 2014).............................................16

*Weinstein v. McClendon*,
    757 F.3d 1110 (10th Cir. 2014) ...................................................................17

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ...................................................................................21

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) .................................................................18

**Statutes**

15 U.S.C. § 78m(b)(2) ..................................................................................25

15 U.S.C. § 78m(b)(5) ..................................................................................25

**Rules**

17 C.F.R. § 240.13b2-1 .................................................................................25

17 C.F.R. § 240.13b2-2 .................................................................................25

Fed. R. Civ. P. 50(b) ......................................................................................1

Fed. R. Civ. P. 59 ...........................................................................................3

**Other Authorities**

18 Wright, Miller, et al., *Federal Prac. & Proc. Juris.*
    § 4418 (Westlaw 2015) ...............................................................................10

BBX Capital Corporation ("BBX" or the "Company"), formerly known as BankAtlantic Bancorp, Inc., and Alan B. Levan respectfully renew, pursuant to Federal Rule of Civil Procedure 50(b), their motion for judgment as a matter of law on every claim remaining and submit the following memorandum in support thereof:

## INTRODUCTION

**(1)     The Disclosure Claims**

The SEC brought this securities fraud claim against the defendants with great fanfare, loudly accusing them of "misleading investors about loan risks during the financial crises."  Ex. 1. That case has now been reduced to a whimper as all that remains are three sentences uttered by Alan Levan in a lengthy earnings conference call:

> *There are no asset classes that we are concerned about in the portfolio as an asset class. . . .*
>
> *So the portfolio has always performed extremely well, continues to perform extremely well. . . .*
>
> But to our knowledge and in—just in thinking it through, *there are no particular asset classes that we're concerned about other than that one class.*

D-9 at 20-21 (emphasis added).

The jury rejected the SEC's claims under Item 303 that defendants intentionally concealed a "trend of crumbling creditworthiness,"  rejected the SEC's claims that BBX intentionally misled investors by stating that the non-builder land bank loans had a relatively lower degree of risk as compared to builder land loans, and  rejected the SEC's claims that, in the first quarter earnings conference call, the first quarter 10-Q, and the second quarter 10-Q defendants intentionally concealed knowledge obtained about serious problems with BankAtlantic's non-builder land bank loans because of extensions, downgrades, depleted interest reserves, slow absorption rates, and internal emails.  In the face of the actual, extensive, and accurate disclosure the Company made

about its business and the risks that it faced, the SEC's "pieces of the puzzle" argument died an appropriate death.

What was established during the lengthy trial and ratified by the jury's verdict was that BBX *did* disclose the trend or uncertainty believed by management likely to impact or cause future losses—the deteriorating housing market—and that it appropriately warned investors of the loans likely to result in future losses if the uncertainty in the market continued or worsened. What was proven and undisputed was that, when the housing market unexpectedly melted down to a degree beyond anyone's earlier imagination, the losses taken by the Company were precisely those forewarned, and were caused by market forces defendants accurately described as placing the Company at risk.

The evidence at trial, including the testimony of the former head of the SEC's Division of Corporation Finance, John Huber, and the distinguished economist and banking expert, Professor James, established that BBX's disclosure about the condition of its business and the threats to its future was appropriate. The evidence proved that BBX's disclosure was more robust and earlier than all others in Florida and less robust and later than none. Rather than being tardy in reporting the consequence of negative trends and uncertainties, BBX was one of the first companies, if not the first company, to tell the world about the collapsing housing market and its impact on the banking system. While defendants, in October 2007, immediately recognized the consequence of a stunning market meltdown, it was not until a year later, in September 2008, that the entire banking system was revealed as insolvent due to the very same catastrophic conditions in housing markets defendants had revealed and disclosed a year earlier.

What is left of the SEC's disclosure claims—the three sentences—continues to exist for only one reason: the Court, without a factual or legal basis, instructed the jury that three sentences

2

in the July 25 earnings conference call were "objectively false and misleading." Thus, the part of the verdict where the SEC's disclosure claims survived is only as valid as the summary judgment itself. Because the summary judgment of falsity was erroneous, the last shards of the SEC's disclosure claims must be swept away.

We have previously brought to the Court's attention the reasons why the summary judgment was erroneous and incorporate those papers and defendants' Rule 59 Motion. The trial and its outcome have expanded the grounds for setting aside the summary judgment and that part of the verdict it prejudiced.

If there was any doubt about the general impropriety of finding the three sentences were false in a summary fashion this trial eliminates it. The jury was asked to decide the very questions Judge Scola had previously decided without a trial. In urging the jury to provide answers consistent with the Judge's summary conclusions, the SEC provided to the jury the same distorted factual presentation and the same unsubstantiated arguments that had earlier persuaded Judge Scola. Only at the trial, defendants were heard as well, resulting in a verdict that rejected each and every one of the factual determinations underpinning the summary decree.

The verdict trumps the summary judgment. Issue preclusion, direct estoppel, and the Seventh Amendment's Re-Examination Clause bar any retrial of these issues. Judgment must be entered in defendants' favor on this issue.

If allowed to decide the issue, no reasonable jury could find any of the three sentences materially false or misleading. Although in granting summary judgment of falsity Judge Scola did not address the meaning of the operative words in any of the sentences—"performing" and "asset class" — had the words been considered, no falsity claim could be found to exist. There was no evidence to support a conclusion that the non-builder land bank loans were not "performing

3

extremely well." The undisputed evidence established the contrary.  The loans *were* performing extremely well at the time the statements were made.  The SEC's own witness conceded that "performing" means that the loans were current and that repayment was fully secured. "Well" was in the context of the dire market conditions defendants described.

Further, there was no evidence to support a conclusion that the non-builder land bank loans were part of an "asset class," the evidence established without dispute that these loans were never considered a discrete asset class.  The loans were all unique having few common features. Unlike builder land loans, where one could identify a common set of factors that would allow risks to be assessed collectively, the non-builder land bank loans had no such shared characteristics.

No reasonable jury could find these three sentences to have violated federal securities laws. While in entering summary judgment the Court erroneously assumed that the total mix of information consisted of dishonest disclosures in all of the other disclosure documents preceding and following the July conference call, that assumption was tried and proven wrong. Consideration of the three sentences in the proper context, surrounded by what has now been established as proper disclosure on the same subject, compels a conclusion that no reasonable jury could find the three sentences false.  Defendants are entitled to final judgment on what little remains of the SEC's disclosure claims.

**(2)      Held-for-Sale Claim**

The SEC's held-for-sale claim required proof of three elements.  First, the SEC was required to prove that BankAtlantic actually made an affirmative decision to sell certain identified loans.  Second, the SEC was required to prove that the value of the loans, applying held-for-sale accounting principles, was materially lower "as of" December 31, 2007 than the values booked by BBX on a held-for-investment basis.  Third, the SEC was required to prove that defendants knew

that the accounting treatment employed for these loans was wrong, and that they knew that the booked values were materially higher as of December 31, 2007 than they would have been had held-for-sale accounting methodology been employed but nonetheless willfully caused the accountants to record on the company's books and records false financial information.

No reasonable jury, based on the evidence the SEC presented, could find in favor of the SEC on any of those three required elements of proof.  Defendants are entitled to a judgment in their favor on the held-for sale-claim.[1]

## JUDGMENT AS A MATTER OF LAW STANDARD

"[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim."  *Collado v. UPS*, 419 F.3d 1143, 1149 (11th Cir. 2005). Although the Court should interpret the evidence in the light most favorable to the SEC, the SEC "must put forth more than a mere scintilla of evidence."  *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).  "A substantial conflict in the evidence is required," and the motion for judgment as a matter of law should be "denied only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions."  *Id.*

## BBX IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE SEC'S CLAIMS UNDER SECTION 10(B) AND RULE 10B-5

To prove a claim under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 in this case, the SEC bore the burden of proving: (1) a material misrepresentation or omission; and (2) scienter. *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).  To prove a

---

[1] References to "DE" are to docket entries. References to "Tr. __" are to pages of the trial transcript. References to "D-__" and "P-__" are to exhibits admitted into evidence.  References to "Ex. __" are to the exhibits to the Declaration of Jenea M. Reed Submitted in Support of Defendants Post-Trial Motions and dated January 12, 2015.  Citations and quotations are omitted unless otherwise indicated.

violation of Rules 10b-5(a) and 10b-5(c), the SEC also bore the burden of proving additional elements.  D.E. 414 at 14, 17.

I.   **BBX Is Entitled to Judgment as a Matter of Law on the Vestiges of the SEC's Disclosure Fraud Claim—Questions 5a, 5b, 8a, and 8b.**

The jury found that the three sentences included within the July 25 conference call supported a claim for securities fraud but only after the Court told it that the three sentences were "objectively false and misleading."

A.   **The Court's Summary Judgment and Instruction of Objective Falsity Was Erroneous.**

Defendants' accompanying motion for new trial articulates the grounds for setting aside the summary judgment determining the three sentences to be "objectively false."  We incorporate by reference that motion as well as the papers previously filed by defendants related to the partial summary judgment motion and order on falsity.  *See* DE 116; DE 117; DE 127; DE 130; DE 131; DE 132; DE 252; DE 253; DE 256; DE 275; D.E. 308; D.E. 309; DE 310.  The summary judgment was erroneous.  The instruction was improper.  Without it, no reasonable jury would have found in favor of the SEC on this claim.

At the very best for the SEC, there was a genuine issue of material fact that required the jury to decide whether the three sentences, considered in the total mix of information, were true.  *E.g.*, *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013); *see also* DE 308 at 17-19 & n. 7 (collecting cases).  That defendants at least created an issue of fact on the summary judgment briefing was obvious.  It becomes even more obvious after the jury considered the identical evidence summarily considered and resolved by the Court over a period of six weeks and reached a contrary conclusion in a day.

Knowledge of the language of banking is critical as well as knowledge of the business of banking.  Securities disclosure is as much art as science and requires understanding of the

6

relationship among different kinds of filings such as annual reports (10-Ks), quarterly reports (10-Qs), and periodic disclosures.  Securities laws require that disclosures alleged to be fraudulent be viewed in the context of the total mix of information provided by the company.

At trial, the SEC relied upon internal communications and data in an effort to prove that Alan Levan believed something other than what he said.  He has a long history in real estate and banking.  He had at the time access to all of the information relied on by the SEC—and, of course, much more.  He knew the borrowers and their ability to survive difficult conditions without loss to the bank.  His years of experience allowed him to make contemporaneous judgments and conclusions from all of the information at his disposal.  It is not unlikely that someone without his knowledge, experience, or similar access might reach different conclusions than he reached.  However, the law is beyond debate—or at least should have been beyond debate—that in such a circumstance, the testimony of one about the truth of what he said creates at the very least an issue of fact against the critical conclusions of others.  *E.g.*, *Feliciano*, 707 F.3d at 1247 (11th Cir. 2013); *see also* DE 308 at 18 n. 7.

The evidence suggesting that Alan Levan was correct in his judgments and disclosures was compelling and unrefuted.  When the housing market crashed, BBX immediately set out to recognize the losses caused by the market "falling off the cliff."  Most others facing the same problems engaged in the process of "extending and pretending."  BBX's losses were precisely as had been forewarned.  *See* pp. 15-17, below.

While the Court characterized its finding as "objective" falsity, there is nothing objective about it.  It is the product of a highly subjective and one-sided view of a complex body of evidence that, when tried, consumed most of six weeks.

A meat axe pretrial approach to such highly complex issues of fact was unwarranted.  In light of the trial and verdict, that is no longer fairly debatable. The manifest error in entering the

summary judgment and instructing the jury on falsity can no longer be denied.

The culmination of the Court's summary judgment was an instruction of falsity as to three sentences in a single disclosure event. Oddly, however, the words contained in those sentences are barely even mentioned in the summary judgment order. Instead, the foundation for the order consists of a lengthy series of summary conclusions that were later presented and rejected by the jury.

The bases for the Court's conclusion that the three sentences were objectively false were the Court's summary conclusions that:

(1) BBX's Form 10-Qs for both the first and second quarters of 2007 and in the first quarter earnings conference call, intentionally failed to disclose a "trend" of "crumbling creditworthiness" with respect to its non-builder land bank loans.   DE 234 at 5-10.

(2) Defendants were aware of but failed to disclose the trend of declining credit quality as it related to both builder land bank loans and non-builder land bank loans.   DE 234 at 5-10.

(3) The Court's review of the evidence established that the language describing non-builder land bank loans as having a relatively lower level of risk would only contribute to an investor's misimpression that the Bank's non-builder land bank loans were unaffected by the economic downturn during the first two quarters of 2007.  DE 234 at 10, 16.

(4) The 10-Qs failed to disclose the "known trend of extensions granted and loans downgraded to nonpassing status," D.E. 234 at 10, and that there was no disclosure of the internal concerns related to "the overall declining credit quality of the Commercial Residential Portfolio." DE 234 at 10.

(5) Alan Levan's March 14 email addressed concerns about the entire CRE portfolio and thus, Levan knew "the entire portfolio had deteriorated significantly," D.E. 234 at 14, establishing that, contrary to its disclosure, BBX was "concerned about the entire Commercial Residential Portfolio, not just the BLB loans." DE 234 at 14.

(6) BBX's "disclosures in the 10-Qs and earnings calls" "hide from investors" the "trend of crumbling creditworthiness" shown by "extensions, loan downgrades, and so on" and "affirmatively misrepresent BBX's concerns regarding non-BLB loans." DE 296 at 2.

The Court's summary conclusions, central to its summary judgment of falsity, did not fare well when subjected to the rigors of a trial.

At trial, the SEC undertook to obtain a jury verdict supporting each of the foregoing

conclusions the Court had assumed in entering summary judgment.  As it had with the Court, the SEC contended that the first quarter earnings call and BBX's two Form 10-Qs violated securities laws by hiding a known trend of crumbling creditworthiness and hiding from investors its actual concerns about the condition of the non-builder land bank loans.  In support of these contentions the SEC presented the same evidence it had provided to the Court to obtain the summary judgment. It reargued as well every inference from the evidence the Court had found persuasive enough to find that no trial on the point was necessary. *E.g.,* Tr. 4686, 4689, 4692, 4700-01 (Closing Argument; DE 427).

The jury rejected each of the foundational elements assumed by the Court in determining three sentences to be objectively false, rejecting the SEC's claims of securities fraud with respect to the first quarter conference call and each of the Form 10-Qs.  The jury found no violation with respect to any of these disclosures. DE 415 at 2-4, 10-12.

Thus, the very foundation for the summary judgment was stripped away by the jury's verdict. The jury's verdict was achieved through the proper process of resolving factual disputes—the one provided for in the Bill of Rights—and the summary judgment was not entered following such a process.  As a consequence, it is not difficult to figure out how this must end.  The summary judgment of falsity must be set aside and the verdict based on an instruction of falsity must be set aside as well.

**B.     The SEC Cannot Retry the Factual Issues it Tried and Lost in the Jury's Resolution of those Disclosure Claims Where an Erroneous Instruction of Falsity Was Not Given.**

The consequence of the jury's verdict on the precise issues relied upon by the Court to grant partial summary judgment is not only fatal to the partial summary judgment it is also fatal to the last remaining disclosure claim.

Issue preclusion, direct estoppel, and the Seventh Amendment's Re-Examination Clause all

therefore require entry of judgment in favor of the defendants on the SEC's claim that the July 25 conference call violated the securities law.  Where a party does not try an entire claim to a jury and the jury necessarily rejects elements of that claim, the party is estopped, consistent with the Re-Examination Clause, from having either the Court or a second jury re-determine that issue. *Duchateau v. Camp, Dresser & McKee*, Inc., 713 F.3d 1298, 1302 (11th Cir. 2013); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 (11th Cir. 2007). As is explained in *Federal Practice & Procedure*: "The jury's valid resolution of common issues is binding at trial of the untried claim, and may forestall the need for any further trial."  18 Wright, Miller, et al., *Federal Prac. & Proc. Juris.* § 4418 (Westlaw 2015).  Here where the SEC elected to try only a portion of their claim based on the July 25 conference call by not asking the jury to determine falsity and the jury in the context of the other three disclosures necessarily rejected the facts underlying that claim, this Court and the SEC are bound by the jury's finding that there were no material omissions or misrepresentations.  The finding of securities fraud based on the July 25 conference call must be vacated and judgment entered in favor of the defendants.

   **C.    Viewed as They Must be in the Context of the Total Mix of Information Provided by BBX to Investors, No Reasonable Jury Could Determine that the Three Sentences Were Materially False or Misleading**

   "[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original).  "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the *total mix* of information."  *Id*. at 231-32 (emphasis added).

      **1.    The Surrounding Contemporary Disclosure Precludes any Reasonable Jury from Determining that Any of the Three Sentences Were Materially False or Misleading.**

   The total mix of information includes voluminous disclosures on the same subjects as the

three sentences that have been carefully tested and have passed muster in several ways.  The Eleventh Circuit ruled, as a matter of law, that BBX in its public filings prior to July 25, 2007 "affirmatively warned the public" of the risk that market forces posed to its entire commercial real estate portfolio, including non-builder land bank loans. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 730 & n.29 (11th Cir. 2012).

Five disclosure documents during the applicable period discussing the same subjects in detail were not challenged by the SEC including (1) the January 31, 2007 press release and Form 8-K, D-2; (2)  the March 1, 2007 Form 10-K for the fiscal year ending January 31, 2006 (the benchmark disclosure for 2007), D-4; (3) the April 24, 2007 press release and Form 8-K, D-5; and (4) the July 24 press release and Form 8-K.  Nor did the SEC challenge any part of the voluminous July 25, 2007 earnings conference call other than the three sentences.  D-9.

The jury rejected the SEC's challenges to: (1) the April 25, 2007 first quarter earnings conference call, D-6;  (2)  the May 10, 2007 first quarter Form 10-Q, D-7;  and (3) the August 9, 2007 Form 10-Q for the second quarter of 2007, D-10.  *See* DE 415.

BBX's disclosure included in these eight disclosure documents can no longer be challenged as misleading or incomplete. The disclosures were substantial, detailed, and accurate.  BBX advised investors in no uncertain terms about the "trend or uncertainty" management believed was likely to impact, for better or worse, future earnings—the severely deteriorating real estate market. *E.g.*, D-4 at 2, 16-17; D-6 at 4, 8, 10, 17-18, 27; D-7 at 18-19. It advised investors that land and finished projects were not selling, that without sales it was difficult to value the security for its loans, that if these conditions persisted more of its borrowers would default leaving the bank in a position of having to foreclose mortgages and pursue guarantors, but that if land devalued, it would be a substantial problem depending on the magnitude of the deflation that existed.  *E.g.*, D-6 at 17,

11

24-28; D-7 at 19; D-9 at 15, 26-27, 31.

Not satisfied with describing the trend or uncertainty created by market conditions, the Company advised investors about the loans it believed most likely to suffer losses if conditions persisted or worsened. It advised that BankAtlantic had approximately $500 million in commercial real estate loans in which the borrowers were in some development stages of a variety of commercial ventures, the bulk of which was housing related, and that the Bank was carefully watching and monitoring all of those loans in light of the depressed market conditions. D-2 at 6; D-6 at 27; D-7 at 18-19; D-9 at 14-15.

By the end of the first quarter BBX described a subcategory of its commercial real estate portfolio about which it was particularly concerned.  That group of 12 loans, dubbed for disclosure purposes "builder land loans," totaled about $140 to $160 million of the $500 million CRE portfolio.  *E.g.,* D-6 at 4-10; D-7 at 18-19.  Investors were told that these builder land bank loans were particularly problematic in this environment because the homebuilders were not acquiring the land as expected, sales of completed lots and units was slow or non-existent, and in some instances, the bank's security consisted of letters of credit where funding might be a challenge. *E.g.*, D-6 at 25; D-7 at 18-19; D-10 at 22.

BBX advised investors of its belief that the remainder of the commercial real estate loans to borrowers were engaged in some interim stage of development for different types of commercial and residential developments had a relatively lower level of risk than the builder land bank loans. *E.g.*, D-7 at 18-19; D-10 at 22.  Because these other loans had few common features, BBX described them only as commercial and residential development loans that were not builder land bank loans.  BBX advised investors that these other loans were also subject to the depressed conditions existing in the market but that management believed these borrowers had a different

level of commitment to their projects and possessed greater staying power to survive depressed conditions for a longer period. *E.g.*, D-7 at 18-19; D-10 at 22. Investors were told that these other loans possessed a "relatively lower level of risk." *E.g.*, D-7 at 18-19; D-10 at 22.

The three sentences must be viewed as if they are part and parcel of all of this disclosure. They cannot be viewed in isolation. They cannot be viewed, as the Court erroneously did, with an assumption that BBX's other disclosures were false, misleading, or omissive. In the July 25 conference call in which the three sentences have a small part, Alan Levan described in detail the difficult market conditions facing the homebuilding borrowers and the absence of sales. He expressed great concern about where the market was going and the losses that would occur if property values significantly declined. *E.g.*, D-9 at 14-15, 26-28, 30-31.

Alan Levan's statement that the loans other than the builder land bank loans were performing extremely well was indisputably true. There was no factual dispute that in the lexicon of banking and as BBX had publicly disclosed, performing is synonymous with accruing and that if a loan is paying as agreed and secured by an excess of collateral it is performing. *See, e.g.*, D-4 at F16; D-8 at 25; Tr. 2118-19, 2470 (Turner; DE 389; DE 393); Tr. 3590 (James; DE 418), Tr. 3421-23 (Abdo; DE 417). There was no factual dispute that previously commercial loans had for one reason or another been downgraded to watch list, continued to perform, and ultimately paid off. D-1 at 11; Tr. 3270-71 (Abdo; DE 404). There was no factual dispute that with the exception of loans previously identified as non-performing, the balance of the non-builder land bank loans were performing and had historically performed well. Every witness asked about this sentence testified that he or she believed it was true. Tr. 895 (Toalson; DE 358), Tr. 1368-69 (Mindling; DE 368), Tr. 3421-23 (Abdo; DE 417), Tr. 3861-64 (Levan; DE 420). Not a single witness took the stand and said otherwise. A reasonable jury could not conclude that the statement was materially

13

false or misleading.

Similarly, no reasonable jury could find Alan Levan's statement, "just in thinking it through" that there are no asset classes as an asset class that we are concerned about, D-9 at 21, materially false or misleading in the context of all of the disclosure that had been made.  The record conclusively established that the commercial real estate loans other than the builder land bank loans had many different characteristics that prevented identification of them as "an asset class."  The size of the loans ranged from $30 million to $1,000.  Tr. 3401, 3406 (Abdo; DE 417). While there was a residential component to most of them, the projects financed included single family, multi-family, commercial, mixed use, and even marinas.  Tr. 3400-07 (Abdo; DE 417). There was no geographical similarity. Tr. 3400-07 (Abdo; DE 417).  Indeed, the very label by which they are identified is a non-label.  They are not described for what they were but were described for what they were not.  They were not builder land bank loans.  No one within BankAtlantic had ever described them as an asset class.

Whether there was or was not an asset class is not an academic issue.  BBX and Alan Levan had described unique factors that made all builder land bank loans worrisome.  The context of the question asked of Alan Levan was whether there were other kinds of loans with common characteristics that would also establish a common set of risks that could be monitored.  Because the characteristics of the remaining loans were indisputably uncommon there was no other set of common risk factors to consider with respect to these loans other than the general risk of the real estate market that was vigorously disclosed.

Every witness who testified about these two sentences expressed the belief that they were true.  Tr. 895-96 (Toalson; DE 358), Tr. 1368 (Mindling; DE 368), 3420-24 (Abdo; DE 417), Tr. 3863-64 (Levan; DE 420).  No witness took the stand and testified that they were false.  No

reasonable jury could have concluded that the sentences were false. A summary decree that there was an asset class and that Levan was worried about it is not defensible.

It is in this total mix that Alan Levan's three sentences must be viewed.  Viewed in that context, Alan Levan's statement that the commercial real estate loans other than the builder land bank loans were performing extremely well and that there was not an asset class about which defendants were concerned other than the builder land bank loans simply added additional factual information to the risk disclosure that was indisputably true.

>    **2.    The Housing Market Crash Caused the Third Quarter Losses to the Non-Builder Land Bank Loans and Objectively Established the Truth of Alan Levan's Three Sentences.**

The SEC made no effort to establish that any of the three sentences was proven false when judged by subsequent events.  The SEC offered no evidence that, absent the same intervening market collapse discussed in *Hubbard*, that "an asset class" of non-builder land bank loans caused a material loss to BBX's income.

Indeed, the SEC offered no evidence that even after the intervening event—an unanticipated crash of a magnitude not experienced since the Great Depression—that the non-builder land bank loans suffered a material loss either measured by a number of loans or by the amount of any loss.  Not accepting the SEC's silence, defendants proved at trial that all of the losses taken for non-builder land bank loans were caused by the housing market crash and not by any factors known previously and concealed. Tr. 3437-39, 3459-60 (Abdo), Tr. 3924-3931, 3937-38, 3978 (Levan); D-514; D-530.  The undisputed evidence also showed that if BBX had only suffered losses for the non-builder land bank loans, it would have reported a profit.  D-2234; D-2235; D-12 at 1; *see also* Tr. 4517-19 (Huber; DE 425).

The undisputed evidence showed that the forewarned risk of the Florida real estate market, which materialized in the third quarter crash, was the sole cause of the losses.  Viewed

"objectively" in retrospect, defendants' disclosure was the antithesis of dishonest, incomplete, or misleading. And, of course, disclosures that, when viewed as a whole, forewarn of risks that come to pass cannot create liability as a matter of law.[2]

> **3.** **The SEC's Silence About the Florida Real Estate Market Crash in the Third Quarter of 2007 Speaks Volumes.**

At trial, the SEC undertook to ignore entirely the systemic collapse in the real estate market that caused BankAtlantic's loan losses. Not once, in opening or closing argument did the SEC acknowledge the undisputed fact that, in the third quarter of 2007, the housing market crashed. This market adjustment was not just a little bump in the road but a collapse greater in magnitude that any similar event following the Great Depression. Tr. 3552-53, 3599, 3616-18, 3630-31 (James; DE 417; DE 418). In pretending that this did not happen, the SEC gives meaning to the old saw, "Aside from that Mrs. Lincoln, how was the play?"

> **D.** **No Intent to Deceive or Severe Recklessness**

Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Such intent may be established by showing "severe recklessness" or "an extreme departure from the standards of ordinary care" "that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Mizzaro v. Home Depot,* Inc., 544 F.3d 1230, 1238 (11th Cir. 2008). The SEC was required to prove that the defendants "must have been aware of both of [the] materiality [of the undisclosed fact] and that its non-disclosure would likely mislead investors." *SEC v. Gane*, 2005 WL 90154, at *15 (S.D. Fla. Jan. 4, 2005) (brackets in

---

[2] *E.g., United Food and Commercial Workers Union Local 880 Pens. Fund v. Chesapeake Energy Corp.*, __ F.3d __, 2014 WL 6725435, at *5-6, 8 (10th Cir. Aug. 8, 2014); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 288-89 (5th Cir. 2006); *Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399-400 (11th Cir. 1995); *In re Donald J. Trump Casino Sec. Litig*, 7 F.3d 357, 364 (3rd Cir. 1993).

original).[3]  The SEC failed to create a jury question on scienter for many independent reasons.

The SEC's expert, Lynn Turner conceded that, putting aside the held-for-sale issue, he could not "recall seeing anything else" "which was intended other than that to mislead the market." Tr. 2601 (Turner; DE 394).

The undisputed evidence establishes that BBX's disclosures of the impact of the Florida real estate market were earlier and better than similarly situated financial institutions.  Tr. 474 (Engelberg; DE 353); *see also* Tr. 2938 (Alexander; DE 393).  This alone defeats scienter.  And the disclosures of other Florida financial institutions from 2007, admitted into evidence, similarly show that BBX was far more forthcoming than its peers.[4]

BBX's public disclosures through July 25, 2007 were far more pessimistic than the predictions of the Chairman of the Federal Reserve Board and the Secretary of the Treasury. Indeed, only ten weeks earlier, the Chairman of the Federal Reserve Board had announced that "[t]he vast majority of mortgages, including even subprime mortgages, continue to perform well." D-364 at 6; *see also* D-276.  From then to early August, these officials predicted the housing market slowdown would be "contained," and predicted a recovery in late 2007 or early 2008.  D-364 at 2-3; D-423 at 2-5, 7-9, 21-22; Tr. 3590, 3594-95, 3599, 3603, 3607 (James; DE 418).  The Federal Reserve Bank of Philadelphia's survey of professional economists and forecasters also showed similar expectations and that virtually no one anticipated what was to come in the ensuing

---

[3] *See also, e.g., Weinstein v. McClendon*, 757 F.3d 1110, 1114 (10th Cir. 2014)*; City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989).

[4] D-1072 through D-1078 (Bank of Florida); D-1080 through D-1089 (BankUnited); D-1096 through D-1102 (Capital City Bank Group); D-1397 through D-1406 (Seacoast Banking Corporation of Florida); D-1430 through D-1436 (TIB Financial).

months and years.  Tr. 3612, 3614 (James; DE 418).[5]

The SEC itself introduced overwhelming evidence that—rather than intending to conceal risks or acting with severe recklessness towards the risks of misleading investors—Alan Levan and other members of executive management actively monitored BankAtlantic's loans so that they could promptly disclose credit risks, non-accruals, reserves, and charge-offs prior to the third quarter of 2007.  *See, e.g,* P-30; P-41; P-44; P-346.

The undisputed evidence showed that BBX pushed hard to recognize losses and reserves in the third quarter of 2007, behavior indicative of full disclosure and plainly rejecting a contrary conclusion.  D-517; D-522.

Finally, the SEC offered zero legitimate reason for Alan Levan or BBX to temporarily conceal problems and then follow that concealment by aggressive loss recognition far earlier than most others in the same circumstances.  The same people who allegedly intended to conceal problems immediately reported the dire consequence of the market meltdown without hesitation or equivocation.  The SEC offered no evidence of suspicious stock sales or any other way in which either defendant would have profited by a penny from the theorized fraud.  As the Eleventh Circuit has held, the absence of stock sales that would have enabled the defendants to profit from the alleged fraud weighs against finding scienter.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008).  Here BBX, in which Levan owned an enormous stake, purchased *millions* of shares during the period that the SEC argues that BBX and Alan Levan were inflating BBX's

_____

[5] The Eleventh Circuit and other courts have explained that negative disclosures generally counsel against finding scienter as a matter of law.  *See, e.g., Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001); *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 8 (1st Cir. 2006); *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).  And the Eleventh Circuit has affirmed entry of judgment as a matter of law where expert testimony at trial established that a commodities broker had employed "a common and accepted industry practice" because it defeated any inference of fraudulent intent.  *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677, 679 (11th Cir. 1988).  *See also, e.g, Platsis v. E.F. Hutton & Co.*, 946 F.2d 38, 41 (6th Cir. 1991).

price. D-0015 at 34; P-062 at 26-27.  Both held those shares when BBX's stock price cratered in late October 2007.  No reasonable jury could infer, as the SEC's fraud theory required it to do, that the defendants intended to defraud themselves.

E.    **The Three Sentences Were Immaterial Statements of Opinion.**

If the SEC were right that the words "perform," "concern," and "asset class" in the three sentences have such elastic definitions, then those statements on the July 25 conference call would be non-actionable opinions.

The Eleventh Circuit has affirmed a motion to dismiss based on the absence of materiality where a foreclosure-processing business had touted the "rigor" of its process, the "efficiency" and "accuracy" of its operations, and its "effective" staff training because "these terms do not assert specific, verifiable facts that reasonable investors would rely on."  *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enter.*, 572 Fed. Appx. 713, 716-17 (11th Cir. 2014).  Nor did the SEC introduce evidence that could have created a jury question about whether, even if actionable opinions, Alan Levan's statements were objectively and subjectively false.[6]

II.   **Defendants Are Entitled to Judgment as a Matter of Law on the SEC's Held-for-Sale Securities Fraud Claim—Questions 2a, 2b, 7a, 7b, 9a, and 9b.**

A.    **No Material Misrepresentations or Omissions**

1.    **No Proof of any Decision to Sell the JMP Loans**

Loans should be transferred to held-for-sale "[o]nce a *decision* has been made to sell [the] loans."  P-2 at 6 (emphasis added); Tr. 2235, 2251, 2539-40 (Turner; DE 391; DE 393).

In late October 2007, Alan Levan signed an engagement letter for JMP Securities LLC to

---

[6] Although the Supreme Court is currently considering the issue, the vast majority of the Courts of Appeals have held that for opinions to be false the plaintiff is required "show *both* that the defendant expressed an opinion that wasn't his real opinion (sometimes called 'subjective disbelief') *and* that the opinion didn't prove out in the end (sometimes called 'objective falsity').''  *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neil & Partners, L.P.*, 761 F.3d 1109, 1113 (10th Cir. 2014) (emphasis added).

"advise [BankAtlantic] concerning opportunities to sell certain loans and real estate owned."  P-162.  The letter said that BankAtlantic's "board of directors and senior management . . . will make all decisions regarding whether and how to pursue any opportunity or transaction."  P-162.

The SEC introduced no evidence that senior management, the Major Loan Committee, or the Board of Directors ever decided to sell loans.  Tr. 2532 (Turner; DE 393); *see also* Tr. 2517-18, 2593 (Turner; DE 393; DE 394).   Undisputed evidence showed that after going through the exercise to determine if a market existed, sometime in 2008 Tony Avila of JMP called Alan Levan and said that no market existed, Tr. 3971-72 (Levan; DE 421), so the exercise never reached the point where any decision could be made.  Tr. 3458 (Abdo); Tr. 3957-58 (Levan; DE 421); *see also* Tr. 1532-33 (Avila; DE 382).  There was nothing to discuss or decide which is why there is no evidence of any decision.

The only basis for the jury's verdict was the Court's erroneous instruction on falsity that gave false substance to the SEC's repeated charge that Alan Levan was "a liar," the central argument in the SEC's held-for-sale claim.  That accusation, bolstered by prejudicial error, cannot create a fact question to overcome the documentary evidence and undisputed testimony among the persons involved in determining if a market existed. Absent a decision to sell there is no held-for-sale accounting issue, Tr. 2274, 2516 (Turner; DE 391; DE 393), and thus judgment as a matter of law in favor of defendants is required.

### 2.  The SEC Offered No Competent Evidence that the JMP Loans Should Have Had a Materially Different Value at December 31, 2007.

The SEC failed, as a matter of law, to show that the value of BankAtlantic's loans was materially misstated at December 31, 2007 for many independent reasons.

As explained in defendants' briefing on their *Daubert* motion concerning Lynn Turner's held-for-sale opinion as well as defendants' motion for a new trial that are incorporated by

reference, DE 156; DE 162; DE 211; DE 277; DE 285, Turner's opinion on the held-for-sale issue is inadmissible and judgment as a matter of law in favor of the defendants is therefore required, *Weisgram v. Marley Co.*, 528 U.S. 440, 453 (2000).

The SEC presented zero evidence of what the value of the JMP loans should have been at the measurement date.  FASB 157 and fair value accounting require proof of value "at the measurement date," D-1550 ¶ 5, which here was December 31, 2007, Tr. 2292-93, 2543 (Turner; DE 391; DE 393).  Turner speculated that as best he could tell all of the JMP numbers "came in around the end of January, first part of February" but provided no dates when anyone saw the two columns of data on the matrix that he purported to use to establish values.  Tr. 2541 (DE 393). And undisputed evidence and testimony showed that the Florida real estate market's downward spiral continued in the first quarter of 2008 so that any values in 2008 would not represent values as of December 31, 2007.  P-240; D-845.  Amy Engelberg admitted at trial that the market was dropping so rapidly in the first quarter of 2008 that you "probably" could not look at a February price and draw any conclusions about what a loan was worth two months earlier.  Tr. 600, 604-06 (Engelberg; DE 356).  And Turner admitted that he generally understood that the real estate market "was collapsing," even though he did not have the qualifications to perform, and did not perform, any analysis to backdate the JMP numbers to December 31, 2007. Tr. 2317, 2580 (Turner; DE 391; DE 394).  Thus, what the SEC provided was a witness with an admitted lack of expertise to value loans, who relied on meaningless information provided in 2008 which he was unable to extrapolate back to the measurement date. There is not a scintilla of competent evidence to establish that the values provided by BBX on its financial statements was greater than values derived from any held-for-sale valuation methodology.

Moreover, the SEC failed to establish that the JMP numbers could establish value under

any appropriate valuation methodology.   The SEC failed to establish that Turner's figures represented the required "exchange value," or a value that a market participant would accept. FASB 157's reference to a "transaction between market participants" contemplates not merely the unilateral submission of a letter of intent or term sheet but a price at which a market participant would sell.  *See* D-1550 ¶¶ 5, C25.  Here, there were not even term sheets on the column of "bids" upon which Turner purported to rely.  He did not know nor is there evidence that anyone knew anything about the substance of such bids, on whose behalf they were made (if anyone) or whether they included terms and conditions that would fundamentally alter the values reflected simply as percentages on a matrix.  The SEC's expert could not identify any evidence that "*anyone* would have sold*" at those prices and he testified that he had "done no study to see whether people would or would not have sold at those prices."  Tr. 2554 (Turner; DE 393) (emphasis added).

And the SEC, at best for it, presented evidence of fire sale pricing, which cannot establish fair value as a matter of law.  Under fair value accounting, "[t]he transaction to sell the asset or transfer the liability is an orderly transaction, *not a forced transaction (for example, if the seller is experiencing financial difficulty)*."  D-1550 ¶ C25 (emphasis added).  Undisputed evidence established that the numbers about which any evidence was introduced reflected precisely such a perception.  On November 7, 2007, a director at one of the JMP participants, CPI, sent an email to JMP indicating "we are looking for distressed residential opportunities," "deals that allow us to buy finished lots for free," and "[i]f you find opportunities that *scream 'distress'* those will appeal to us."  D-684 (emphasis added).  And the JMP participants that the SEC called at trial testified that they were looking to purchase distressed assets and that they assumed BankAtlantic was under duress and needed capital.  Tr. 1621 (Ahrens; DE 383); Tr. 1780-81, 1802-03 (Polachek; DE 386); Tr. 2038 (Lenhart; DE 388).

Defendants' expert Linda MacDonald also testified that the definition of fair value excludes an investment value that "considers just what's good for" the prospective purchaser, Tr. 4293 (MacDonald; DE 424), which is the only evidence that the SEC even colorably offered at trial. Each JMP participant called at trial testified that he was seeking the best prices for his firm, sometimes driven exclusively by an internal rate of return and sometimes driven by a desire to purchase the underlying land securing the loan rather than the loan itself.  Tr. 1622-23 (Ahrens; DE 383); Tr. 1810-12 (Polachek; DE 386); Tr. 2042 (Lenhart; DE 388).

There was no evidence that any of the numbers generated as a result of the JMP process represented fair value at any point in time, let alone at the measurement date of December 31, 2007.

### B.    The SEC Did Not Introduce Any Evidence of Scienter

"The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *Meyer v. St. Joe Co.*, 2012 WL 94584, at *10 (N.D. Fla. Jan. 12, 2012), *aff'd,* 710 F.3d 1189 (11th Cir. 2013); *see also  Malin v. IVAX Corp.*, 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998), *aff'd*, 226 F.3d 647 (11th Cir. 2000) (table).  Where GAAP violations result from accountants "reasonably reaching different conclusions" in impairment analyses, courts have found no scienter as a matter of law.  *Meyer*, 2012 WL 94584, at *10; *see also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1260 (M.D. Fla. 2002).  Given the undisputed evidence that there was no decision to sell and that the value of the loans was properly calculated and reported at December 31, 2007, further supported by the expert testimony of the drafter of the fair value rule, the SEC did not create a jury question on scienter.  And the SEC could not and did not introduce any evidence that Alan Levan had any involvement in the accounting.

The undisputed evidence also showed that there is no scienter because BBX involved PwC in its accounting decision and PwC supported the accounting treatment.  Although the SEC frequently harps on BBX CFO Valerie Toalson's November 15, 2007 email to Alan Levan flagging the

potential held-for-sale issue, P-175, it simply ignores Toalson's subsequent November 29 email to Alan Levan indicating that PwC was "generally comfortable" with the JMP engagement and only recommended certain that "documentation have wording that clearly represents management's intent and is not misleading." D-713. And Alan Levan subsequently received an engagement letter from Avila that, out of an excess of caution, referred to the engagement as one to "advise [BankAtlantic] concerning opportunities to test market certain loans and real estate owned." P-188 at 2. In other words, the last word that Alan Levan received was that the Chief Financial Officer, the Controller, and the outside auditors were "comfortable" with the accounting treatment. And PwC then signed off on BBX's financial statements that treated the JMP loans as held for investment, D-17 at F3-F4; Tr. 886 (Toalson; DE 358), and the SEC could not and did not show that there was a subsequent restatement. That defeats scienter as a matter of law.[7]

To meet this shortfall of proof, the SEC fell back on a simple argument, bolstered by the Court's erroneous instruction of falsity: Alan Levan is a liar. He is not and such arguments without evidence cannot establish an intent to deceive.

### DEFENDANTS ARE ENTITLED JUDGMENT AS A MATTER OF LAW ON THE SEC'S OTHER CLAIMS—QUESTIONS 19, 22, 23, 24, 27, 31, 30,  32, 33, AND 34

Every one of the jury's answers finding the defendants liable for technical, non-fraudulent violations of other securities laws required the SEC to prove a material misrepresentation or omission and many required something akin to scienter like knowledge or unreasonableness.[8] And the SEC's

---

[7] For cases on auditor input, *see In re John Alden Financial Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1279 (S.D. Fla. 2003); *Meyer v. St. Joe Co.*, 2012 WL 94584, at *10 (N.D. Fla. Jan. 12, 2012); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714, 717 (8th Cir. July 5, 2001). For cases on certification and the absence of restatements *see Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1252 (11th Cir. 2008); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).

[8] Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 (Question 27) requires "requires proof of a material misrepresentation or a materially misleading omission." *SEC v. Coffman*, 2007 WL 2412808, at *12 (D. Colo. Aug. 21, 2007); *see also SEC v. Patel*, 2008 WL 781914, at *16

aiding and abetting claims (Questions 30, 32, and 34) can succeed only if there is a primary violation, the defendant has general awareness of an impropriety, and if the defendant knowingly and substantially assisted the violation.  The SEC identified no evidence unique to these claims at trial or during argument and, therefore, for all of the reasons identified above, it failed to establish a jury question on any of these claims.

## CONCLUSION

Judgment should be entered in favor of defendants on all the remaining claims and defendants should be awarded the costs of this action.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request three hours of oral argument on this Motion and the accompanying Rule 59 motions for the reasons articulated in the Rule 59 motion.

---

(D.N.H. Mar. 24, 2008).   Section 13(b)(2)(A) (Questions 31 and 32) requires certain issuers to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2). Section 13(b)(2)(B) (Questions 33 and 34) requires an issuer to "devise and maintain a system of internal controls" that meets certain specified standards. 15 U.S.C. § 78m(b)(2).  Section 13(b)(5) (Question 19) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book record, or account described in [§ 13(b)(2)]."  15 U.S.C. § 78m(b)(5).  Rules 13b2-1 and 13b2-2 (Questions 23 and 24) require proof of an underlying misstatement or omission in either books and records or in communications with accountants.  17 C.F.R. § 240.13b2-1; 17 C.F.R. § 240.13b2-2.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

By:  /s/ Eugene E. Stearns
       EUGENE E. STEARNS
       Florida Bar No. 149335
       estearns@stearnsweaver.com
       GORDON M. MEAD, JR.
       Florida Bar No. 49896
       gmead@stearnsweaver.com
       JENEA M. REED
       Florida Bar No. 84599
       jreed@stearnsweaver.com
       CECILIA D. SIMMONS
       Florida Bar No. 469726
       csimmons@stearnsweaver.com
       MATTHEW C. DATES
       Florida Bar No. 90994
       mdates@stearnsweaver.com

       *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of January, 2015, I obtained permission from

Judge Gayles' chambers to file by emailing the foregoing document to his email address and

served it also on this day on all counsel of record identified on the attached Service List.


         /s/  Jenea M. Reed
         JENEA M. REED

27

<u>**SERVICE LIST**</u>

*Securities and Exchange Commission v. BankAtlantic Bancorp, Inc. and Alan B. Levan*
Case No. 0:12-cv-60082-DPG
United States District Court, Southern District of Florida

James M. Carlson
carlsonja@sec.gov
Russell Koonin
kooninr@sec.gov
Andrew O. Schiff
schiffa@sec.gov
Brian P. Knight
knightb@sec.gov
SECURITIES AND EXCHANGE
COMMISSION
801 Brickell Avenue
Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300

*Attorneys for Plaintiff*

28